# EXHIBIT A

Dockets.Justia.com

Fred T. Isquith (FI 6782)                                      Electronically Filed
Mary Jane Fait (ME 1434)
**Wolf Haldenstein Adler Freeman**
  **& Herz LLP**
270 Madison Avenue
New York, New York  10016
(212) 545-4600

Mark Solomon
Christopher M. Burke
William J. Doyle, II
David W. Mitchell
*All Admitted Pro Hac Vice*
**Lerach Coughlin Stoia**
  **& Robbins LLP**
401 B Street Suite 1700
San Diego, California  92101
(619) 231-1058

Interim Co-Lead Counsel for Plaintiffs

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re ELEVATOR ANTITRUST LITIGATION | Civil Action No. 04-CV-01178(TPG) |
| | MDL No. 1644 |
| This Document Relates To: | **SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| ALL ACTIONS. | JURY TRIAL DEMANDED |

### NATURE OF THIS ACTION

Plaintiffs, on behalf of themselves and all others similarly situated, bring this Second

Consolidated Amended Complaint ("Complaint") against defendants United Technologies

Corporation, Otis Elevator Co., Kone Corporation, Kone Inc., Schindler Holding Ltd., Schindler

Elevator Corp., ThyssenKrupp AG, Thyssen Elevator Capital Corp., ThyssenKrupp Elevator Corp., and their unnamed co-conspirators, and in support of their Complaint state as follows:

1.    This case arises out of a conspiracy among all defendants to fix prices, rig bids for the sale and service of elevators and allocate markets and customers. Plaintiffs, on behalf of themselves and the Class described below, bring this action pursuant to §§1 and 2 of the Sherman Act, 15 U.S.C. §§l and 2, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

2.    Pursuant to Rules 23(a), 23(b) and 23(b)(3) of the Federal Rules of Civil Procedure, plaintiffs seek treble damages, injunctive relief, attorneys' fees and costs under the antitrust laws of the United States on behalf of themselves and all others similarly situated.

## JURISDICTION AND VENUE

3.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1391(b) and (c) and 15 U.S.C. §§15, 22 and 26.

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and (c) and 15 U.S.C. §§15, 22, and 26. Defendants and their co-conspirators have committed acts in furtherance of the conspiracy in this District, each defendant has conducted business and/or maintained offices with this District, as have certain of defendants' co-conspirators, as identified in this Complaint.

## THE PARTIES

**Plaintiffs**

5.    During the period alleged in the Complaint, the following representative plaintiffs purchased elevators and/or elevator maintenance and repair services from defendants. As a result of defendants' conspiracy, these plaintiffs have been injured in their business and property because the prices they paid were artificially raised to anti-competitive levels by defendants and their co-conspirators.

- 2 -

6.    Plaintiff Transhorn, Ltd. ("Transhorn") is an English corporation with its principal place of business in London, England. Transhorn is the manager/owner of an elevator building in London, England.

7.    Plaintiff 1775 Housing Associates ("1775") is a New York corporation with its headquarters located in New York, New York. 1775 is the owner of the apartment buildings located at 107-129 East 126th Street, New York, New York, 10035.

8.    Plaintiff Triangle Housing Associates, L.P. ("Triangle") is a New York corporation with its headquarters located in New York, New York. Triangle is the owner of the apartment buildings located at 112-128 East 128th Street, New York, New York, 10035.

9.    Plaintiff Rochdale Village, Inc. ("Rochdale") is a New York corporation and manager/owner of a housing cooperative with over 5,000 residential units and 121 elevators located in Jamaica, New York.

10.    Plaintiff Birmingham Building Trades Towers, Inc. ("Birmingham") is an Alabama not-for-profit corporation with its principal place of business in Birmingham, Alabama. During the relevant period, Birmingham was the manager/owner of a building with 236 residential units for elderly citizens, containing two elevators, located at 2021 Tenth Avenue South, Birmingham, Alabama.

11.    Plaintiff Riverbay Corporation ("Riverbay") is a New York corporation with its headquarters located in Bronx, New York. Riverbay is the manager/owner of Co-Op City, a housing cooperative with over 15,000 residential units in 35 high rise towers located at 2049 Bartow Avenue, Bronx, New York, 10475.

12.    Plaintiff D.F. Chase, Inc. ("D.F. Chase") is a Tennessee corporation with its principal place of business in Nashville, Tennessee. D.F. Chase is a construction company that

has purchased, in recent years, more than $1,500,000 of elevator and escalator products for installation and use in buildings being constructed by D.F. Chase.

13.     Plaintiff Towers of Coral Springs Ltd. ("Coral Springs") is a Florida limited partnership with its principal place of business in Coral Springs, Florida. Coral Springs is the owner of a building with two elevators located at 2855 University Drive, Coral Springs, Florida.

14.     Plaintiff 181 Maple Avenue Associates ("Maple") is a New York partnership with its principal place of business in New York. Maple is the manager/owner of an elevator building located at 181 Maple Avenue, Rockville Centre, New York.

15.     Plaintiff Lenox Road Associates ("Lenox") is a New York partnership with its principal place of business in New York. Lenox is the manager/owner of an elevator building located at 30 Lenox Road, Rockville Centre, New York.

16.     Plaintiff Olen Commercial Realty Corp. ("Olen") is a Nevada corporation with its principal place of business in Newport Beach, California. Olen is the manager/owner of 20 buildings, containing collectively 46 elevators, located in Brea, Irvine, Lake Forest, Margarita, Mission Viejo, Newport Beach and San Clemente, California.

17.     Plaintiff Bay Crest Condominium Association ("Bay Crest") is a California non-profit mutual benefit corporation with its principal place of business in San Francisco, California. Bay Crest is the manager of a two-tower condominium complex containing 287 units, and four elevators, located at 201 Harrison Street, San Francisco, California.

18.     Plaintiff Joseph M. Bennardi d/b/a Nedmac Associates, Inc. (Nedmac") is a New Jersey corporation with its headquarters located in Camden, New Jersey.

19.     Plaintiff Joseph M. Bennardi d/b/a Building Supers of Camden, Inc. ("Building Supers") is a New Jersey corporation with its headquarters located in Camden, New Jersey.

- 4 -

**Defendants**

20.    Defendant United Technologies Corporation ("UTC") is a Delaware corporation with its principal place of business in Hartford, Connecticut. During the period set forth in this Complaint, United was engaged in the business of selling elevators and providing elevator maintenance and repair services to customers in the United States and Europe.

21.    Defendant Otis Elevator Co. ("Otis") is a New Jersey corporation with its principal place of business in Farmington, Connecticut. During the period set forth in this Complaint, Otis was engaged in the business of selling elevators and providing elevator maintenance and repair services to customers in the United States and Europe. Otis is a wholly owned subsidiary of UTC. Otis and UTC are collectively referred to as the "Otis Defendants".

22.    Defendant Kone Corporation is a Finnish company with its principal place of business in Helsinki, Finland. During the period set forth in the Complaint, Kone was engaged in the business of selling elevators and providing elevator maintenance and repair services to customers in the United States and Europe. Kone employs 35,000 people around the world and generated $6.5 billion in sales last year.

