# EXHIBIT D

Dockets.Justia.com

N. 1371 /ü ̀i Reg. Dec.

## REPUBBLICA ITALIANA
## IN NOME DEL POPOLO ITALIANO
### IL TRIBUNALE AMMINISTRATIVO REGIONALE DEL
### LAZIO

- Sezione Prima -

costituita dai sig.ri

| Mario Egidio Schinaia | Presidente |
| Alberto Novarese | cons. est. |
| Nicola Gaviano | consigliere |

ha pronunciato la seguente

## S E N T E N Z A

sui ricorsi:

n. 11644/2000 proposto dalla **OTIS** spa - in persona del suo Consigliere delegato ing. Aurelio Arpinati, rappresentata e difesa dagli avv.ti Mario Siragusa, Filippo Amato e dal prof. Salvatore Alberto Romano ed elettivamente domiciliata presso lo studio di quest'ultimo in Roma, C.so Vittorio Emanuele II n. 284;

n. 11603/2000 proposto dalla **CEAM** srl- in persona del suo Consigliere delegato sig. Pietro Mazzacurati, rappresentata e difesa dagli avv.ti Mario Siragusa, Filippo Amato e dal prof. Salvatore Alberto Romano ed elettivamente

2

domiciliata presso lo studio di quest'ultimo in
Roma, C.so Vittorio Emanuele II n. 284;
n. 11790/2000 proposto dalla **SCHINDLER** spa, in
persona dell'Amministatore delegato ing.
Giuseppe Lupo, rappresentata e difesa dagli
avv.ti Piero D'Amelio, Priscilla Petitti e
Claudio Tesauro, ed elettivamente domiciliata
preso lo studio del primo in Roma, via della
Vite 7;
n. 12091/2000 proposto dalla soc. **KONE Italia**
spa in persona del legale rappresentante dott.
Roberto Pecchioli, rappresentata e difesa
dall'avv. prof. Andrea Guarino e dagli avv.ti
Vanda Martelli e Antonio Rossi, ed
elettivamente domiciliata presso il primo in
Piazza Borghese 3 (studio legale Guarino);
n. 11796/2000 proposto da **CIOCCA** srl in persona
del legale rappresentante sig. Bruno Ponzano,
rappresentata e difesa dall'avv.to prof.
Giuseppe Franco Ferrari, avv.ti Enrico Adriano
Raffaelli, Paolo Todaro ed elettivamente
domiciliata presso lo studio Rucellai &
Raffaelli di quest'ultimo in Roma via Lucrezio
Caro 50;
n. 11802/2000 proposto da **MASPERO ELEVATORI** srl
in persona del legale rappresentante sig.
Libero Maspero, rappresentata e difesa
dall'avv.to prof. Giuseppe Franco Ferrari,
avv.ti Enrico Adriano Raffaelli, Paolo Todaro
ed elettivamente domiciliata presso lo studio

Rucellai & Raffaelli di quest'ultimo in Roma
via Lucrezio Caro 50;

n. 11810/2000 proposto da **Mario e Paolo Bosisio**
srl in persona del legale rappresentante sig.
Mario Bosisio, rappresentata e difesa
dall'avv.to prof. Giuseppe Franco Ferrari,
avv.ti Enrico Adriano Raffaelli, Paolo Todaro
ed elettivamente domiciliata presso lo studio
Rucellai & Raffaelli di quest'ultimo in Roma
via Lucrezio Caro 50;

n. 11813/2000 proposto da **DALDOSS ELEVETRONIC**
spa rappresentata e difesa dall'avv.to prof.
Giuseppe Franco Ferrari, avv.ti Enrico Adriano
Raffaelli, Paolo Todaro ed elettivamente
domiciliata presso lo studio Rucellai &
Raffaelli di quest'ultimo in Roma via Lucrezio
Caro 50;

n. 11816/2000 proposto da **ELEVAT ASCENSORI** srl
in persona del legale rappresentante sig.
Maurizio Pisà, rappresentata e difesa
dall'avv.to prof. Giuseppe Franco Ferrari,
avv.ti Enrico Adriano Raffaelli, Paolo Todaro
ed elettivamente domiciliata presso lo studio
Rucellai & Raffaelli di quest'ultimo in Roma
via Lucrezio Caro 50;

n. 11819/2000 proposto da **LENZI AG** spa in
persona del legale rappresentante sig. Franco
Lenzi, rappresentata e difesa dall'avv.to prof.
Giuseppe Franco Ferrari, avv.ti Enrico Adriano
Raffaelli, Paolo Todaro ed elettivamente

domiciliata presso lo studio Rucellai &
Raffaelli di quest'ultimo in Roma via Lucrezio
Caro 50;

n. 12932/2000 proposto da **PARAVIA ASCENSORI** Spa
in persona del presidente Antonio Paravia,
rappresentata e difesa dall'avv.t Gennaro
Stellato ed elettivamente domiciliata presso lo
studio dell'avv.to Gianfranco Ruggieri in Roma
via Claudio Monteverdi 16;

## *CONTRO*

l'**Autorità garante della concorrenza e del
mercato**, in persona del legale rappresentante
p.t., in giudizio rappresentata e difesa
dall'Avvocatura Generale dello Stato e presso
la stessa domiciliata in Roma via dei
Portoghesi 12;

con l'intervento ad opponendum
(ric. n. 12091/2000)

di **Soc. Consorzio Servizi Ascensori CSA**, in
persona del legale rappresentante,
rappresentato e difeso dall'avv.to prof. Franco
Gaetano Scoca ed elettivamente domiciliata
presso lo studio di quest'ultimo in Roma via G.
Paisiello 55;

per l'annullamento
della delibera dell'Autorità della concorrenza
e del mercato 11 maggio 2000 recante:
- l'accertamento della violazione dell'art. 2,
comma 2 della legge n. 187/90 attraverso la
predisposizione da parte delle imprese

4

ricorrenti di condizioni generali di contratto
uniformi per la fornitura e il montaggio di
ascensori ed in particolare di clausole di
prezzo, che risultano applicate dalla
generalità degli associati;

- l'accertamento della violazione dell'art. 3,
comma 1, lett. b) della L. n. 287/90, da parte
delle imprese Otis Spa, Kone Italia Spa e
Schindler Spa;

- la cessazione delle infrazioni;

- l'applicazione di sanzioni amministrative
pecuniarie;

Visti ricorsi con i relativi allegati;

Visto l'atto di costituzione in giudizio
dell'Autorità garante della concorrenza e del
mercato, l'intervento della soc. Consorzio
Servizi Ascensori CSA limitatamente al ricorso
n. 12091/2000;

Viste le memorie prodotte dalle parti a
sostegno delle proprie difese;

Visti gli atti tutti della causa;

Uditi alla pubblica udienza del 31 gennaio
2001 - relatore il consigliere Alberto Novarese
- gli avv.ti *[testo manoscritto illeggibile]*

6

# FATTO

Con gli undici ricorsi indicati in epigrafe le
imprese ricorrenti hanno impugnato la delibera
11 maggio 2000 con la quale l'Autorità garante
della concorrenza e del mercato ha accertato
nei loro confronti l'infrazione delle
disposizioni della legge n. 287/90 ed ha
inflitto alle stesse una sanzione
amministrativa pecuniaria.