23.    Defendant Kone Inc. ("Kone") is a Delaware corporation with its principal place of business in Moline, Illinois and offices in New York, New York. During the period set forth in this Complaint, Kone Inc. was engaged in the business of selling elevators and providing elevator maintenance and repair services to customers in the United States and Europe. Kone Inc. is a wholly owned subsidiary of Kone Corporation. Kone Corporation and Kone are collectively referred to as the "Kone Defendants".

24.    Defendant Schindler Holding Ltd. ("Schindler Holding") is a corporation organized and run under the laws of Switzerland with its principal place of business in Hergiswil, Switzerland. During the period set forth in this Complaint, Schindler Holding was engaged in the

business of selling elevators and providing elevator maintenance and repair services to customers in the United States and Europe.

25. Defendant Schindler Elevator Corporation ("Schindler") is a Delaware corporation with its principal place of business in Morristown, New Jersey. During the period set forth in this Complaint, Schindler was engaged in the business of selling elevators and providing elevator maintenance and repair services to customers in the United States and Europe. Schindler is a wholly owned subsidiary of Schindler Holding. Schindler Holding and Schindler are collectively referred to as the "Schindler Defendants".

26. ThyssenKrupp AG is a German corporation with its principal place of business in Dusseldorf, Germany. During the period set forth in this Complaint, ThyssenKrupp AG was engaged in the business of selling elevators and providing elevator maintenance and repair services to customers in the United States and Europe.

27. ThyssenKrupp Elevator Corp. ("ThyssenKrupp Elevator") is a Delaware Corporation with its principal place of business in Whittier, California. During the period set forth in this Complaint, ThyssenKrupp Elevator was engaged in the business of selling elevators and providing elevator maintenance and repair services to customers in the United States and Europe. ThyssenKrupp Elevators is a wholly owned subsidiary of ThyssenKrupp AG.

28. Thyssen Elevator Capital Corp. ("Thyssen") is a Delaware corporation with its principal place of business in Whittier, California. During the period set forth in this Complaint, Thyssen was engaged in the business of selling elevators and providing elevator maintenance and repair services to customers in the United States and Europe. Thyssen is a wholly owned subsidiary of ThyssenKrupp AG. ThyssenKrupp AG, Thyssen and Thyssen Krupp Elevator are collectively referred to as the "Thyssen Defendants".

- 6 -

29.    Whenever in this Complaint reference is made to any act, deed or transaction by or through its corporation, it means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or other representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

30.    The phrase "elevator repair and maintenance services" when used in this Complaint, includes service tools and replacement parts.

31.    Various individuals, partnerships, and corporations not named in this Complaint have participated as co-conspirators in the violations of law alleged in this Complaint, and have performed acts in furtherance thereof. The identity of all co-conspirators is unknown at this time and will require discovery. When their true identities are ascertained the Complaint shall be amended to reflect their true names.

## CLASS ACTION ALLEGATIONS

32.    Plaintiffs bring this action on behalf of themselves and the members of the following Class and Sub-Classes:

## CLASS

All persons or entities who purchased elevators or elevator repair and maintenance services from defendants or their unnamed co-conspirators in the United States and Europe from February 13, 2000 through the present (the "Class Period"). Excluded from the Class are defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

## SUB-CLASSES

(a)    All persons or entities who purchased elevators or elevator repair and maintenance services from defendants or their unnamed coconspirators in the United States from February 13, 2000 through the present ("Sub-Class A"). Excluded from this sub-class are defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

(b)    All persons or entities who purchased elevator repair or maintenance services from the Otis Defendants for service on Otis elevators in the United States from February 13, 2000 through the present ("Sub-Class B"). Excluded from this sub-class are defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

- 7 -

(c)    All persons or entities who purchased elevator repair or maintenance services from the Kone Defendants for service on Kone elevators in the United States from February 13, 2000 through the present ("Sub-Class C"). Excluded from this sub-class are defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

(d)    All persons or entities who purchased elevator repair or maintenance services from the Schindler Defendants for service on Schindler elevators in the United States from February 13, 2000 through the present ("Sub-Class D"). Excluded from this sub-class are defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

(e)    All persons or entities who purchased elevator repair or maintenance services from the Thyssen Defendants for service on Thyssen elevators in the United States from February 13, 2000 through the present ("Sub-Class E"). Excluded from this sub-class are defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

33.    Plaintiffs do not know the exact size of the Class and Sub-Classes since such information is exclusively in the control of defendants. However, due to the nature of the trade and commerce involved, plaintiffs believe that the Class and Sub-Class members are at least in the thousands and are so numerous and geographically dispersed that joinder of all persons is impracticable.

34.    Plaintiffs' claims are typical of other members of the Class and Sub-Classes who likewise sustained antitrust injury and were damaged through sales of elevators and/or elevator repair and maintenance services at artificially high prices.

35.    Plaintiffs will fairly and adequately protect the interests of the Class and Sub-Classes. Plaintiffs purchased elevators and elevator maintenance and/or repair services from defendants and have a common and non-antagonistic interest in recovering money lost through unlawful activity and enjoining and deterring future unlawful activity in the elevator and escalator sales and services market. Plaintiffs' undersigned counsel are experienced in antitrust and other complex class action litigation.

36.    Common questions of law and fact predominate over questions pertinent to only individual Class and Sub-Class members. Questions of law and fact common to the Class and Sub-Class members predominate over questions, if any, that may affect only individual members because defendants have acted on grounds generally applicable to the entire Class and Sub-Classes. Such generally applicable conduct is inherent in defendants' collusion. Common questions of law and fact include:

(a)    Whether defendants and others combined, conspired, or contracted to fix prices of elevators and elevator maintenance and repair services at artificially high levels;

(b)    Whether defendants and others combined, conspired, or contracted to rig bids for elevator sales and service contracts;

(c)    Whether defendants and others combined, conspired, or contracted to allocate markets and customers for elevator sales and maintenance services;

(d)    The dates of the formation of this illegal contract or conspiracy;

(e)    The identities of participants in the conspiracy;

(f)    The manner and means of the conspiracy;

(g)    Whether defendants conspired to monopolize the market in the United States for sales and services of elevators;

(h)    Whether defendants effectively conditioned the sales of its elevators in the United States upon a customer's purchase of maintenance service from that defendant;

(i)    Whether defendants and their co-conspirators fraudulently concealed their conspiracy and other antitrust violations;

(j)    Whether Class and Sub-Class members have been damaged by the illegal conspiracy and other antitrust violations, including the degree to which prices paid by the Class and

- 9 -

Sub-Classes are higher than those that would be paid in a market free from collusion and other antitrust violations; and

        (k)    The appropriateness of injunctive relief to restrain future violations.

    37.    Class action treatment is superior to other means of prosecuting these claims as the prosecution of separate actions by individual Class and Sub-Class members would create a risk of inconsistent or varying adjudication. Moreover, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication, effort or expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Class and Sub-Classes are readily identifiable.