Le soc. <u>Otis Spa e Ceam Spa</u> hanno dedotto:

A) sull'asserita violazione dell'art. 2 L.
287/90 derivante dall'adozione di condizioni
generali di contratto uniformi)

1. Violazione dell'art. 2 L. 287/90 e dei
principi di diritto in materia di concorrenza.
Eccesso di potere per difetto di istruttoria e
per insufficienza di motivazione (in relazione
all'asserita violazione derivante dall'adozione
di condizioni generali di contratto);

B) sull'asserita violazione dell'art. 2
derivante dall'adozione della clausola di
variabilità dei prezzi

2. Violazione dell'art. 2 L. 287/90 e de
principi di diritto in tema di concorrenza.
Eccesso di potere per travisamento dei fatti;

3. Violazione dell'art. 2 L. 298/90 e dei
principi di diritto in tema di concorrenza.
Eccesso di potere per difetto di motivazione,
contraddittorietà e per travisamento dei fatti,

6

illogicità manifesta. Errore nei presupposti di
fatto.

C) sulla condanna per pretesa violazione
dell'art. 3 della L. 287/90

(in relazione alla definizione del mercato
rilevante)

6. Violazione art. 3 L. n. 287/90 e dei
principi di diritto in tema di concorrenza e di
abuso di posizione dominante. Eccesso di potere
per difetto di istruttoria e per insufficienza
di motivazione;

(in relazione alla definizione di posizione
dominante)

7. Violazione art. 3 L. n. 287/90 e dei
principi di diritto in tema di concorrenza e di
abuso di posizione dominante. Eccesso di potere
per illogicità manifesta e contraddittorietà.
Difetto di istruttoria. Insufficienza di
motivazione;

8- (sotto altro profilo) Violazione art. 3 L.
n. 287/90 e dei principi di diritto in tema di
concorrenza e di abuso di posizione dominante.
Eccesso di potere per errore sui presupposti,
illogicità manifesta e contraddittorietà.
Difetto di istruttoria. Insufficienza di
motivazione.

Sull'abuso di posizione dominante con l'effetto
di eliminazione della concorrenza nel mercato
della manutenzione derivante dal comportamento
contestato.

8

9. (sotto ulteriore profilo) Violazione art. 3
L. n. 287/90 e dei principi di diritto in tema
di concorrenza e di abuso di posizione
dominante. Eccesso di potere per errore sui
presupposti, illogicità manifesta e
contraddittorietà. Difetto di istruttoria.
Insufficienza di motivazione.

Sulla gravità e durata delle infrazioni

10. Violazione degli artt. 2 e 15 della L.
287/90. Eccesso di potere per insufficienza di
motivazioni e di istruttoria.

11. Violazione degli artt. 3 e 15 della L.
287/90. Eccesso di potere per insufficienza di
motivazione e di istruttoria.

Sulla sanzione pecuniaria

12. Violazione degli artt. 2, 3 e 15 della L.
287/90. Eccesso di potere per insufficienza di
motivazione e di istruttoria.

Schindler Spa ha dedotto:

1. Violazione di legge (art. 2 l. n. 287/90)
Eccesso di potere per errore sui presupposti,
difetto di istruttoria, illogicità manifesta.
Violazione del principio di proporzionalità

2. Violazione di legge (art. 3 l. n. 287/90)
Eccesso di potere per sviamento. Eccesso di
potere per difetto di istruttoria e di
motivazione. Perplessità e confusione
dell'azione amministrativa. Illogicità
manifesta.

3. Violazione di legge (art. 15 l. n. 287/90)

8

Eccesso di potere per difetto di istruttoria e di motivazione. Errore sui presupposti. Violazione del principio di proporzionalità.

La Kone Spa ha dedotto:

1. Mancata corrispondenza tra la contestazione iniziale e la valutazione finale con riguardo all'oggetto e alla natura della presunta infrazione. Violazione e falsa applicazione dell'art. 97 Cost. art. 8 l. 241/90, degli artt. 2, 12 e 14 l. 287/90 e dell'art. 6 D.P.R. 217/98. Eccesso di potere per perplessità.

2. Violazione e falsa applicazione delle stesse norme per assoluta indeterminazione della contestazione.

3. Violazione e falsa applicazione dell'art. 9, D.P.R. 217/90. Violazione del principio del contraddittorio.

4. Violazione e falsa applicazione dell'art. 3 l 287/90. Eccesso di potere per difetto dei presupposti e per carenza di istruttoria. Eccesso di potere per valutazione travisata ed illogicità dei presupposti.

5. Eccesso di potere per erroneo e travisato apprezzamento dei presupposti, per difetto di istruttoria e di motivazione. Eccesso di potere per sviamento e per perplessità. Eccesso di potere per illogicità delle motivazioni. Violazione e falsa applicazione dell'art. 3 l. 287/90.

6. Eccesso di potere, sotto altro profilo, per
i vizi già denunciati.

7. Eccesso di potere in tutte le sue forme
sintomatiche. Violazione e falsa applicazione
dell'art. 2, comma 1, l. 287/90. Eccesso di
potere per indeterminatezza e perplessità con
riferimento alla qualificazione dell'asserita
infrazione.

8. Eccesso di potere in tutte le sue forme
sintomatiche. Violazione e falsa applicazione
dell'art. 2 l. 287/90.

9. Eccesso di potere in tutte le sue forme
sintomatiche e in particolare per disparità di
trattamento. Violazione e falsa applicazione
dell'art. 15, comma 1, l. 287/90.

<u>Ciocca Srl, Maspero elevatori Srl, Mario e
paolo Bosisio Srl, Daldoss Elevetronic Spa,
Elevat ascensori Srl, Lenzi AG Spa,</u> con ricorsi
distinti hanno dedotto:

Violazione e falsa applicazione della l. 287/90
con particolare riferimento agli artt. 2 e 15
del D.P.R. n. 217/98; violazione e falsa
applicazione dell'art. 3 l. 241/90; eccesso di
potere per insufficienza, illogicità e
irragionevolezza della motivazione, per difetto
di istruttoria, per carenza dei presupposti
fattuali, per travisamento dei fatti e per
manifesta ingiustizia, disparità di trattamento
e contraddittorietà con precedenti
provvedimenti.

II

Paravia Ascensori Spa ha dedotto:

Difetto assoluto di motivazione. Violazione e falsa applicazione della l. n. 287/90. Difetto di istruttoria. Illogicità. Contraddottorietà.

Difetto di istruttoria. Violazione e falsa applicazione dell'art. 14 l. 287/90.

Violazione e falsa applicazione dell'art. 2 della l. 287/90.

Violazione di legge in relazione alla sanzione comminata ex art. 15 legge 287/90.

E' intervenuto ad opponendum limitatamente al ricorso proposto da Kone Italia Spa, la soc. Consorzio Servizi Ascensori opponendosi all'accoglimento del gravame.