    38.    Defendants have acted on grounds generally applicable to the entire Class and Sub-Classes, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class and Sub-Classes.

### TRADE AND COMMERCE

    39.    Defendants and their co-conspirators manufacture and sell elevators, and also contract with customers for elevator sales and for the provision of elevator maintenance and repair services.

    40.    During the Class Period, the conduct of defendants and their co-conspirators has taken place in and affected the interstate and foreign trade and commerce of the United States. The conduct of defendants and their co-conspirators has directly and substantially restrained such trade and commerce.

- 10 -

## ALLEGATIONS OF WRONGDOING

41.    Beginning at least as early as 2000 and continuing until now, defendants and their co-conspirators engaged in a combination and conspiracy to suppress and eliminate competition in the sale and service of elevators by fixing the price of elevators, replacement parts and services, rigging bids for contracts for elevator sales, allocating markets and customers for elevator sales and maintenance services, and rigging bids for contracts for elevator maintenance and repair services. Defendants and their co-conspirators conducted the combination and conspiracy in the United States and Europe, and its effects were felt by plaintiffs and Class members in the United States and Europe.

42.    The alleged combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and co-conspirators, the substantial terms of which were to agree to fix and maintain prices for elevators and services, allocate markets and customers for elevator sales and maintenance services, and to coordinate bid prices for contracts for the sale of elevators and the provision of elevator maintenance and repair services in the United States and Europe.

43.    For purposes of forming and carrying out the charged combination and conspiracy, the defendants and co-conspirators did those things that they combined and conspired to do, including among other things:

(a)    Participated in meetings and conversations in Europe and the United States to discuss the prices of elevators and elevator maintenance contracts sold in the United States and Europe and to discuss the applicable customers or markets for such elevators and elevator service contracts;

- 11 -

(b)     Agreed, during those meetings and conversations, to charge prices at certain levels and otherwise increase or maintain prices of elevators and services sold in the United States and Europe;

(c)     Agreed in advance on bid prices and bid winners for elevator sales contracts, and for contracts for the provision of elevator and escalator maintenance and repair services;

(d)     Discussed and exchanged price quotations to certain customers so as not to undercut the price of a competitor;

(e)     Allocated markets and customers for the sale and maintenance of elevators consistent with the agreements reached;

(f)     Collusively required customers purchasing new elevators from any defendant to also enter into a long-term maintenance and repair contract with that same defendant; and

(g)     Agreed and took collective actions to drive independent repair companies out of the marketplace or otherwise eliminate or decrease the availability of competitive options for elevator maintenance services, including preventing or restricting the access of independent repair companies and other competitors to proprietary replacement parts and proprietary repair equipment and software.

44.     The combination and conspiracy engaged in by the defendants and their co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1.

## THE ELEVATOR INDUSTRY

45.     The industry for sales and service of elevators in the United States is characterized by economic conditions that are consistent with and conducive to the conspiracy alleged herein. There are a relatively small number of companies in the industry and high barriers to entry resulting from the capital-intensive nature of the business.

- 12 -

46.    The industry for sales and service of elevators in the United States is highly concentrated, with the top four Defendant sellers accounting for approximately 75% of the market. During the Class Period, Defendants and their co-conspirators dominated the market for sales and service of elevators and exercised market power in the pricing of sales and service of elevators, raised prices, acted in concert to prevent new entrants from entering the market place and allocated customers and markets.

47.    The market for sales and service of elevators in the United States is an oligopoly: a few firms producing and selling a product and associated service which, in combination or by agreement, had the power to and did set prices in the market. The coordinated conduct of Defendants and their co-conspirators in their pricing and bidding practices during the Class Period was the product of collusion. The industry for sales and service of elevators is closely knit, with many of a Defendants' management personnel having family or close friends who are employed by another Defendant. Company executives for Defendants often attend industry, trade association and social functions together, creating ample opportunities for Defendants to meet and discuss pricing and bidding practices. The purpose of these elevator trade associations is to promote information distribution.

48.    Each Defendant belongs to a number of associations and trade groups, and Defendants belong to many of the same elevator industry associations and trade groups. For example, Otis, Kone, Schindler and Thyssen all belong to the Southern California Elevator Industry Group, which holds monthly luncheon meetings and an annual golf tournament in Los Angeles. All four also belong to the Elevators Association of Florida and Otis, Kone and Schindler each have a representative on the board of directors of that association. Otis, Schindler and Thyssen are also members of the Chicago Elevators Association. Otis, Kone and Schindler

- 13 -

are Trust members of National Elevator Industry, Inc., an association that represents the interests of companies that manufacture and maintain elevators and promotes new industry codes and standards. Otis, Kone and Schindler are also all members of the Europeans Elevator Association, which offers "Antitrust Guidelines" on its website. The British affiliates of Otis, Kone, Schindler and Thyssen all belong to the Lift and Escalator Industry Association. Otis, Kone, Schindler and Thyssen are all members of the Elevator Escalator Safety Association and the American Society of Mechanical Engineers, which hosted an elevator emergency workshop in March 2004, attended by representatives of each of the four companies.

49.     Defendants also engage in standardized industry practices that make collusion more feasible and effective. For example, Defendants issue standard price lists and contracts for maintenance and repair of elevators, which include similar, if not identical, language and terms.

50.     As part of their overall conspiracy to artificially raise prices and exclude competition, defendants allocate customers in the elevator maintenance market in part by agreeing to and designing their elevators to require proprietary diagnostic and service tools that Defendants will not provide to other elevator service companies. Defendants also make parts, manuals, schematic diagrams and software for the elevators they sell difficult or impossible for their competitors to obtain, and engage in as variety of other conduct designed to prevent competition for service contracts on the elevators they sell. As a result, there is no effective competition for the service and repair work for Defendants' elevators for several years after installation, giving each Defendant an effective monopoly on service for these new elevators.

51.     As much as 60-70% of defendants' business is the maintenance and service of elevators. To ensure elevator safety, most building owners are required by law to have an elevator maintenance and service contract. The first decade after an elevator is sold and installed is by far

- 14 -

the most profitable period for service and maintenance since, since relatively little service and few replacement parts are typically required during these first years. As a result, the defendants' control of elevator maintenance is a key part of the conspiracy. After the initial warranty period, during which Defendants provide all maintenance and service on the elevators they sell, Defendants seek to enter into long-term maintenance contracts with these customers. Defendants' maintenance contracts include stiff penalties for early termination by the customer and "evergreen" clauses that provide for automatic renewal unless the customer takes action to discontinue the contract.

52.    Defendants prevent other companies from effectively competing to service the elevators Defendants sell, through a variety exclusionary conduct that makes it difficult or impossible for other companies to service elevators manufactured by Defendants. Each Defendant deliberately designs its own elevators in order to make it more difficult for any other company to service or maintain those elevators. For example, the proprietary elevator control systems sold by Defendants contain embedded computer systems and software. In order to repair or service elevators manufactured by Defendants it is necessary to perform diagnostic testing using proprietary service tools available only to Defendants. These hand-held devices, typically with a digital read-out screen and alphanumeric keypad, have been used to test and service Defendants' elevators since the late 1980's and are still widely used. These service tools are inserted directly into the elevator's controller and are necessary to set, adjust or reconfigure the electronic parameters of the elevator and to diagnose problems with the computerized functions of the elevators. Some elevators also allow diagnostics to be done using a lap-top computer upon which the appropriate software has been installed. Defendants also refuse to release this software to customers who purchase their elevators or other elevator maintenance companies.