Si è costituita l'Autorità garante della concorrenza e del mercato.

In vista dell'udienza pubblica del 31 gennaio 2001 le parti hanno presentato argomentate memorie e nel corso della trattazione orale hanno diffusamente illustrato le proprie tesi.

DIRITTO

1. Gli undici ricorsi in esame si rivolgono contro la delibera (11.5.2000) con la quale l'Autorità garante della concorrenza e del mercato ha accertato che le imprese ricorrenti - attive nella produzione, installazione e manutenzione di ascensori ed aderenti ad Assoascensori (Associazione nazionale industrie ascensori e scale mobili - ex ANIE):

II

12

—    hanno violato l'art. 2, comma, 2 della
legge 287/90, predisponendo condizioni generali
di contratto uniformi per la fornitura ed il
montaggio di ascensori ed, in particolare,
clausole di prezzo;

—    tre di esse (Otis, Kone e Schindler) hanno
anche abusato della loro posizione dominante
nel mercato dei pezzi di ricambio originali, in
violazione dell'art. 3, comma 1, lett. b della
legge n. 287/90 rifiutando, o ritardando senza
giustificazione, di fornire a imprese
indipendenti i ricambi originali necessari per
lo svolgimento dell'attività di manutenzione
degli ascensori;

ha disposto la cessazione dall'attuazione e
dalla continuazione delle infrazioni accertate;

ha inflitto a ciascuna delle ricorrenti, in
ragione della grave restrizione della
concorrenza in materia di prezzi di vendita
degli ascensori e dell'ostacolo all'attività
dei concorrenti determinata dall'abuso di
posizione dominante, una sanzione
amministrativa pecuniaria che varia, in
proporzione al rispettivo fatturato e in
ragione del livello di responsabilità, da oltre
sette miliardi a poco più di un milione.

Con recentissima delibera, adottata
nell'imminenza della trattazione dei ricorsi
l'Autorità ha provveduto ad una parziale
rideterminazione dell'importo delle sanzioni

inflitte ad alcune delle imprese ricorrenti,
accogliendo in tutto o in parte le doglianze
che queste ultime hanno avanzato con riguardo
al calcolo del rispettivo fatturato.

Gli undici ricorsi possono essere riuniti ai
fini di una trattazione congiunta, essendo
evidenti le ragioni di connessione oggettiva.

2. Tenuto conto della diversità delle
infrazioni sanzionate (l'intesa e l'abuso di
posizione dominante) e conseguentemente della
diversità delle questioni da ognuna di esse
coinvolte, vanno esaminate dapprima le
doglianze che tutte le ricorrenti rivolgono
contro la determinazione assunta dall'Autorità
sull'intesa, dando la precedenza – secondo
l'ordine logico – a quelle concernenti il
procedimento, per poi passare all'esame delle
questioni relative all'abuso di posizione
dominante.

3. Secondo Kone l'infrazione concernente la
predisposizione, in sede di Assoascensori, di
condizioni generali di contratto ed in
particolare della clausola sul prezzo, non
corrisponde a quella contestata, e vi è anche
perplessità sulla definizione del comportamento
sanzionato contenuta nella delibera – ora
definito intesa, ora pratica concordata, ora
delibera associativa – fattispecie distinte
quanto agli elementi costitutivi e al momento
rilevante della realizzazione dell'infrazione

(le determinazioni associative sulle condizioni
generali di contratto sono del 1986 e del 1988,    *i*
cioè anteriori all'entrata in vigore della
legge n. 287/90).

Tutto ciò avrebbe compromesso il diritto di
difesa .

Anche Ciocca e le altre imprese minori
(Maspero, Bosisio, Daldoss, Elevat e Lenzi)
hanno sottolineato che le determinazioni
associative sono state assunte anteriormente
all'entrata in vigore della legge nazionale
antitrust e quando alcune di esse (Maspero e
Lenzi) neppure erano iscritte ad Assoascensori
e comunque senza la loro partecipazione attiva
e continuata.

Kone denuncia anche la violazione dell'art. 9
del regolamento delle procedure istruttorie
dell'Autorità (D.P.R. 30.4.98 n. 217) in quanto
le sono state richieste informazioni su
Assoascesori prima che quest'ultima fosse
formalmente inquisita e non è stato indicato lo
scopo per cui ciascuna informazione era
richiesta.

Queste doglianze non sono fondate.

L'istruttoria ha preso avvio (delib. 11.2.1999)
da una denuncia concernente il rifiuto di una
delle imprese ricorrenti di fornire i pezzi di
ricambio originali, ma – in relazione al
materiale documentale acquisito – è stata poi
estesa (delibb. 21.10.1999 e 10.11.1999) ad

15

Assoascensori e a tutte le imprese associate
con riguardo alla predisposizione di *i*
"Condizioni generali di contratto .. (in cui) .
. è contenuta una Clausola di variabilità
prezzi..", sicché non vi è alcuna difformità
tra il comportamento contestato nel corso
dell'istruttoria e quello successivamente
sanzionato.

Quanto al secondo profilo delle censure,
l'insegnamento del giudice comunitario (da
ultimo: Corte di giustizia 8.7.99 n 692
Comm/Anic, Trib. di I grado 20.4.99 n. 694
"polipropilene") è nel senso che se l'art. 85,
n. 1 (ora 81 n. 1) Trat. UE, (sostanzialmente
riprodotto nell'art. 2, comma 1, della L.
287/90) distingue il concetto di "pratica
concordata" da quello di "accordi fra imprese"
o di "decisioni di associazioni di imprese".
Ciò è dovuto all'intenzione di comprendere fra
i comportamenti vietati da questo articolo ogni
forma di coordinamento e di collusione tra
imprese, che anche quando non si spinge fino
all'attuazione di un vero e proprio accordo
costituisce una consapevole collaborazione tra
di esse in funzione anticoncorrenziale.

Pertanto una serie di comportamenti di più
imprese può costituire espressione di
un'infrazione unica e complessa, riconducibile
in parte al concetto di accordo e in parte a
quello di pratica concordata.

16

"..nell'ambito di una violazione complessa, la
quale ha coinvolto svariati produttori...
durante parecchi anni . . non si può
protendere da parte della Commissione che essa
qualifichi esattamente la violazione, per
ognuna delle imprese e in ogni momento, come
accordo o come pratica concordata, dal momento
che, in ogni caso, l'una e l'altra di tali
forme di violazione sono previste dall'art. 85
del Trattato.(Trib. sent. cit.)

"Di conseguenza, sebbene la nozione di accordo
e di pratica concordata presentino elementi
costituitivi parzialmente diversi, esse non
sono reciprocamente incompatibili. Pertanto, il
Tribunale non deve pretendere che la
Commissione qualifichi come accordo o pratica
concordata ognuno dei comportamenti accertati,
ma può legittimamente ritenere che la
Commissione abbia correttamente qualificato
taluni dei comportamenti, in via principale,
come <<accordi>> e altri, in via subordinata,
come <<pratiche concordate>> senza che ciò
produca conseguenze inaccettabili in tema di
prova nè violi i diritti della difesa delle
imprese interessate"(Corte sent. cit.).