53.    As the elevator industry has increased it use of embedded computer systems, an increasing amount of new elevator equipment has required the use of these specialized electronic service tools which often limited the building owner's choice of elevator maintenance companies for all future maintenance and repair to the original manufacturer. These specialized service tools made for the elevators sold by each defendant are not available on the open market and generally not even sold to customers who purchase Defendants' elevators. In the rare instances when Defendants allow the customers to whom they sold elevators to purchase service tools for these elevators, Defendants have required such customers to agree in writing that they will only use the service tools to maintain their own equipment and will not allow them to be sold to, or used by, other elevator maintenance companies. Defendants also refuse to freely release the schematic diagrams for the elevators they sell to their competitors or customers, making it even more difficult for any other company to maintain or repair them.

54.    The only way an independent elevator maintenance company can repair the modern proprietary elevator systems designed and manufactured by Defendants is to reverse engineer the necessary software and service tools, which is usually prohibitively costly and time-consuming, particularly for smaller independent elevator maintenance companies which do not have the vast resources that Defendants have. Defendants' scheme to control the market through the use of "secret" maintenance information effectively precludes smaller elevator repair companies from competing for such contracts and forcing small elevator repair companies out of business or making them ripe for acquisition by defendants. This scheme has resulted in the dramatic recent consolidation within the elevator service market, and the corresponding decline in competition in the overall elevator service market. In fact, each Defendant is aware that the other Defendants are reverse engineering their respective proprietary systems, software and service

- 16 -

tools, which are protected by numerous patents and/or copyrights. Defendants do not, however, generally sue one another for patent and copyright violations in connection with such reverse engineering, but instead selectively enforce these intellectual property rights only against independent elevator service companies. Even Defendants, however, often do not bid on maintenance contracts for newer elevators produced by one of the other Defendants, knowing that they lack the necessary information and tools.

55.    Defendants' allocation of customers and markets through control of "secret" maintenance information is part and parcel of their overall conspiracy to artificially inflate prices for elevators and elevator maintenance contracts. It is unnecessary to design and manufacture elevators with proprietary features that prevent other companies from maintaining or repairing them. For example, Motion Control Engineering, Mid-American Elevator and Minnesota Elevator, Inc. all use "open systems" which include non-proprietary elevator controllers. These companies release and make publicly available the diagnostic and service tools, including necessary software tools and schematic drawings required to repair or service their elevators. As a result, these "open system" elevators can be much more easily maintained and repaired by other companies than Defendants' equipment. Although Defendants' customers sometimes request a non-proprietary controller manufactured by another company, Defendants either refuse to install such equipment or otherwise discourage such requests. For example, because Motion Control Engineering does not itself install the non proprietary elevator controllers in sells, it cannot control the price quoted for the installation of its controllers. Defendants dissuade customers who request a Motion Control Engineering controller by quoting an inflated labor charge for its installation which makes using a Motion Control Engineering controller seem more expensive than the proprietary controllers manufactured by Defendants.

- 17 -

56.    The recent introduction of Remote Elevator Monitoring ("REM") as a feature on some of the newest elevators has made it even more difficult for other companies to compete for maintenance contracts for such elevators. For example, the REM installed by Otis on many of the new elevators it sells automatically transmits fault codes to the Otis office allowing Otis to diagnose the problem, and send a technician if necessary. The REM allows Otis to save on the cost of regular visits by technicians who have gone from monthly to twice a year. The REM, which is touted to the customer as a vital safety feature, is removed by Otis if the customer enters into a maintenance contract with any other company to dissuade the customer from inviting bidding on maintenance contracts. Defendants' growing use of REM's further ties customers to using the Defendant from whom they purchase elevators to perform the maintenance on those elevators.

57.    In furtherance of their scheme to exclude other companies from providing maintenance on the elevators, Defendants also make it difficult for other companies it obtain OEM parts needed to repair or service the elevators sold by Defendants. To the extent such parts are made available to competitors, these parts are sold at an inflated price and shipments are sometimes intentionally delayed in order to restrain the ability of other companies to compete for this service work.

58.    There is no objective or pro-competitive justification for any of this conduct. Defendants have collectively introduced measures which have severely restricted competition in the elevator maintenance market and have resulted in continued consolidation of market share for elevator maintenance as independent elevator maintenance companies have been unable to effectively compete and are driven out of business or acquired by defendants. Because Defendants collectively control a substantial portion of the market for new elevator sales and act

- 18 -

in concert to prevent their competitors from servicing the new elevators they sell, the effect of this scheme is to eliminate competition in the overall elevator service market and allow Defendants to maintain the artificially high prices they charge for elevator maintenance.

59. Defendants also agreed to coordinate the elevator service market by allocating customers through coordinating bids on particular elevator maintenance contracts. For example, in addition to its subsidiary Otis, Defendant UTC also owns North American Elevator Services ("NAES") and Delta Elevator Services. NAES was established to operate elevator companies that were not under the Otis name. In fact, the relationship between Otis, UTC and the NAES companies is not disclosed to prospective customers, who are instead led to believe that they are independent companies that compete with one another. Nevertheless, when customers solicit elevator maintenance bids from both Otis and one or more of the nominally independent NAES elevator service companies, Otis management often confers with the management of the solicited NAES company and determines which company would submit a bid. UTC uses its ownership and control of Otis and the smaller elevator service companies owned through NAES to allocate market share and to prevent Otis from having to lower its prices. Otis focuses primarily on procuring elevator maintenance contracts for high rise buildings but tries to also procure some elevator maintenance contracts for low-rise buildings. Otis's prices for low-rise maintenance contracts, however, are usually higher than those offered by smaller elevator repair companies, including those owned by NAES. By controlling which of its companies bid for which maintenance contracts, UTC is able to keep Otis's prices for elevator maintenance in low-rise buildings higher than if Otis and NAES companies bid on every contract for which their bids were solicited.

- 19 -

60.    The other Defendants have created similar arrangements by acquiring smaller, independent elevator maintenance companies, which continue to operate in their own name although they are actually owned and controlled by one of the Defendants. For example Thyssen, which has a strong presence in the New York region, has acquired numerous smaller elevator repair companies in the region that operate under their own names and help allow Thyssen to maintain its own high prices for elevator maintenance.

61.    Defendants' unlawful conspiracy and anti-competitive conduct alleged herein is international in nature and scope. Defendants have viewed and treated the market for sales and service of elevators as a global market, such that the prices charged in the European market affect the prices in the United States and vice versa. Defendants needed to, and did, collude in both regions in order to effectively collude in either region.