Questi principi interpretativi (la cui
osservanza si impone anche con riguardo alla
normativa nazionale antitrust in forza
dell'art. 1, comma 4, della L. n. 287/90)
trovano perfetta applicazione nella fattispecie

in esame, atteso che l'intesa sull'adozione
delle condizioni generali di contratto e della
clausola di variabilità prezzi è stata
assunta formalmente in sede associativa
anteriormente all'entrata in vigore della legge
nazionale antitrust.

Le condizioni generali di contratto e la
clausola di variabilità prezzi sono state
applicate, però, anche nel periodo più recente
e successivo alla entrata in vigore della legge
287/90 da tutte le imprese che hanno aderito ad
Assoascensori e tali condizioni sono state
oggetto di discussione in sede associativa
anche ai fini della revisione delle stesse.

Se, quindi, il comportamento in questione è
ricollegabile ad una originaria "decisione di
associazione di imprese", successivamente
presenta gli elementi propri dell'accordo o
della pratica concordata con riguardo alla
concertazione delle imprese (discussioni in
Assoascensori) da cui è conseguita
l'applicazione delle condizioni generali e
della clausola di variabilità prezzi dopo
l'entrata in vigore della legge 287/90, o con
riguardo al comportamento delle imprese che,
anche se rimaste estranee alla concertazione,
si sono consapevolmente e fattivamente
adeguate.

Nelle ragioni espresse trovano confutazione
anche le censure, di ordine sostanziale,

avanzate dalle imprese minori, tenuto conto che
risulta provato che nelle negoziazioni con gli
acquirenti applicavano le condizioni generali
di contratto e la clausola di variabilità
prezzi e tenuto conto, altresì, che un'impresa
può essere ritenuta responsabile di un'intesa
globale durata vari anni anche se è dimostrata
la sua diretta partecipazione solo ad alcuni
degli elementi costitutivi di tale intesa,
quando le è noto il piano complessivo e a esso
ha dimostrato fattivamente di adeguarsi (arg.
ex Trib. I grado sent. cit.).

Va osservato, infine, che nel corso
dell'audizione (avvenuta l'11 maggio 1999)
l'Autorità ha chiesto ai rappresentanti di Kone
chiarimenti sui rapporti dell'impresa con le
associazioni di categoria e sia questa
informazione, che le altre, erano dirette a
verificare il suo coinvolgimento nell'abuso di
posizione dominante contestatole nella delibera
11 febbraio 1999, citata nel verbale.

Non è quindi ravvisabile la denunciata
violazione dell'art. 9 del regolamento per le
istruttorie in quanto era chiaro lo scopo per
cui le informazioni erano richieste e dalle
informazioni acquisite l'Autorità ben poteva
ampliare l'istruttoria con riguardo a nuove
ipotesi di infrazione e nei confronti di altri
soggetti.

19

4. Il nucleo centrale delle doglianze dedotte dalle ricorrenti, e su cui le stesse hanno particolarmente insistito nelle memorie, si incentra sull'assunto che la determinazione dell'Autorità si basa su elementi documentali che non sarebbero idonei a dimostrare la valenza anticoncorrenziale delle condizioni generali di contratto e della stessa clausola di variabilità prezzi, e in mancanza di un riscontro di effetti anticoncorrenziali nel mercato che siano ricollegabili all'applicazione di dette condizioni, riscontro che l'Autorità non ha effettuato, non vi sarebbero ragioni per ricomprendere l'intesa assunta in Assoascensori tra quelle vietate dall'art. 2 della legge 287/90 e per applicare le relative sanzioni.

L'Autorità con tale determinazione sarebbe quindi incorsa nella violazione di tale disposizione di legge e nell'eccesso di potere per difetto di istruttoria, travisamento dei fatti, illogicità e carenza di motivazione.

Oppone al riguardo l'Autorità che l'intesa sull'adozione della clausola di "variabilità" dei prezzi, che si basa su uno schema di calcolo del prezzo "contenente determinati tassi di calcolo", ha un oggetto anticoncorrenziale e, di per sé, si pone in contrasto con la normativa antitrust, a prescindere dagli effetti che possono essersi determinati nel mercato

interessato, il cui accertamento, quindi, non è rilevante ai fini della determinazione adottata.

5. Osserva il Collegio che il percorso logico che ha seguito l'Autorità per giungere alla derminazione censurata è - nei suoi punti essenziali - il seguente:

- le imprese aderenti ad Assoascensori hanno posto in essere un sistematico scambio di informazioni "sensibili" e "riservate" concernenti le vendite di nuovi impianti e i servizi di manutenzione in base alle quali Assoascensori ha elaborato periodicamente "statistiche di vendita" e "statistiche di servizi" fornite alle associate, che garantivano la conoscenza delle condizioni di concorrenza in dettaglio (i dati delle statistiche di vendita si riferivano a 15 segmenti distinti del mercato di produzione, le vendite sono riportate sia in valore che in termini quantitativi, permettendo, per ogni segmento di mercato, la rilevazione del prezzo medio dell'ascensore) e in tempo reale (rilevazioni trimestrali per le vendite e semetrali per i servizi di manutenzione)(parr. 96 e 97).

- *"Sebbene lo scambio di informazioni, . . . non costituisca oggetto di specifica contestazione nel presente provvedimento, esso evidenzia l'elevato grado di collaborazione*

*esistente tra le imprese associate ed è propedeutico e funzionale al coordinamento da parte delle medesime delle proprie strategie commerciali, nonché strumentale alla realizzazione dei comportamenti restrittivi della concorrenza oggetto di analisi"(par. 97);*

- in seno ad Assoascensori sono state predisposte (1966, 1979), rielaborate (1988) e sono tuttora oggetto di ulteriore rielaborazione e di discussione, condizioni generali di contratto per la fornitura ed il montaggio di ascensori, comprendenti la clausola di "variabilità" dei prezzi, che hanno ricevuto applicazione generale da parte delle associate;

- la clausola di "variabilità" prezzi *"definisce un meccanismo di formazione del prezzo di vendita finale dell'impianto e di adeguamento del medesimo in considerazione delle variazioni di costo intervenute tra il momento dell'ordine e quello dell'installazione. Tale clausola, così come strutturata è pertanto in grado di orientare le scelte dei concorrenti in ordine non solo, come vorrebbe una lettura esegetica della sua titolazione ("variabilità") all'aggiornamento del prezzo di vendita autonomamente fissato dalle imprese, ma proprio in relazione alla determinazione del prezzo finale di vendita degli impianti". . . "la conferma di ciò si*

ricava da un documento interno . . . nel quale
si legge che la clausola avrebbe dovuto essere
riformulata nel senso che "il prezzo di vendita
dovrebbe essere determinato dalla singola
impresa sulla base della sua struttura
imprenditoriale, quale sommatoria dei propri
costi e dell'utile voluto.. e non derivare da
una non meglio precisata convenzione"(par.
101).