62.    In late 1998, the Italian Antitrust Authority instituted an investigation into the collusive bidding and price-fixing in the elevator sale and maintenance markets. Documents containing detailed information regarding a conspiracy to fix prices were found during the investigation. For example, the Italian Antitrust Authority determined that the members of Italy's most prominent national association for elevator maintenance, which include Otis SpA, Kone Italian SpA and Schindler SpA (the Italian subsidiaries of Defendants UTC, of Kone Corporation and Schindler Holding, respectively) had drawn up, adopted and distributed price lists with the intention of fixing prices for elevator maintenance services. The Italian Antitrust Authority concluded that this conduct constituted an agreement to restrict competition. The Italian Antitrust Authority also obtained documents regarding the cost of servicing elevators, and concluded that, in light of these costs, the elevator service companies including by Otis SpA, Kone Italian SpA and Schindler SpA could have been charging prices that were much lower than the prices set forth

in the price lists, showing that the prices for elevator maintenance were artificially inflated as the result of the price-fixing conspiracy.

63.    In the spring of 1999, The Italian Antitrust Authority also initiated an investigation of Otis SpA, Kone Italian SpA, and Schindler SpA for antitrust violations, including agreeing to restrict competition and abuse of their dominant market power in the markets for elevator maintenance and elevator replacement parts. The Italian Antitrust Authority found that Otis SpA, Kone Italian SpA and Schindler SpA had a predominant share of the market, not only for elevator sales and installation, but also the market for elevator maintenance.  The Italian Antitrust Authority described practices by each of these companies that had the effect of excluding competitors from the elevator maintenance markets. The practices included refusal to provide use and maintenance manuals to customers and refusal to sell to independent elevator service companies spare parts necessary to maintain elevators manufactured by Otis SpA, Kone Italian SpA and Schindler SpA.  The Italian Antitrust Authority also found defendants had restricted competition in the elevator maintenance market by imposing long-term contracts that included opportunistic renewal clauses and substantial penalties on elevator customers.  The Italian Antitrust Authority found that this conduct was the standard practice of Otis SpA, Kone Italian SpA and Schindler SpA.

64.    The Italian Antitrust Authority concluded that the identical and simultaneous nature of this conduct by Otis SpA , Kone Italian SpA, and Schindler SpA, designed to keep other companies from competing to provide maintenance service for their elevators, resulted from a horizontal conspiracy and/or concert of action by Otis SpA, Kone Italian SpA and Schindler SpA. In May 2000, the Italian Antitrust Authority completed its investigation and determined that the Italian national association for elevator manufacturers and it members, including Otis SpA, Kone

- 21 -

Italian SpA and Schindler SpA, had conspired to restrict competition by imposing standardized terms, particularly price terms in their contracts for the sale, installation and maintenance of their elevators. The Italian Antitrust Authority also ruled that Otis SpA , Kone Italian SpA and Schindler SpA had abused their dominant position in the elevator sales, maintenance and parts markets by refusing to supply replacement parts for the elevators they manufactured to independent elevator maintenance companies.

65.    In May 2000, the Italian Antitrust Authority issued a collective fine of ITL 18 billion (EUR 9.3 million) to Kone SpA and thirteen other members of the Italian Elevator Association for alleged violations of Italian Antitrust law.

66.    In January 2004, The European Commission raided the offices of each of the four defendants to gather evidence of bid-rigging, collusion and other anticompetitive practices. Following those raids, the European Commission issued the following statement: "The commission has good reason to believe that the manufacturers [including of defendants Kone Corporation, Schindler Holding and ThyssenKrupp AG] may have shared between themselves the tenders for sale & installation of elevators & escalators and may have colluded to restrict competition with regard to after-sales services."

67.    On March 17, 2004, the Wall Street Journal reported that "UTC said some employees at its Otis unit's offices in Europe may have acted illegally..." and that "its own internal investigation had given it reason to believe that some Otis employees in a small number of locations may have engaged in activities at a local level in violation of Otis and UTC policies and applicable competition law."

68.    On March 18, 2004, World Markets Analysis reported that Kone Corporation admitted on March 17, 2004 that it had engaged in anti-competitive activities at its subsidiaries in

- 22 -

Germany, Belgium and Luxembourg by fixing prices. Kone conducted an internal audit after European Union (EU) competition authorities raided the company's offices as well as the premises of its competitors in January while investigating a suspected Europe-wide cartel in the elevator and escalator market. The Finnish group said in a statement that it had "taken immediate measures to stop anything that could potentially be considered as anti-competitive behavior," adding it was "fully responsive and co-operative" with the European Commissions investigation.

69.    In a May 6, 2004 Purchasing.com article, UTC "said employees of its Otis Elevator unit may have taken part in an alleged price-fixing scheme where leading elevator companies held secret price-fixing and bid-rigging meetings."

70.    Defendants' pricing for sales and service of elevators in the United States is intertwined with pricing in Europe. All of the Defendants sell and service elevators in both the United States and Europe through corporate affiliates or other business units. Elevator systems sold in the United States by Defendants are manufactured in Europe and imported to the United States. Invoicing to customers in the United States and Europe is handled through the same inter-company accounting system.

## FRAUDULENT CONCEALMENT IN FURTHERANCE OF THE CONSPIRACY

71.    Throughout the Class Period, defendants effectively, affirmatively and fraudulently concealed their unlawful conspiracy from plaintiffs and Class members. Plaintiffs and other Class members had no knowledge of the contract, combination or conspiracy alleged in this Complaint, or any facts that might have led to the discovery thereof, in the exercise of reasonable diligence, until late January 2004. At that time, it was reported that the European offices of defendants Kone Corporation, Schindler Holding and ThyssenKrupp AG were raided in a January 28, 2004 inspection by the European Union Commission, and that these defendants were being investigated by European and antitrust investigators for participating in an international cartel to fix the price

of elevators and escalators and elevator and escalator maintenance and repair services, and to rig bidding on contracts for elevators and escalators and elevator and escalator maintenance and repair services in violation of antitrust laws.

72.    Defendants engaged in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

73.    Defendants' wrongful conduct as alleged in this Complaint was carried out in part through means and methods which were designed and intended to avoid detection, and which in fact successfully precluded detection. Although plaintiffs exercised due diligence throughout the Class Period, they could not have discovered defendants' unlawful scheme and conspiracy at any earlier date, because of defendants' effective, affirmative and fraudulent concealment of their activities.

74.    Defendants and their co-conspirators actively, intentionally and fraudulently concealed the existence of the conspiracy from plaintiffs by one or more of the following affirmative acts, including the acts in furtherance of the conspiracy:

(a)    Secret meetings and phone calls in which prices, bids, customers and markets were discussed and agreed;

(b)    Instructing participants at meetings of the conspiracy not to maintain and/or destroy records of the meeting;

(c)    Instructing participants at meetings of the conspiracy to give inaccurate and untrue information to government investigators about the nature of the anti-competitive activity;

(d)    Instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy;

(e)    Confirming the anti-competitive, unlawful plan to a small number of people and key officials at each defendant company and misrepresenting the reasons for unlawful conduct to their own employees;

(f)    Avoiding either references in documents, or the creation of documents otherwise created in the ordinary course of defendants' and co-conspirators' businesses, regarding conduct which would constitute an antitrust violation or anti-competitive act;

(g)    Participating in secret meetings and conversations to monitor and enforce adherence to the conspiracy; and

(h)    Falsely representing that prices were fair and competitive.