"Anche laddove .. ci si volesse fermare ad una
interpretazione letterale della clausola e
attribuire alla medesima il significato di mero
meccanismo di adeguamento dei prezzi, essa
costituirebbe comunque un'intesa restrittiva
della concorrenza almeno su una componente del
prezzo finale. . . la stessa Commissione UE ha
ritenuto (che) "gli schemi di calcolo
contenenti determinati tassi di calcolo" sono
idonei a determinare una restrizione della
concorrenza.." (par. 105).

- ".. i comportamenti consistenti nello
standardizzare le condizioni contrattuali di
vendita inclusive di uniformi clausole di
garanzia e di prezzo, nonché la generalizzata
adozione delle stesse, configurano intese
aventi oggetto restrittivo della
concorrenza"(par. 107), .. particolarmente
grave (in quanto) la clausola di prezzo
contenuta nelle condizioni generali di vendita,
determina la fissazione convenzionale

*dell'incidenza di ciascuna voce di costo sul prezzo finale. Pertanto essa ha ad oggetto la restrizione della concorrenza di prezzo sul mercato"*(par. 123).

6. Rileva, preliminarmente, il Collegio che non solo l'Autorità nella sua determinazione finale ha ritenuto esplicitamente di non considerare l'accordo sullo scambio di informazioni quale comportamento vietato ai sensi dell'art. 2, comma 2, L. 287/90 (a differenza di quanto contestato nella comunicazione delle risultante istruttorie), ma del complesso delle condizioni generali di contratto ha ritenuto rilevante ai fini della determinazione adottata unicamente la "clausola di variazione prezzi" in quanto idonea ad orientare le imprese nella formazione del prezzo finale di vendita degli impianti.

Vale al riguardo il rilievo - sottolineato nei gravami presentati dalle imprese minori e anche censurato in termini di difetto di motivazione - che nulla si dice nella delibera in relazione alla idoneità della clausola di garanzia o delle altre condizioni generali di contratto a restringere o falsare "in maniera consistente" (art. 2, comma 1 L. 287/90) il gioco della concorrenza nel mercato interessato.

Nel par. 105 l'Autorità avanza la tesi sussidiaria che la clausola di variabilità prezzi è atta a determinare una restrizione della concorrenza anche se intesa quale *"mero*

*meccanismo di adeguamento dei prezzi"*, in quanto *"costituirebbe comunque un'intesa restrittiva della concorrenza almeno su una componente del prezzo finale"* e la stessa Commissione UE ha ritenuto che *"gli schemi di calcolo contenenti determinati tassi di calcolo sono atti a determinare una restrizione della concorrenza"*.

Peraltro l'Autorità (parr. 120/125) nel valutare la gravità della violazione dell'art. 2 L. 287/90 ha considerato detta clausola solo in quanto *"determina la fissazione convenzionale dell'incidenza di ciascuna voce di costo sul prezzo finale"* e non già quale mero meccanismo di adeguamento dei prezzi già fissati ai fenomeni inflativi.

Se può ammettersi che la clausola – anche intesa in quest'ultimo senso – contiene pur sempre *"schemi di calcolo contenenti determinati tassi di calcolo"* che la Commissione UE con la *"comunicazione"* del 29.7.1968 ha ritenuto restrittivi della concorrenza e se può ammettersi che, in astratto, anche l'adeguamento dei prezzi ai fenomeni inflativi (tra ordine di acquisto e consegna del prodotto) può essere definito una *"componente"* del prezzo finale, è pur vero che non sarebbe stato sufficiente il semplice riferimento a tali elementi formali per dimostrare che l'applicazione della clausola

25

(intesa in tal senso) incappava nel divieto dell'art. 2 della L. 287/90, sia perché non appare di immediata percezione - secondo criteri di logicità e ragionevolezza - che il mero adeguamento al fenomeno inflativo (tra ordine e consegna dell'impianto) possa ritenersi idoneo a restringere "in modo consistente" il gioco della concorrenza,sia perché ben diverse sono le vicende per le quali la Commissione ha fatto applicazione del divieto in questione, così chiarendone la portata.

Nella decisione 8.2.1980 (caso "BDS") la Commissione ha sanzionato lo schema di calcolo che comportava: un "supplemento di prezzo per piccole quantità", un "supplemento per dimensione", "un supplemento per ordinazione posta" e "un margine di profitto pari al 5% della somma degli elementi di calcolo" da aggiungere al prezzo base di prodotti siderurgici.

Nella decisione 21.1.98 (caso Extra di lega) la Commissione ha sanzionato l'intesa dei produttori di acciai speciali diretto a fissare il prezzo degli stessi in ragione dell'aumento del prezzo dei metalli nobili (nichel, ecc.) contenuti nel prodotto, rispetto a quello rilevato ad una certa data (in cui il prezzo del nichel era al minimo storico).

Sono vicende non paragonabili, quanto agli effetti sul prezzo del prodotto, alla clausola diretta ad indicizzare il prezzo nel periodo

(non trascurabile ma neppure lunghissimo) che
separa l'ordine e la conclusione del contratto       *i*
dalla consegna dell'impianto e da cui non
sembra logico far discendere (in mancanza di un
accertamento sulla sua effettiva incidenza)
l'effetto di "uniformare le politiche di prezzo
delle imprese".

7. La clausola in questione è così formulata:

<<ANIE  . . .
          CLAUSOLA VARIABILITA' PREZZI ELEVATORI

A - Il prezzo di vendita è calcolato in base ai seguenti
riferimenti:
   1)Costo della manodopera, cioè salari ed oneri afferenti,
in base al Bollettino Variazioni Carico salariale ANIE
N._____del_____
2) Costo delle materie prime, quale risulta dalla quotazioni
del Bollettino Prezzo ANIE N. __ del_____

B - Si conviene che detti prezzi sono convenzionalmente
attribuiti come segue:
   35%  ·  alla manodopera relativa alle lavorazioni in
officina;
   30% - alla manodopera relativa al montaggio;
   35% - alle materie prime, che incidono convenzionalmente
come segue:
        40% - laminati a caldo
        40% - fusioni ghisa meccanica Kg 21·100
        20% - cavo rigido unipolare isolato con
              PVC H05 V·U sezione 1 mm/2

C · Le eventuali variazioni in piu o in meno del costo della
manodopera d'officina e dei prezzi delle materie prime
verranno calcolate tenendo per base le date: dell'ordine e
dell'approntamento dei materiali, mentre le eventuali
variazioni in più o in meno della manodopera di montaggio
verranno calcolate per il periodo che intercorre dalla data
di approntamento dei materiali a quelle della consegna
dell'impianto.