75.    Plaintiffs, in the exercise of reasonable diligence, could not have uncovered the violations set forth in this Complaint at any earlier time because of defendants' efforts to conceal the unlawful activity from detection. Moreover, while plaintiffs have diligently sought to protect themselves from unlawful activity, plaintiffs were unable to detect the secret activity, which by its nature is self-concealing, until it was disclosed publicly. Accordingly, the statute of limitations has been tolled and suspended with respect to any and all claims arising from the conspiracy until not earlier than February 2004.

## COUNT I
## HORIZONTAL PRICE FIXING BY ALL DEFENDANTS
## (PER SE) – SHERMAN ACT §1

76.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of the Class.

77.    From a date unknown, but at least from January 2000 and continuing through the present, defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. §1.

78.    In furtherance of the unlawful conspiracy, each of the defendants and their co-conspirators has committed overt acts, including, *inter alia*:

(a)    Participating in meetings and conversations in Europe and the United States to discuss the prices of elevators and elevator service contracts sold in the United States and Europe and to discuss the applicable customers or markets for such elevators and elevator service contracts;

(b)    Agreeing, during those meetings and conversations, to charge prices at certain levels for elevators and elevator service contracts sold in the United States and Europe;

(c)    Agreeing in advance on bid prices and bid winners for elevator sales contracts, and for contracts for the provision of elevator maintenance and repair services;

(d)    Discussing and exchanging price quotations to certain customers so as not to undercut the price of the competitor;

(e)    Allocating customers and markets for the sale and maintenance of elevators consistent with the agreements reached;

(f)    Collusively requiring customers purchasing new elevators from any defendant to also enter into a long-term maintenance and repair contract with that same defendant; and

(g)    Agreeing and taking collective actions to drive independent repair companies out of the marketplace or otherwise eliminate or decrease the availability of competitive options for elevator maintenance services, including preventing or restricting the access of independent repair companies and other competitors to proprietary replacement parts and proprietary repair equipment and software.

79.    As a direct and proximate result of the conspiracy, defendants have restrained competition and injured plaintiffs and each Class member in their business and property in that

- 26 -

each has paid a higher price for elevators or elevator service and repair than it would have paid absent the concerted unlawful activity.

80.    The conduct of defendants and their co-conspirators constitutes a *per se* violation of §1 of the Sherman Act 15 U.S.C. §1.

81.    In the alternative, the conduct of defendants and their co-conspirators and constitutes an unreasonable restraint of trade in violation of §1 of the Sherman Act 15 U.S.C. §1.

**COUNT II**
**CONSPIRACY TO MONOPOLIZE BY ALL DEFENDANTS**
**SHERMAN ACT § 2**

82.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of Sub-Class A.

83.    From a date unknown, but at least from January 2000 and continuing through the present, defendants and their co-conspirators have combined, conspired and/or contracted to monopolize the market for sales and service of elevators sold in the United States in violation of 15 U.S.C. §2.

84.    Defendants deliberately entered into the conspiracy alleged with the specific intent to achieve an unlawful monopoly in the market for sales and services of elevators sold in the United States.

85.    In furtherance of the unlawful conspiracy, each of the defendants and their co-conspirators has committed overt acts, including, *inter alia*:

    (a)    Participating in meetings and conversations in Europe and the United States to discuss the prices of elevators and elevator service contracts sold in the United States and to discuss the applicable customers or markets for such elevators and elevator service contracts;

(b)    Agreeing, during those meetings and conversations, to charge prices at certain levels for elevators and elevator service contracts sold in the United States;

(c)    Agreeing in advance on bid prices and bid winners for elevator sales contracts, and for contracts for the provision of elevator maintenance and repair services;

(d)    Discussing and exchanging price quotations to certain customers so as not to undercut the price of the competitor;

(e)    Allocating customers and markets for the sale and maintenance of elevators consistent with the agreements reached;

(f)    Collusively requiring customers purchasing new elevators from any defendant to also enter into a long-term maintenance and repair contract with that same defendant; and

(g)    Agreeing and taking collective actions to drive independent repair companies out of the marketplace or otherwise eliminate or decrease the availability of competitive options for elevator maintenance services, including preventing or restricting the access of independent repair companies and other competitors to proprietary replacement parts and proprietary repair equipment and software.

86.    As a direct and proximate result of the conspiracy to monopolize, defendants have restrained competition and injured plaintiffs and each Sub-Class A member in their business and property in that each has paid a higher price for elevators or elevator service and repair than it would have paid absent the concerted unlawful activity.

**COUNT III**
**MONOPOLIZATION OF MAINTENANCE MARKET BY THE OTIS DEFENDANTS**
**SHERMAN ACT § 2**

87.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of Sub-Class B.

88.    Through the actions described herein, the Otis Defendants have willfully acquired and maintained monopoly power in the Otis Maintenance Market, which is the U.S. market for service contracts on Otis elevators.

89.    The Otis Defendants have engaged in predatory conduct in the Otis Maintenance Market in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

90.    The Otis Defendants' monopolization of the Otis Maintenance Market has harmed competition in that Market, and has caused injury to the buyers and sellers in that Market. Prices in the Otis Maintenance Market have been higher than they would have been in a competitive market; the supply of services in that Market has been lower than it would have been in a competitive market; and the number and effectiveness of competitors has been diminished by unlawful means.

91.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated the Otis Defendants' monopolization of the Otis Maintenance Market.

92.    Plaintiffs have been damaged as the result of the Otis Defendants' monopolization of the Otis Maintenance Market.

**COUNT IV**
**ATTEMPT TO MONOPOLIZE THE MAINTENANCE MARKET**
**BY THE OTIS DEFENDANTS**
**SHERMAN ACT § 2**

93.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of Sub-Class B. The Otis Defendants have acted with the specific intent to monopolize the Otis Maintenance Market.

94.    There was and is a dangerous possibility that the Otis Defendants will succeed in its attempt to monopolize the Otis Maintenance Market because the Otis Defendants control a large percentage of that market, and further success by the Otis Defendants in excluding competitors from

that Market will confer a monopoly on the Otis Defendants in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

95.    The Otis Defendants' attempted monopolization of the Otis Maintenance Market has harmed competition in that Market, and has caused injury to the buyers and sellers in that Market. Prices in the Otis Maintenance Market have been higher than they would have been in a competitive market; the supply of services in that Market has been lower than it would have been in a competitive market; and the number and effectiveness of competitors has been diminished by unlawful means.

96.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated the Otis Defendants' attempted monopolization of the Otis Maintenance Market.

97.    Plaintiffs have been damaged as the result of the Otis Defendants' attempted monopolization of the Otis Maintenance Market.