D - Premesso che l'ANIE provvede quindicinalmente a
calcolare gli indici progressivi di variazione dei costi
della manodopera e dei materiali in base alle incidenze
percentuali soprariportate, si conviene e si accetta che la
variazione in piu o in meno  da fatturare scaturirà dalla
seguente formula:

$$P = \frac{P0}{100}\left(35\frac{S1}{S0} + 30\frac{S2}{S0} + 35\frac{M}{M0}\right)$$

in cui
   P  =  prezzo di vendita revisionato;
   P0 =  prezzo di vendita;

27

S1 = indice della manodopera di officina in
vigore al termine del periodo di approntamento dei materiali
di cui al punto C;
S2 = media ponderale degli indici della manodopera in
vigore durante il periodo di montaggio calcolato come al
punto C;
S0 = indice della manodopera indicato nel Bollettino
Prezzi ANIE, di cui al punto A;
M = indice delle materie prime in vigore al termine del
periodo di approntamento dei materiali di cui al punto C;
M0 = indice delle materie prime indicato nel Bollettino ANIE
di cui al punto A.

La variazione dell'importo della fornitura, risultante dai
calcoli suddetti, dovrà essere regolata alla presentazione
della rispettiva fattura, risultante dai calcoli suddetti,
dovrà essere regolata alla presentazione della relativa
fattura. Il pagamento della rata all'ordine non infirma
l'applicazione della clausola di variabilità prezzi
Milano 1 gennaio 1979 >>

Osserva il Collegio che, considerata nella sua

unitarietà - secondo i comuni criteri di

interpretazione dei documenti destinati ad

essere inseriti in un negozio giuridico - la

clausola sembra diretta ad indicizzare il

prezzo fissato nel contratto o nella proposta

di acquisto agli aumenti di costo dei fattori

produttivi che si potrebbero verificare fino

alla consegna del prodotto.

I punti A e B della clausola sembrano

costituire le necessarie premesse logiche per

procedere ai calcoli di cui ai punti C e D e

sembrano rispondere all'esigenza di consentire

la rilevazione delle variazioni dei costi

distintamente in relazione ai diversi fattori

produttivi e in relazione al momento in cui

ciascuno di tali fattori si inserisce nel procedimento di produzione.

Ciò corrisponde alla tesi delle imprese ricorrenti e alla circostanza che la clausola è stata concordata in sede associativa in un periodo in cui l'inflazione era notevole e rilevante l'esigenza di indicizzazione, anche per limitati periodi di tempo.

Ritiene, invece, l'Autorità che i punti A e B erano diretti a suggerire alle imprese uno schema di calcolo di formazione del prezzo sulla base dei costi rilevabili dalle statistiche trimestrali da cui emergeva anche il prezzo medio degli ascensori.

A tale conclusione l'Autorità perviene, come si è detto, sulla base del dato letterale del punto A della clausola ("Il prezzo di vendita è calcolato in base ai seguenti elementi..") confermato da un documento dell'ANIE secondo cui "il prezzo di vendita dovrebbe essere determinato dalla singola impresa sulla base della sua struttura imprenditoriale, quale sommatoria dei propri costi e dell'utile voluto.. e non derivare da una non meglio precisata convenzione".

Ritiene il Collegio che tali circostanze non possano ritenersi sufficienti a dimostrare l'assunto.

29

Quanto al dato letterale vale il rilievo che
l'enunciato contenuto nel punto A della        *i*
clausola non può essere estrapolato per
attribuirgli un significato diverso da quello
desumibile dal suo contesto.

Anche il documento ANIE del 1994, che comunque
si riferisce ad una analisi tecnica e non è
diretto a rappresentare un comportamento
effettivo delle imprese, non ha un significato
univoco ben potendo essere interpretato in
conformità al contenuto complessivo della
clausola di variazione prezzi, e cioè esprimere
l'esigenza che anche ai fini della
indicizzazione del prezzo occorre avere
riguardo alla incidenza effettiva dei fattori
produttivi e ai profitti d'impresa e non a
quella convenzionale ivi stabilita.

Quanto affermato dall'Autorità nel paragrafo
(par. 103) "... l'analisi dei contratti prodotti nel corso
del procedimento evidenzia che la generalità degli operatori
abbia attribuito uguale peso ai medesimi parametri di
revisione prezzi. Implicitamente, quindi, risulta
predeterminata in maniera omogenea, per tutti gli aderenti
all'Assoascensori, l'incidenza di ciascuna voce sul prezzo
finale" dimostra - contrariamente all'assunto -
le finalità di indicizzazione della clausola e
la circostanza che dall'esame di tali contratti

30

non    era    dato    desumere    la    pretesa

omogeneizzazione   dei   prezzi   finali   dei   ;

prodotti.

Il   Collegio   non   si   nasconde   che   ben

difficilmente imprese che intendono violare la

normativa antitrust producano documenti meno

che ineccepibili e che è altamente improbabile

che   in   fattispecie   di   questo   tipo   possa

raggiungersi   una   prova   documentale   certa,

sicchè l'Autorità preposta può fare ricorso ad

elementi presuntivi. Però, in presenza di un

documento formato nel 1979, quando le imprese

potevano    legittimamente    e    chiaramente

coordinare   la   propria   attività   nel   mercato

nazionale anche in funzione anticoncorrenziale,

non appare logico attribuire al documento un

senso    diverso    da    quello    desumibile

complessivamente dal suo enunciato.

In tali circostanze l'Autorità - non avendo

acquisito   prove   documentali   o   elementi

presuntivi   decisivi   a   conferma   che   la

concertazione tra le imprese aveva un oggetto

anticoncorrenziale   rientrante   nel   divieto

dell'art. 2 della L. n. 287/90, non poteva

sottrarsi alla concreta verifica di effetti

anticoncorrenziali nel mercato che - secondo la tesi che aveva dato avvio all'istruttoria - la clausola in questione era idonea a generare. E ciò non al fine di accertare un elemento costitutivo della fattispecie, ma a fini probatori.

Del resto ad un accertamento di tal genere non si era sottratta, al fine di acquisire ulteriori elementi di prova, neppure la Commissione nei due precedenti sopra richiamati, pur trattandosi di intese con "oggetto" anticoncorrenziale, mentre nella vicenda in esame si sarebbe trattato unicamente di analizzare un congruo numero di contratti stipulati dalle imprese ricorrenti.

Il Collegio ritiene di dover concludere nel senso che dai documenti raccolti nell'istruttoria non sembra emergere in modo persuasivo che la clausola oggetto dell'intesa o della pratica concordata fosse tale da incidere sulla formazione dei prezzi finali dei prodotti e in quanto tale idonea a restringere o falsare in modo consistente la concorrenza.

Appare quindi fondata la censura di eccesso di potere per difetto di istruttoria, illogicità

e difetto di motivazione in quanto gli elementi acquisiti e le ragioni esposte nella delibera impugnata non sono tali da dimostrare che le ricorrenti hanno violato l'art. 2 della legge n. 287/90.

8. Si può quindi passare all'esame delle doglianze avanzate da OTIS, CEAM, Kone e Schindler avverso le determinazioni relative all'abuso di posizione dominante, in violazione dell'art. 3 della l. 287/90 e all'applicazione delle sanzioni corrispondenti.

Va osservato che l'Autorità non ha direttamente contestato a Ceam l'abuso di posizione dominante, e che con la recentissima delibera del 19 gennaio 2001 ha addossato alla capogruppo OTIS l'ammontare della sanzione pecuniaria relativa a tale infrazione già posta a carico, con la delibera originaria, della Ceam stessa.