**COUNT V**
**MONOPOLIZATION OF MAINTENANCE MARKET BY THE KONE DEFENDANTS**
**SHERMAN ACT § 2**

98.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of Sub-Class C.

99.    Through the actions described herein, the Kone Defendants have willfully acquired and maintained monopoly power in the Kone Maintenance Market, which is the U.S. market for service contracts on Kone elevators.

100.    The Kone Defendants have engaged in predatory conduct in the Kone Maintenance Market in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

101.    The Kone Defendants' monopolization of the Kone Maintenance Market has harmed competition in that Market, and has caused injury to the buyers and sellers in that Market. Prices in the Kone Maintenance Market have been higher than they would have been in a competitive market; the supply of services in that Market has been lower than it would have been in a competitive market; and the number and effectiveness of competitors has been diminished by unlawful means.

102.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated the Kone Defendants' monopolization of the Kone Maintenance Market.

103.    Plaintiffs have been damaged as the result of the Kone Defendants' monopolization of the Kone Maintenance Market.

**COUNT VI**
**ATTEMPT TO MONOPOLIZE THE MAINTENANCE MARKET BY**
**THE KONE DEFENDANTS'**
**SHERMAN ACT § 2**

104.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of Sub-Class C.

105.    The Kone Defendants' have acted with the specific intent to monopolize the Kone Maintenance Market.

106.    There was and is a dangerous possibility that the Kone Defendants will succeed in their attempt to monopolize the Kone Maintenance Market because the Kone Defendants control a large percentage of that market, and further success by the Kone Defendants in excluding competitors from that Market will confer a monopoly on the Kone Defendants in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

107.    The Kone Defendants' attempted monopolization of the Kone Maintenance Market has harmed competition in that Market, and has caused injury to the buyers and sellers in that Market. Prices in the Kone Maintenance Market have been higher than they would have been in a

competitive market; the supply of services in that Market has been lower than it would have been in a competitive market; and the number and effectiveness of competitors has been diminished by unlawful means.

108.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated the Kone Defendants' attempted monopolization of the Kone Maintenance Market.

109.    Plaintiffs have been damaged as the result of the Kone Defendants' attempted monopolization of the Kone Maintenance Market.

**COUNT VII**
**MONOPOLIZATION OF MAINTENANCE MARKET BY**
**THE SCHINDLER DEFENDANTS**
**SHERMAN ACT § 2**

110.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of Sub-Class D.

111.    Through the actions described herein, the Schindler Defendants have willfully acquired and maintained monopoly power in the Schindler Maintenance Market, which is the U.S. market for service contracts on Schindler elevators.

112.    The Schindler Defendants have engaged in predatory conduct in the Schindler Maintenance Market in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

113.    The Schindler Defendants' monopolization of the Schindler Maintenance Market has harmed competition in that Market, and has caused injury to the buyers and sellers in that Market. Prices in the Schindler Maintenance Market have been higher than they would have been in a competitive market; the supply of services in that Market has been lower than it would have been in a competitive market; and the number and effectiveness of competitors has been diminished by unlawful means.

114.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated the Schindler Defendants' monopolization of the Schindler Maintenance Market.

115.    Plaintiffs have been damaged as the result of the Schindler Defendants' monopolization of the Schindler Maintenance Market.

**COUNT VIII**
**ATTEMPT TO MONOPOLIZE THE MAINTENANCE MARKET BY THE**
**SCHINDLER DEFENDANTS**
**SHERMAN ACT § 2**

116.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of Sub-Class D.

117.    The Schindler Defendants have acted with the specific intent to monopolize the Schindler Maintenance Market.

118.    There was and is a dangerous possibility that the Schindler Defendants will succeed in its attempt to monopolize the Schindler Maintenance Market because the Schindler Defendants control a large percentage of that market, and further success by the Schindler Defendants in excluding competitors from that Market will confer a monopoly on the Schindler Defendants in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

119.    The Schindler Defendants' attempted monopolization of the Schindler Maintenance Market has harmed competition in that Market, and has caused injury to the buyers and sellers in that Market. Prices in the Schindler Maintenance Market have been higher than they would have been in a competitive market; the supply of services in that Market has been lower than it would have been in a competitive market; and the number and effectiveness of competitors has been diminished by unlawful means.

120.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated the Schindler Defendants' attempted monopolization of the Schindler Maintenance Market.

121.    Plaintiffs have been damaged as the result of the Schindler Defendants' attempted monopolization of the Schindler Maintenance Market.

**COUNT IX**
**MONOPOLIZATION OF MAINTENANCE MARKET BY**
**THE THYSSEN DEFENDANTS**
**SHERMAN ACT § 2**

122.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of Sub-Class E.

123.    Through the actions described herein, the Thyssen Defendants have willfully acquired and maintained monopoly power in the Thyssen Maintenance Market, which is the U.S. market for service contracts on Thyssen elevators.

124.    The Thyssen Defendants have engaged in predatory conduct in the Thyssen Maintenance Market in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

125.    The Thyssen Defendants' monopolization of the Thyssen Maintenance Market has harmed competition in that Market, and has caused injury to the buyers and sellers in that Market. Prices in the Thyssen Maintenance Market have been higher than they would have been in a competitive market; the supply of services in that Market has been lower than it would have been in a competitive market; and the number and effectiveness of competitors has been diminished by unlawful means.

126.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated the Thyssen's monopolization of the Thyssen Maintenance Market.

127.    Plaintiffs have been damaged as the result of Thyssen's monopolization of the Thyssen Maintenance Market.

**COUNT X**
**ATTEMPT TO MONOPOLIZE THE MAINTENANCE MARKET BY**
**THE THYSSEN DEFENDANTS**
**SHERMAN ACT § 2**

128.    Plaintiffs reallege and incorporate herein by reference all of the allegations set forth hereinabove on behalf of Sub-Class E.

129.    The Thyssen Defendants have acted with the specific intent to monopolize the Thyssen Maintenance Market.

130.    There was and is a dangerous possibility that the Thyssen Defendants will succeed in its attempt to monopolize the Thyssen Maintenance Market because the Thyssen Defendants control a large percentage of that market, and further success by the Thyssen Defendants in excluding competitors from that Market will confer a monopoly on the Thyssen Defendants in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

131.    The Thyssen Defendants' attempted monopolization of the Thyssen Maintenance Market has harmed competition in that Market, and has caused injury to the buyers and sellers in that Market. Prices in the Thyssen Maintenance Market have been higher than they would have been in a competitive market; the supply of services in that Market has been lower than it would have been in a competitive market; ant the number and effectiveness of competitors has been diminished by unlawful means.

132.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated the Thyssen Defendants' attempted monopolization of the Thyssen Maintenance Market.