Essendo l'ammontare di tale sanzione comunque rapportato al fatturato di Ceam ed essendo stati contestati anche comportamenti di quest'ultima, deve ritenersi - in mancanza di diversi rilievi da parte della stessa - che

permanga    in    tale    impresa    l'interesse

all'impugnativa.

Ritiene il Collegio che anche con riguardo a

tale determinazione colgano nel segno le

censure di difetto di istruttoria, illogicità e

difetto di motivazione sollevate dalle

ricorrenti, in quanto anche in tale circostanza

gli elementi documentali acquisiti

dall'Autorità non sembrano sufficienti a

dimostrare - con ragionevole certezza - che

queste ultime abbiano effettivamente tenuto un

comportamento diretto a rifiutare o ritardare

senza giustificazione la fornitura, alle

imprese indipendenti di manutenzione, di

ricambi originali necessari per lo svolgimento

dell'attività di manutenzione degli ascensori.

L'Autorità ha ritenuto che "Nell'ambito della

strategia finalizzata al mantenimento della propria

posizione nel mercato della manutenzione, ciascuna impresa

di produzione di ascensori ha adottato comportamenti volti

ad assicurarsi la manutenzione degli ascensori di propria

marca. A tal fine esse hanno messo in atto un generalizzato

rifiuto di fornitura dei propri pezzi di ricambio talvolta

esplicito e talvolta implicito . . Al rifiuto esplicito può

essere assimilato anche il comportamento consistente

nell'evasione degli ordini a 60/90 giorni o addirittura a

120 giorni . . in tale ultimo caso . l'impianto rimarrà

34

*fermo dai due ai quattro mesi .    a scapito dell'immagine e*

*della reputazione di tali operatori" (par  114).*

9. A tale conclusione è pervenuta   sulla base dei

seguenti elementi probatori (parr. 81/84):

per il gruppo OTIS:

a) richieste inevase ad Otis di fornitura di

parti di ricambio (doc. Emiliana Ascensori);

*b)* lettere inviate a propri ex clienti

(audizione ex dipendenti);

c) scrittura privata standard da Ceam nei

rapporti con i propri concessionari tecnici;

d) segnalazione della Grosseto Servizi

Ascensori;

per il gruppo Kone:

a) lettera di Kone ad un condominio di L'Aquila;

b) dichiarazione ad un cliente che "la Kone

ascensori è esclusivista della ricambistica

originale";

c) inevase richieste a Kone Ascensori di

fornitura di parti di ricambio;

per Schindler:

a) lettera ad una società di manutenzioni presso

l'Aeroporto di Fiumicino;

b) lettera al CO.TR.AN.

c) dichiarazioni che l'evasione di ordini

sarebbe avvenuta in 60/90 giorni.

Per tutte, infine, l'Autorità ha richiamato la vicenda del Supercondominio Torri San Benigno di Genova.

10. Osserva innanzitutto il Collegio che di tutta la documentazione acquisita dall'Autorità solo la lettera inviata dalla Filiale di l'Aquila di Kone ad un condominio reca un esplicito rifiuto di fornire o meglio la minaccia di non fornire materiali di ricambio al chiaro fine di assicurarsi la continuità del servizio di manutenzione:

(.. Vi comunichiamo che, essendo venuti a conoscenza per le vie brevi dell'affidamento ad altra ditta del servizio di manutenzione, e considerato che l'impianto era dotato di garanzia per un anno sui materiali che risultano difformi, non ci assumiamo nessuna responsabilità per eventuali avarie e ci riserviamo altresì di non fornire materiali di ricambio per l'eventuale riparazione dell'elevatore).

Un solo atto di rifiuto proveniente dalla filiale di una delle imprese non è però sufficiente a dimostrare un comportamento significativo in tal senso, che per essere tale deve essere reiterato e generalizzato, cioè tale da dimostrare un consapevole intendimento in tal senso dell'impresa e da permettere di escludere motivazioni occasionali e soggettive. Tutti gli altri documenti richiamati recano solo elementi indiziari che peraltro non

36

presentano un significato univoco in tal senso
o per il loro contenuto (Otis: c - d; Kone: b;)
o perché non vi è una ragionevole certezza che
la richiesta rimasta inevasa sia effettivamente
pervenuta all'impresa (Otis a; Kone c;
Schindler b), o perchè il riscontro è avvenuto
comunque in un tempo corrispondente con le
esigenze dell'impresa di manutenzione
(Schindler: a), o per genericità (Otis:b;).
Neppure la vicenda delle Torri di San Benigno
di Genova è univoca in tal senso.
Occorre innanzitutto riconoscere che, come
sottolineato dalle difese delle ricorrenti,
appare singolare che a fronte di asseriti
comportamenti restrittivi perpetrati per
numerosi anni a danno di circa millecinquecento
(par. 47) imprese indipendenti che curavano la
manutenzione di oltre il 60% dei 650.000
impianti attivi di elevazione (tab. 2 par. 53)
sia di vecchia (alcune parti dell'argano non
sono sostituibili con pezzi compatibili) che di
nuova generazione (schede elettroniche non
riproducibili), siano stati acquisiti solo
alcuni elementi presuntivi, anziché, come
sarebbe ragionevole aspettarsi, decine e decine
di proteste e di attestazioni delle imprese
(singolarmente o per il tramite delle loro
associazioni) che si erano viste rifiutare
dalle ricorrenti la fornitura dei pezzi di
ricambio originali.

Non vi è, infatti, ragione per sospettare comportamenti collusivi tra le imprese dominanti e le imprese indipendenti di manutenzione.

Le associazioni di categoria (Anacam, Anim CNA e CSA) nel corso delle audizioni (8 giugno, 10 giugno e 8 luglio 1999), pur concordando sulle difficoltà di reperire i pezzi di ricambio originali per il comportamento delle ricorrenti, non hanno – però – saputo riferire di episodi specifici e riscontrabili di rifiuto di fornitura.

Neppure l'audizione (2.6.1999) di ex tecnici della Otis ha portato a segnalazioni specifiche e controllabili di rifiuti di fornitura nel periodo rilevante ai fini dell'istruttoria.

Quanto alla vicenda del "Supercondominio Torri San Benigno", che gestiva ascensori Otis, Kone e Schindler manutenuti dalle rispettive imprese costruttrici, si osserva che alla sua richiesta di voler appaltare la manutenzione di tutti gli ascensori ad una sola di tali imprese, le risposte sono state del seguente tenore

(OTIS (13.10.98): ..relativamente al contenuto della Vs richiesta ci è di obbligo premettere che, come ben sapete, gli elevatori installati nelle Torri . . non sono di nostra costruzione e la maggior parte di essi presentano sulla manovra dei sofisticati sistemi di software che si possono decifrare esclusivamente con l'ausilio di appositi terminali (ciascuna casa costruttrice ha i propri) e ovviamente, di personale dedicato e dotato di adeguata preparazione, e questo rappresenta il ns unico grande limite nell'accostarsi alla Vs iniziativa.