133.    Plaintiffs have been damaged as the result of the Thyssen Defendants' attempted monopolization of the Thyssen Maintenance Market.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs on behalf of themselves and all other similarly situated respectfully request:

A.    That the Court certify a class pursuant to Federal Rule of Civil procedure 23(b);

B.    That the unlawful combination and conspiracy and other illegal activities alleged herein be adjudicated and decreed a *per se* violation or, in the alternative, a rule of reason violation, under §§1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2;

C.    That plaintiffs and the Class recover damages against each defendant, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15;

D.    That plaintiffs and the Class be awarded their expenses and costs of suit including reasonable attorneys' fees to the extent provided by law;

E.    That plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

F.    That this Court permanently enjoin all continuing and future unlawful activity by defendants in violation of the antitrust laws; and

G.    That plaintiffs and the Class be awarded such additional relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

- 36 -

Dated: July 19, 2005

By:_____

Fred T. Isquith (FI 6782)
Mary Jane Fait (ME 1434)
**Wolf Haldenstein Adler Freeman
& Herz LLP**
270 Madison Avenue
New York, New York  10016
(212) 545-4600

Mary Jane Fait
**Wolf Haldenstein Adler Freeman
& Herz LLC**
55 West Monroe Street
Suite 1111
Chicago, Illinois  60603

Mark Solomon
Christopher M. Burke
William J. Doyle II
David W. Mitchell
*All Admitted Pro Hac Vice*
**Lerach Coughlin Stoia
& Robbins LLP**
401 B Street Suite 1700
San Diego, California  92101
(619) 231-1058

*Interim Co-Lead Counsel for Plaintiffs*

**Additional Plaintiffs Counsel**

| | |
|---|---|
| Joe R. Whatley, Jr.<br>Glenn M. Connor<br>Richard P. Rouco<br>WHATLEY DRAKE, LLC<br>2323 2nd Avenue, North<br>P.O. Box 10647<br>Birmingham, Alabama 35203-0647<br>Telephone: (205) 328-9576<br>Facsimile: (205) 328-9669<br>***Counsel for Plaintiff Birmingham Building Trades Towers, Inc.*** | Nadeem Faruqi<br>Antonio Vozzolo<br>Beth Ann Keller<br>FARUQI & FARUQI, LLP<br>320 East 39th Street<br>New York, New York 10016<br>Telephone: (212) 983-9330<br>Facsimile: (212) 983-9331<br>***Counsel for Plaintiff Birmingham Building Trades Towers, Inc.*** |
| James G. Stranch, III<br>C. Dewey Branstetter<br>J. Gerard Stranch<br>BRANSTETTER, KILGORE, STRANCH & JENNINGS<br>227 Second Avenue, North – 4th Floor<br>Nashville, Tennessee 37201-1631<br>Telephone: (615) 254-8801<br>Facsimile: (615) 255-5419<br>***Counsel for Plaintiff D.F. Chase, Inc.*** | Daniel L. Rottinghaus<br>Jeffrey B. Cereghino<br>Steven R. Weinman<br>BERDING & WEIL, LLP<br>3420 Stone Valley Road West<br>Alamo, California 94507<br>Telephone: (925) 838-2090<br>Facsimile: (925) 820-5592<br>***Counsel for Plaintiff Olen Commercial Realty Corporation*** |
| Lester L. Levy, Sr.<br>WOLF POPPER LLP<br>845 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 759-4600<br>Facsimile: (212) 486-2093<br>***Counsel for Plaintiffs Towers of Coral Springs, Ltd., 181 Maple Avenue Associates, and Lenox Road Associates*** | Ann D. White<br>Jayne A. Goldstein<br>MAGER WHITE & GOLDSTEIN LLP<br>One Pitcairn Place<br>165 Township Line Road<br>Jenkintown, Pennsylvania 19046<br>Telephone: (215) 481-0273<br>Facsimile: (215) 481-0271<br>***Counsel for Plaintiff Towers of Coral Springs, Ltd.*** |
| Brian J. Robbins<br>ROBBINS UMEDA & FINK, LLP<br>1010 Second Avenue, Suite 2360<br>San Diego, California 92101<br>Telephone: (619) 525-3990<br>Facsimile: (619) 525-3991<br>***Counsel for Plaintiff Birmingham Building Trades Towers, Inc.*** | |

| | |
|---|---|
| Deborah M. Buell<br>CLEARY GOTTLIEB STEEN &<br>HAMILTON<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225-2000<br>Facsimile: (212) 225-3999<br>***Counsel for Defendants Otis Elevator Co.<br>and United Technologies Corp.*** | Pat M. McDermott<br>Mark Leddy<br>CLEARY, GOTTLIEB, STEEN &<br>HAMILTON<br>2000 Pennsylvania Avenue, N.W.<br>Suite 9000<br>Washington, D.C. 20006<br>Telephone: (202) 974-1500<br>Facsimile: (202) 974-1999<br>***Counsel for Defendants Otis Elevator Co.<br>and United Technologies Corp.*** |
| Allan Paul Victor<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>***Counsel for Defendants Thyssen Elevator<br>Capital Corporation, Thyssenkrupp Elevator<br>Capital Corporation, and Thyssenkrup<br>Elevator Corporation*** | ***Thyssenkrupp AG***<br>***Thyssenkrupp Elevator AG***<br>Attn: Legal Department<br>August-Thyssen-Strasse 1<br>40221<br>Dusseldorf, GERMANY |
| Kenneth M. Kramer<br>SHEARMAN & STERLING<br>599 Lexington Avenue<br>New York, New York 10022-6069<br>Telephone: (212) 848-4900<br>Facsimile: (212) 848-7179<br>***Counsel for Defendant Schindler Elevator<br>Corporation*** | Stewart M. Gisser<br>Associate General Counsel<br>SCHINDLER ELEVATOR CORPORATION<br>20 Whippany Road<br>Morristown, New Jersey 07960-1935<br>Telephone: (973) 397-6580<br>Facsimile: (973) 397-6574<br>***Counsel for Defendant Schindler Elevator<br>Corporation*** |
| Michael Evan Jaffe<br>THELEN REID & PRIEST LLP<br>701 Pennsylvania Avenue, N.W.<br>Suite 800<br>Washington, D.C. 20004<br>Telephone: (202) 508-4000<br>Facsimile: (202) 508-4321<br>***Counsel for Defendants Kone Inc.<br>and Kone Corp.*** | ***Schindler Holding, Ltd.***<br>Attn: Legal Department<br>Seestrasse 55<br>CH-6052 Hergiswil<br>Nidwalden, SWITZERLAND |

Allan Paul Victor
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
***Counsel for Defendants Thyssen Elevator***
***Capital Corporation, Thyssenkrupp Elevator***
***Capital Corporation, and Thyssenkrupp***
***Elevator Corporation***

Kenneth M. Kramer
SHEARMAN & STERLING
599 Lexington Avenue
New York, New York  10022-6069
Telephone: (212) 848-4900
Facsimile: (212) 848-7179
***Counsel for Defendants Schindler Elevator***
***Corporation***

Stewart M. Gisser
Associate General Counsel
Schindler ELEVATOR CORPORATION
20 Whippany Road
Morristown, New Jersey  07960-1935
Telephone: (973) 397-6580
Facsimile: (973) 397-6574
***Counsel for Defendant Schindler Elevator***
***Corporation***