Vi facciamo notare inoltre, che, trovandoci di fronte ad apparecchiature tecnologicamente avanzate, un altro aspetto da non sottovalutare è la necessità di poter disporre di ricambi originali in quanto ogni ipotetico adattamento da

parte di una casa diversa dalla costruttrice è da escludere
a priori.
Riteniamo che la Vs iniziativa miri ad aumentare
l'efficienza dell'apparato manutentivo, e quindi pensiamo
che non sia etico proporci per un incarico che non saremmo
comunque in grado di portare a compimento secondo standard
qualitativi che ci poniamo come obiettivo giornaliero nello
svolgimento delle ns attività. .

Kone (3.11.98) .. è nostra intenzione eseguire il servizio
solo sugli impianti in ns manutenzione in quanto produzione
Kone
Tale decisione è dettata dal fatto che, per le particolari
caratteristiche degli elevatori non possiamo garantire un
approvvigionamento dei materiali rapido con pezzi di
ricambio originali prodotti dalle ns fabbriche. ,

Schindler (19.10.98) . . Dall'analisi effettuata sugli
impianti è emerso che, data la tipologia degli stessi,
manovre elettroniche a microprocessori comandate da
computer e la logica di comando, non ci è possibile
concedere un servizio di assistenza in linea con quelli
offerti alla ns Clientela e quindi che soddisfi le Vs
esigenze..)

Da tali risposte emerge sicuramente la mancanza

di interesse delle imprese ad assumere la

manutenzione degli ascensori non di propria

produzione, per motivi diversi: mancanza di

personale addestrato, minore rapidità nel

reperire i pezzi di ricambio e riduzione del

proprio standard operativo, ma non il comune

intedimento di non fornire alle rispettive

concorrenti i pezzi di ricambio originali.

Non appare particolarmente probante la denuncia

di Emiliana ascensori, quanto al mancato

riscontro di Otis alle richieste di fornitura

di due schede per manovra, tenuto conto che non

vi è prova che Otis abbia ricevuto la prima

richiesta, mentre quanto alla seconda ha buon

gioco la difesa dell'impresa a sottolinearne la

inattendibilità in relazione alla mancanza di

coincidenza (vi è una differenza di oltre due

mesi) dell'avviso di ricevimento con la data
della lettera.

Sostanzialmente le stesse considerazioni
valgono con riguardo alle richieste di Ema a
Kone e di Co.Tr.An a Schindler.

Ugualmente del tutto singolare appare la
vicenda segnalata dalla Grosseto Servizi da cui
non può trarsi la conclusione che la OTIS o la
Ceam rifiutavano la fornitura dei pezzi di
ricambio.

Neppure scrivere ai propri clienti che
l'impresa ha in esclusiva i ricambi originali
per gli ascensori di propria produzione
significa necessariamente che l'impresa rifiuta
di fornire i pezzi di ricambio di propria
produzione.

Anche il contratto standard di Ceam con i
propri concessionari tecnici non prova
necessariamente che la Ceam rifiutava di
fornire i propri pezzi di ricambio richiesti
delle imprese di manutenzione interessate.

Alle stesse conclusioni si deve giungere con
riguardo ai restanti documenti concernenti Kone
e Schindeler.

Inoltre gli indizi nel senso del rifiuto di
fornitura che l'Autorità ha ritenuto di poter
desumere dai documenti richiamati, trovano una
possibile e plausibile smentita nella
circostanza – pacifica – che Kone aveva
affidato ad una controllata del gruppo il

compito di commercializzare i pezzi di ricambio originali (attività poi interrotta in quanto non remunerativa) e che le imprese effettivamente provvedevano a fornire a terzi pezzi di ricambio di loro produzione (tabulati forniti all'Autorità).

Dagli elenchi versati in giudizio risulta che tali forniture riguardavano sia le altre imprese ricorrenti sia imprese terze, alcune delle quali risultano comprese nell'elenco di imprese di manutenzione indipendenti (per quanto si asserisce) prodotto da Otis.

Tali rilievi possono inficiare, a prescindere da quanto si è già detto, sia il contenuto probatorio della vicenda dl Supercondominio (in quanto ciascuna delle imprese forniva alle altre i pezzi di ricambio originali), sia l'effettiva rilevanza dei ricambi originali nel mercato della manutenzione e quindi anche il rilievo del peso marginale delle forniture rispetto al fatturato complessivo, sia la conclusione complessiva che le ricorrenti rifiutavano di fornire detti ricambi alle imprese indipendenti.

Naturalmente nella vicenda può assumere rilevanza anche la tipologia dei ricambi effettivamente forniti a terzi, non potendosi escludere che le ricorrenti mentre commercializzavano ricambi comuni, rifiutavano la fornitura di ricambi effettivamente

strategici per assicurarsi la manutenzione degli ascensori di propria produzione a scapito dei concorrenti.

Tuttavia, se difficilmente l'Autorità in materia di abuso di posizione dominante può acquisire sicure prove documentali e deve necessariamente basarsi su elementi indiziari, quando gli elementi acquisiti presentino margini di dubbio e non siano tali, per dovizia e spessore, da opporsi validamente alle plausibili argomentazioni di segno contrario delle imprese interessate, l'Autorità non può sottrarsi dall'attivare tutti i poteri istruttori di cui dispone (audizioni delle imprese concorrenti, accertamenti delle condizioni di mercato, ecc.) per poter fondare le proprie determinazioni su un complesso probatorio solido e appagante.

Per le ragioni esposte si deve ritenere che tale obiettivo non sia stato raggiunto nelle vicenda in esame e che anche le determinazioni adottate nei confronti delle ricorrenti in ordine all'abuso di posizione dominante si presentino carenti sotto il profilo del fondamento probatorio.

11. Concludendo i ricorsi riuniti vanno accolti per l'accertata fondatezza delle censure di carenza di istruttoria, illogicità e difetto di motivazione, e per l'effetto va annullata la determinazione impugnata concernente l'intesa e



42

l'abuso di posizione dominante e le relative sanzioni, rendendo superfluo l'esame delle ulteriori censure che possono essere assorbite.

Sussistono giusti motivi per compensare tra le parti le spese di giudizio.

P.Q.M.

Il Tribunale Amministrativo Regionale del Lazio

- Sezione Prima -

- accoglie i ricorsi previamente riuniti e per l'effetto annulla la determinazione impugnata.

- spese compensate.

Ordina che la presente sentenza sia eseguita dalla Autorità Amministrativa.

Così deciso in Roma nella Camera di Consiglio del 31 gennaio 2001.

Il Presidente

Il Cons. est.

PUBBLICATA MEDIANTE DEPOSITO IN SEGRETERIA

il ...22 FEB 2001

IL SEGRETARIO DI SEZIONE

TRIBUNALE AMMINISTRATIVO REGIONALE DEL LAZIO

Ad i: 2 1 FEB 2001
alla ...

Autorità Generale ...
a norma ...
di procedura 17 agosto 1907 n. 642