# EXHIBIT E

Dockets.Justia.com

 **KERN**

**Global Language Services**
Translations · Interpreting
DTP · Localization

KERN Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169

Tel. (212) 953 2070
Fax (212) 953 2073
kern.ny@kerntranslations.com

**www.e-kern.com**

State of :    New York

County of:    New York

ss.:

# CERTIFICATE OF ACCURACY

*IT IS HEREBY CERTIFIED, that KERN Corporation, a corporation organized and existing under the laws of the State of New York, is professionally engaged in the rendering of foreign language translation services, that it has translated the following document(s)*

## JUDGMENT

*from the **ITALIAN** language into the **ENGLISH** language*
*and that the said translation is a true and correct rendering of the said document to the best of our knowledge and belief.*

Signed by: _____
(Rosana Chinchilla)

for Kern Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169
Tel: 212-953-2070
Fax: 212-953-2073

Subscribed to before me this **12**

Day of **October**, 2005.

Notary Public

**JOY N. WILTERMUTH**
NOTARY PUBLIC, State of New York
No. 01WI - 6093589
Qualified in New York County
My Commission Expires June 2, 2007

San Francisco: The Russ Building · 235 Montgomery Street, Suite 946 · San Francisco, CA 94104
Tel. (415) 433 5376 · Fax (415) 433 5377 · kern.sf@kerntranslations.com

London: Tel 011 44 (20) 78 31 56 00    Frankfurt: Tel 011 49 (69) 75 60 73-0    Berlin: Tel 011 49 (30) 24 72 12 50    Paris: Tel 011 33 (1) 53 93 85 20
Zurich: Tel 011 41 (1) 2 61 11 60    Hong Kong: Tel 011 (852) 28 50 44 55    Amsterdam: Tel 011 31 (20) 6 39 01 19    Lyon: Tel 011 33 (4) 783 783 73

No. ___*1371/2001*___

Reg. Dec.

## THE ITALIAN REPUBLIC

## ON BEHALF OF THE ITALIAN PEOPLE

## THE REGIONAL ADMINISTRATIVE COURT OF LAZIO

### - Section One -

Composed of

Mario Egidio Schinaia, Presiding Judge

Alberto Novarese, Referral Judge

Nicola Gaviano, Associate Judge

Has pronounced the following

### JUDGMENT

On appeals filed by:

No. 11644/2000 brought by OTIS spa in the person of its managing director Aurelio
Arpinati, Eng., represented and defended by the attorneys at law Mario Siragusa and
Filippo Amato, and by Professor Salvatore Alberto Romano, and electing domicile at the
offices of the latter in Rome at the street address of Corso Vittorio Emanuele II, No. 284;
No. 11603/2000 brought by CEAM srl in the person of its managing director Mr. Pietro
Mazzacurati, represented and defended by the attorneys at law Mario Siragusa and
Filippo Amato, and by Professor Salvatore Alberto Romano, and electing domicile at the
offices of the latter in Rome at the street address of Corso Vittorio Emanuele II, No. 284;
No. 11790/2000 brought by SCHINDLER spa in the person of its CEO Giuseppe Lupo,
Eng., represented and defended by the attorneys at law Piero D'Amelio, Priscilla Petitti,

1

and Claudio Tesauro, and electing domicile at the offices of the former in Rome at the street address of Via Della Vite 7;

No. 12091/2000 brought by the company KONE ITALIA spa in the person of its lawful representative Dr. Roberto Pecchioli, represented and defended by the attorney at law Professor Andrea Guarino and the attorneys at law Vanda Martelli and Antonio Rossi, and electing domicile at the premises of the former at the street address of Piazza Borghese 3 (Guarino law office);

No. 11796/2000 brought by CIOCCA srl in the person of its lawful representative Mr. Bruno Ponzano, represented and defended by the attorney at law Professor Giuseppe Franco Ferrari and by the attorneys at law Enrico Adriano Raffaelli and Paolo Todaro, and electing domicile at the offices of Rucellai & Raffaelli of the latter in Rome at the street address of Via Lucrezio Caro 50;

No. 11802/2000 brought by MASPERO ELEVATORI srl in the person of its lawful representative Mr. Libero Maspero, represented and defended by the attorney at law Professor Giuseppe Franco Ferrari and by the attorneys at law Enrico Adriano Raffaelli and Paolo Todaro, and electing domicile at the offices of Rucellai & Raffaelli of the latter in Rome at the street address of Via Lucrezio Caro 50;

No. 11810/2000 brought by Mario and Paolo Bosisio srl in the person of its lawful representative Mr. Mario Bosisio, represented and defended by the attorney at law Professor Giuseppe Franco Ferrari and by the attorneys at law Enrico Adriano Raffaelli and Paolo Todaro, and electing domicile at the offices of Rucellai & Raffaelli of the latter in Rome at the street address of Via Lucrezio Caro 50;

No. 11813/2000 brought by DALDOSS ELEVETRONIC spa, represented and defended by the attorney at law Professor Giuseppe Franco Ferrari and by the attorneys at law Enrico Adriano Raffaelli and Paolo Todaro, and electing domicile at the offices of Rucellai & Raffaelli of the latter in Rome at the street address of Via Lucrezio Caro 50;

No. 11816/2000 brought by ELEVAT ASCENSORI srl in the person of its lawful representative Mr. Maurizio Pisa, represented and defended by the attorney at law Professor Giuseppe Franco Ferrari and by the attorneys at law Enrico Adriano Raffaelli and Paolo Todaro, and electing domicile at the offices of Rucellai & Raffaelli of the latter in Rome at the street address of Via Lucrezio Caro 50;

No. 11819/2000 brought by LENZI AG spa in the person of its lawful representative Mr. Franco Lenzi, represented and defended by the attorney at law Professor Giuseppe Franco Ferrari and by the attorneys at law Enrico Adriano Raffaelli and Paolo Todaro, and electing domicile at the offices of Rucellai & Raffaelli of the latter in Rome at the street address of Via Lucrezio Caro 50;

No. 12932/2000 brought by PARAVIA ASCENSORI Spa in the person of its chairman Antonio Paravia, represented and defended by the attorney at law Gennaro Stellato, and electing domicile at the offices of the attorney at law Gianfranco Ruggieri in Rome at the street address of Via Claudio Monteverdi 16;

AGAINST

Autorita Garante della Concorrenza e del Mercato, the Italian antitrust authority, in the person of its acting lawful representative, represented and defended before the courts by the Office of the National Attorney General, and domiciled with it in Rome at the street address of Via dei Portoghesi 12;

With the intervention, in opposition
(File No. 12091/2000)

of Soc. Consorzio Servizi Ascensori CSA, in the person of its lawful representative, represented and defended by the attorney at law Professor Franco Gaetano Scoca and electing domicile at the offices of the latter in Rome at the street address of Via G. Paisiello 55;

For the nullification

of the decision of the antitrust authority of May 11, 2000, finding:

- The commission of a violation of Paragraph 2 of Article 2 of Law No. 287/90 by means of the preparation by the appellant companies of uniform general contract terms for the

3

supply and assembly of elevators and, in particular, pricing clauses that proved to be applied by the members in general;

- The commission of a violation of Letter b) of Paragraph 1 of Article 3 of Law No. 287/90 by the companies Otis Spa, Kone Italia Spa, and Schindler Spa;

- Ordering cessation of the violations;

- Applying administrative pecuniary penalties;

Upon the appeals with the pertinent attachments;

Upon the record of appearance of the antitrust authority with the intervention of the company Consorzio Servizi Ascensori CSA limited to Appeal No. 12091/2000;

Upon the briefs produced by the parties in aid of their defense;

Upon all of the case records;

Upon the public hearing of January 31, 2001, by the reporting judge Alberto Novarese, of the attorneys at law: *Salvatore Alberto Romano, Mario Siragusa, Laura De Sanctis, Claudio Tesauro, Priscilla Petitti, Piero D'Amelio, Elisabetta Marnata, by delegation, the attorneys at law Giuseppe Franco Ferrari, Adriano Raffaelli, Andrea Guarino, Vanda Martelli, Aristide Police, by delegation, the attorneys at law Franco Gaetano Scoca, Gennaro Stellato, and the National Attorney General Francesco Selefani;*

AS TO THE FACTS

With the eleven appeals indicated in the heading, the appellant companies have challenged the decision of May 11, 2000 by which the antitrust authority held that they were in violation of the provisions of Law No. 287/90 and imposed upon them a pecuniary administrative penalty.

The companies <u>Otis Spa and Ceam Spa</u> have alleged:

A)  As to the asserted violation of Article 2 of Law No. 287/90 deriving from the adopting of general uniform contract conditions) [sic]

1. Violation of Article 2 of Law No. 287/90 and of the principles of law on the subject matter of competition. Exceeding powers due to a defective investigative procedure and due to insufficiency of grounds (in relation to the alleged violation deriving from the adopting of general uniform contract conditions);

B)  As to the asserted violation of Article 2 of Law No. 287/90 deriving from the adopting of a price variation clause

2. Violation of Article 2 of Law No. 287/90 and of the principles of law on the subject matter of competition. Exceeding powers due to ignoring of facts;

3.  Violation of Article 2 of Law No. 298/90 [sic] and of the principles of law on the subject matter of competition. Exceeding powers due to deficiency in grounds and contradictory nature, and due to ignoring of facts and manifest lack of logic. Error in the assumption of facts.

C)  On the finding of alleged violation of Article 3 of Law No. 287/90 (with respect to the definition of the pertinent market)

6. [sic] Violation of Article 3 of Law No. 287/90 and of the principles of law on the subject matter of competition and on abuse of a dominant position. Exceeding powers due to a defective investigative procedure and due to insufficiency of grounds;

(In relation to the definition of dominant position.)

7. Violation of Article 3 of Law No. 287/90 and of the principles of law on the subject matter of competition and on abuse of a dominant position. Exceeding powers due to manifest lack of logic and contradictory nature. Defective investigative procedure. Insufficiency of grounds;

8. (On another level) Violation of Article 3 of Law No. 287/90 and of the principles of law on the subject matter of competition and on abuse of a dominant position. Exceeding powers due to error in assumptions, manifest lack of logic, and contradictory nature. Defective investigative procedure. Insufficiency of grounds.

As to the abuse of dominant position with the effect of eliminating the competition from the maintenance market deriving from the conduct alleged.

9. (On a further level) Violation of Article 3 of Law No. 287/90 and of the principles of law on the subject matter of competition and on abuse of a dominant position. Exceeding powers due to error in assumptions, manifest lack of logic, and contradictory nature. Defective investigative procedure. Insufficiency of grounds.

As to the gravity and duration of the violations

10. Violation of Articles 2 and 15 of Law No. 287/90. Exceeding powers due to insufficiency of grounds and of investigative procedure.

11. Violation of Articles 3 and 15 of Law No. 287/90. Exceeding powers due to insufficiency of grounds and of investigative procedure.

As to the pecuniary penalty

12. Violation of Articles 2, 3, and 15 of Law No. 287/90. Exceeding powers due to insufficiency of grounds and of investigative procedure.

Schindler Spa has alleged:

1. Violation of law (Article 2 of Law No. 287/90)

Exceeding powers due to error in assumptions, defective investigative procedure, and manifest lack of logic. Violation of the principle of proportionality

2. Violation of law (Article 3 of Law No. 287/90)

Exceeding powers due to overreaching. Exceeding powers due to defective investigative procedure and grounds. Distortion and confusion of administrative action. Manifest lack of logic.

3. Violation of law (Article 15 of Law No. 287/90)

Exceeding powers due to defective investigative procedure and grounds. Error in assumptions. Violation of the principle of proportionality.

Kone Spa has alleged:

1. Lack of correspondence between the initial allegation and the final assessment with respect to the subject matter and nature of the alleged violation. Violation and false application of Article 97 of the Constitution, Article 8 of Law No. 241/90, of Articles 2, 12, and 14 of Law No. 287/90, and of Article 6 of Presidential Decree No. 217/98. Exceeding powers due to distortion.

2. Violation and false application of the mentioned rules due to absolute lack of definition of the allegation.

3. Violation and false application of Article 9 of Presidential Decree No. 217/90. Violation of the principle of adversary proceeding.

4. Violation and false application of Article 3 of Law No. 287/90. Exceeding powers due to failure to fulfill prerequisites and due to deficiency of investigative procedure. Exceeding powers due to misguided assessment and lack of logic in assumptions.

5. Exceeding powers due to errors and misguided assessment of assumptions, due to defective investigative procedure and grounds. Exceeding powers due to overreaching and distorting. Exceeding powers due to lack of logic of grounds. Violation and false application of Article 3 of Law No. 287/90.

6. Exceeding powers, on another level, due to the defects already alleged.

7. Exceeding powers in all of the representative forms thereof. Violation and false application of Paragraph 1 of Article 2 of the Law No. 287/90. Exceeding powers due to the lack of definition and distortion relating to the characterization of the alleged violation.

8. Exceeding powers in all of the representative forms thereof. Violation and false application of Article 2 of the Law No. 287/90.

9. Exceeding powers in all of the representative forms thereof and, in particular, due to disparity in treatment. Violation and false application of Paragraph 1 of Article 15 of the Law No. 287/90.

Ciocca Srl, Maspero Elevatori Srl, Mario and Paolo Bosisio Srl, Daldoss Elevetronic Spa, Elevat Ascensori Srl, and Lenzi AG Spa, with separate appeals, have alleged:

Violation and false application of Law No. 287/90 with particular reference to Articles 2 and 15 of Presidential Decree No. 217/98; violation and false application of Article 3 of Law No. 241/90; exceeding powers due to insufficiency, lack of logic, and unreasonable nature of the grounds, due to defective investigative procedure, due to lack of factual information,

due to ignoring of facts, and due to manifest injustice, as well as disparity in treatment and contradictory nature in relation to preceding decisions.

Paravia Ascensori Spa has alleged:

Absolute lack of grounds. Violation and false application of Law No. 287/90. Defective investigative procedure. Lack of logic. Contradictory nature.

Defective investigative procedure. Violation and false application of Article 14 of Law No. 287/90.

Violation and false application of Article 2 of Law No. 287/90.

Violation of law in relation to the penalty provided for in Article 15 of Law No. 287/90.

In opposition, with limitation to the appeal found by Kone Italia Spa, the company Consorzio Servizi Ascensori has intervened to oppose the application of the charge.

The antitrust authority has appeared.

In view of the public hearing of January 31, 2001, the parties have submitted briefs and, during the course of the oral arguments, they have set forth their views in depth.

## AS TO THE LAW

1. The eleven appeals under examination have been filed against the decision (of 5/11/00) in which the Italian antitrust authority (Autorita Garante della Concorrenza a del Mercato) found that the appellant companies active in the production, installation and maintenance of elevators  and members of  elevator and escalator industry association Assoascensori (Associazione Nazionale Industrie Ascensori e Scale Mobili, formerly the ANIE):

- Had violated Paragraph 2 of Article 2 of Law No. 287/90 by formulating general conditions for standard contracts for the supply and installation of elevators and, in particular, pricing clauses;

- Three of them (Otis, Kone, and Schindler) had abused their dominant position in the market for original replacement parts, in violation of Letter b of Paragraph 1 of Article 3 of Law No. 287/90 by refusing, or delaying without justification, to supply - to independent companies – the original replacement parts necessary for them too carry out their elevator maintenance activities;

8

It ordered the cessation of the practices and of the violations found;

It imposed on each of the appellants - due to the serious restriction of competition concerning the sales prices of elevators and the hindering of the activities of competitors brought about by the abuse of a dominant position - an administrative penalty that varied in proportion to the respective sales revenues and depending on the level of liability, from more than seven billion Italian lire to a little over one million.

In an extremely recent decision issued when the appeals were just about to be heard, the antitrust authority partially reassessed the amount of the penalties imposed on several of the appellant companies, accepting in full or in part the challenges raised by them concerning the manner of calculating the respective sales revenues.

The eleven appeals can be joined for the purposes of hearing them together as the grounds for their objective linkage is obvious.

2. Taking into account of the diversity of the violations sanctioned (collusion and abuse of a dominant position) and resulting diversity in the issues involved in each of them, first of all the challenges raised by all of the appellants against the finding made by the antitrust authority will be examined in relation to collusion, giving precedence, in logical order, to those relating to procedure, then proceeding to an examination of the issues relating to abuse of dominant position.

3. According to Kone, the violation concerning the preparation, within Assoascensori, of general contract terms and, more specifically, the pricing clauses, does not match what was charged, and there is also perplexity as to the determination of the conduct sanctioned, which is variously determined to be collusion, then concerted practice, then joint decision, which are distinct cases with regard to their constitutive elements and to the precise time when a violation was committed (the joint determinations on the general contract terms are from 1966 and 1988, that is, prior to the taking effect of Law No. 287/90).           .._

All of this allegedly comprised the right to defense.

Even Ciocca and the other small companies (Maspero, Bosisio, Daldoss, Elevat, and Lenzi.) emphasized that the joint determinations were made prior to the effectiveness of the national antitrust law, and some of these companies (Maspero and Lenzi) were not

9

even enrolled with Assoascensori and therefore did not display active and continuous participation.

Kone also alleges violation of Article 9 of the Rules of Investigative Procedure of the antitrust authority (Presidential Decree No. 217 of 4/30/98) insofar as information was sought on Assoascensori before it was formally subject to investigation and no indication was given as to why any of the information was sought.

These arguments are unfounded.

The investigative proceeding commenced (decision of 2/11/99) with an accusation concerning a refusal by one of the appellant companies to supply original replacement parts, but – with reference to the documentary material obtained - it was then extended (decisions of 10/21/99 and 11/10/99) to Assoascensori and all the member companies in relation to the preparation of "General contract terms ... (which) ... contain a price variation clause …" since there is no difference between the conduct alleged during the course of the investigative proceeding and what was subsequently penalized.

As regards the second objection, what is indicated by the Community case law (most recently, Court of Justice No. 692 of 7/8/99 in Comm v. Anic, Trial Court No. 694 of 4/20/99 "polypropylene" case) is that, if Paragraph No. 1 of Article 85 (now Paragraph No. 1 of Article 81) of the EC Treaty (reproduced in substance in Paragraph 1 of Article 2 of Law No. 287/90) distinguishes among the concepts of a "concerted practice", "collusion between companies", and "decisions by associations of companies". This is because it is the article's intention to include as prohibited conduct any form of co-ordination and collusion between companies that, even if not formalized as an actual agreement, nevertheless constitutes collaboration between the companies involved aimed at preventing competition.

For these reasons, ongoing relations among several companies may constitute a single and complex violation, which in part may be considered to amount to collusion, and. in part, a concerted practice, "in the context of a complex violation, which involves a number producers ... and takes place over a period of several years … it cannot be claimed by the Commission that this can be precisely qualified as a violation by each of the companies involved, and at any given time during that period, either as collusion or a

10

concerted practice, simply because, in any case, either of the forms of violation are foreseen by Article 85 of the Treaty (court judgment, op. cit.).

"Consequently, even if the notion of collusion and concerted practice have constitutive elements that can be partially distinguished, they are not mutually incompatible. Hence, the Court does not have to claim that the Commission qualifies the conduct in question either as collusion or a concerted practice, but it can legitimately hold that the Commission has correctly qualified such conduct, primarily, as "collusion" and other conduct, subordinately, as "concerted practice", without this in fact having unacceptable consequences in relation to the question of proof, nor for that matter does it violate the rights to defense of the parties concerned" (court judgment, op. cit.).

The case in question is a perfect case for the application of these interpretative principles (the observance of which. is also required in relation to the application on national antitrust rules based on Paragraph 4 of Article 1 of Law No. 287/90), given, that the agreement to adopt general contract terms and price variation clauses was formally made within the association prior to the national antitrust law taking effect.

However, the general contract terms and the price variation clause were applied also in more recent times and in the period subsequent to the entry into effect of Law No. 287/90 by all the companies that were members of Assoascensori and those conditions were also debated within Assoascensori with a view to revising them.

If, however, the conduct in question can be traced back to an original "decision of an association of companies", it later presents the characteristics of collusion or a concerted practice, concerning the conduct of the companies in question (discussions within Assoascensori) which resulted in the application of general contract terms and the price variation clause after the entry into effect of Law No. 287/90, or with regard to the conduct of the companies, despite being extraneous to the concerted practice itself, knew about it and actively adapted their practices to it.

In the justifications put forward, the challenges made by the small companies can also be rebutted from a substantive perspective, given that it has been proved that, during negotiations with purchasers, they applied general contract terms and the price variation clause, and given further that a company can be held liable for general collusion over a period of several years, even if it can be shown that its direct participation only related to

certain constitutive elements of the collusion as such, provided that it is aware of the overall plan and it has been proved to have actively adapted its conduct to that of the plan (arguments from the trial court judgment, op, cit.).

Finally, it must be concluded that during the hearing (which took place on May 11, 1999) the antitrust authority asked the representatives of Kone to give clarifications about its company relations , with associations of that category, and both this and further information was aimed at verifying its involvement in the abuse of a dominant position, pursuant to the accusations made in the decision of February 11, 1999, as cited in the minutes.

It is not therefore easy to comprehend the denunciation of the violation of Article 9 of the investigative rules insofar as the reasons why the information was requested were clear, and on the basis of the information gathered, the antitrust authority could quite justifiably extend its investigations to include now possible violations as well as those against other subjects.

4. The crux of the challenges made by the appellants, and which they have insisted upon, in particular in the memorandum, turns on the fact that the determination by the antitrust authority is based on documentary evidence that is not appropriate to demonstrate that the general contract terms and price variation clause amounted to anticompetitive conduct, and given the absence of any verification of anticompetitive effects of such conduct on the market that can be traced to the application of such conditions, no such verification having been carried out by the antitrust authority, there are no reasons to interpret the agreement made in Assoascensori as corresponding to one of those prohibited by Article 2 of Law No. 287/90 and therefore for the application of the respective sanctions.

By such a determination, the antitrust authority has allegedly committed a violation of the legal provisions and has abused its powers due to a procedural defect in the investigation stage, a misrepresentation of the facts, inconsistency of reasoning and lack of grounds for its decision.

In this respect, the antitrust authority objects that the agreement, by adopting a price "variation" clause that is based on a calculation formula for the price "containing fixed calculation rates", thus constituted anticompetitive behavior and, as such, is automatically in conflict with the antitrust regulations, regardless of the effects that it may have on, the

market concerned. Verification of whether or not this is the case is therefore immaterial for the purposes of the determination made.

5. The Adjudicating Panel observes that the logical processes adopted by the antitrust authority in arriving at its sanction - in it essential parts - are the following:

- The companies that are members of Assoascensori set up a procedure for the systematic exchange of "sensitive" and "confidential" information relating to the sale of new installations and maintenance services, on the basis of which Assoascensori periodically developed "sales statistics" and "services statistics" that it supplied to associate members, that guaranteed them detailed knowledge of the conditions of competition (the statistical data referred to 15 distinct sectors of the production market, which for each market sector revealed the average price of elevators) and on a continuous basis (quarterly statistics for sales and semiannual ones for maintenance services) (paragraphs 96 and 97).

- "Even if the exchange of information ... is not the subject of any specific criticism in this determination, it reveals the high level of collaboration among the associated companies and it served the purpose of helping the them coordinate their own sales strategies, as well as create instruments to perform the conduct that restricts competition at issue" (paragraph 97);

- Within Assoascensori, general contract terms for the supply and assembly of elevators, including a price "variation" clause, that were generally applied by the associates, were drafted in 1966, and 1979, redrafted in 1988, are currently the subject of a redrafting and discussion;

- The price "variation" clause "defines the mechanism for the determination of the final sales price for the installation and the adjustment thereof taking into consideration the variation in costs occurring between the time of making the order and installation. Such a, clause, given the way it is couched, is in any case capable of guiding the choices of competitors not only in relation to, as its self-explanatory title ("variability") indicates, the updating of the sales price independently set by the companies, but also in relation to the determination of the final sales price of installations" ... "confirmation of which is drawn from an internal document" ... in which it is stated that the clause should have been reformulated insofar as "the sales price should be determined by an individual company on the basis of its own entrepreneurial structure, which is based on its own costs and

profits desired ... and not be based on a less precisely stated understanding" (paragraph 101).

"Even if ... we were to limit ourselves to a literal interpretation of the clause and consider it to be merely a price adjustment mechanism, it would nonetheless amount to an agreement that restricts competition at least in relation to a part of the final prices ... the European Commission itself has held (that) "calculation mechanisms containing fixed calculation rates" are appropriate instruments to bring about a restriction in competition." (paragraph 105).

- " ... behavior that results in the standardization of the contractual conditions of sales including, uniform guarantee clauses and price clauses, constitute agreements that intend to restrict competition" (paragraph 107), ... which are particularly serious (insofar as) the price clause contained in the general conditions of sale determines the general fixing of the effect of each cost element on the final price. Therefore, this is a clause that aims to restrict competition in relation to market prices".

6.   Provisionally, the Adjudicating Panel notes that the antitrust authority not only explicitly held in its final determination that it was not necessary to consider the agreement on the exchange of information as prohibited behavior under Paragraph 2 of Article 2 of Law No. 287/90 (in contrast to what was contested in the communication containing the results of the investigation procedure), but of all the general contract terms it found that the "price variation clause" was relevant in making the singularly adopted determination, insofar as it was appropriate in guiding companies in the calculation of the final sales price for installations.

In this respect, the point - emphasized in the objections made by the small companies and challenged for lack of grounds - that there is nothing in the decision concerning the appropriateness of the guarantee clause or for that matter other general contract terms that prove they restrict or "consistently" distort (Paragraph 1 of Article 2 of Law No. 287/90) the flow of competition in the market in question.

In paragraph 105, the antitrust authority advanced the argument of subsidiarity, in that the price variation clause is designed to bring about a restriction in competition even if it is intended as a "simple price adjustment mechanism", insofar as "it in any case constitutes an agreement that restricts competition at least in relation to a part of the final price" and

the European Commission itself held that "calculation mechanisms containing fixed calculation rates aim at bringing about a restriction in competition."

Moreover, in evaluating the seriousness of the violation of Article 2 of Law No. 287/90, the antitrust authority (paragraphs 120/125) considered the said provision only insofar as it "determines the agreed fixing of the incidence of each cost element on the final price" and not simply as a means of adjusting prices in line with inflation.

If it is conceded that the clause - even if it is understood in this latter sense - still contains "calculation mechanisms containing fixed calculation rates" that the EU Commission held to be restrictive of competition in its "communiqué" dated 7/29/68, and if it can be conceded in abstract terms that even price adjustment due to inflation (between the purchase order and the delivery of the product) can be construed as a "component" of the final price, it is true that a simple reference to such formal elements would not have been sufficient to prove that the application of the clause (understood in this sense) fell foul of the prohibition as intended by Article 2 of Law No. 287/90. This is due both to the fact that it is not immediately evident - according to criteria of logic and reasonableness - that the simple adjustment due to inflationary phenomena (between the order and the delivery of the installation) can be considered to bring about a "continuous" restriction in the free flow of competition, and also because the events in relation to which the Commission applied the prohibition in question are quite distinct from those in question, which thus clarifies its ambit.

In its decision 2/8/80 (the "BDS" case), the Commission sanctioned a calculation scheme that introduced a "price supplement for small quantities", a "dimension supplement", "a postal order supplement" and "a profit margin equivalent to 5% of the total sum of the elements calculated" to be added to the basic price of iron and steel products.

In a decision dated 1/21/98 (Extra di lega case) the Commission sanctioned an agreement between manufacturers of special steel products aimed at fixing the price of thereof in proportion to increases in the cost of noble metals (such as nickel) that constituted part of the product, as compared with the price fixed at a given date (in which the price of nickel was at an all time low).

The facts of these situations are not comparable, in relation to the effects on the price of the product, to the clause aimed at indexing the price over the period (not negligible, but

also not an extended period) between the making of the order and signing of the contract, and the delivery of the installation, in relation to which it does not seem logical to drop (in the absence of any verification of the actual incidence thereof) the effect of "uniting the pricing policies of the companies".

7. The clause in question is thus formulated:

<<ANIE . . .

## PRICE VARIATION CLAUSE FOR ELEVATORS

A - The sale price is calculated according to the following parameters:

1) Cost of labor, namely wages and relevant expenses, on the basis of the Changes in the Wage Expense Bulletin, ANIE No. _____ of _____.

2) Cost of raw materials, on the basis of the quotations referred to in the Price Bulletin, ANIE No. _____ of _____.

B – It is agreed that these prices are to be attributed by convention as follows:

35% workshop labor;

30% assembly labor;

35% raw materials, represented by the following by convention:

      40% hot-rolled materials;

      40% engineering cast iron, 21-100 kg;

      20% unipolar rigid cable insulated with

          PVC H05 V-U section 1 mm/2

C - Any fluctuations in the cost of workshop labor and the prices of raw materials will be referred to dates of order, while any fluctuations in the cost of labor and assembly will be referred to the period elapsing between the preparation of the materials and the delivery of the plant;

D - After it is pointed out that the ANIE periodically calculates the progressive indexes of any fluctuations in the costs of labor and raw materials according to the said percent incidences, it is agreed that any fluctuation in prices shall result from the following formula:

$$P = \frac{P0}{100} \left( 35 \frac{S1}{S0} + 30 \frac{S2}{S0} + 35 \frac{M}{M0} \right)$$

where:

P = the end price:

P0 = the sale price;

S1 = the index of workshop labor applicable at the end of the period of preparation for the materials referred to in point C;

S2 - the weighted average of the labor indexes applicable during the assembly period as calculated under point C;

S0 = the labor index reported in the ANIE's bulletins about prices referred to in point A;

M = the raw material index applicable at the end of the period of preparation for the materials referred to in point C;

M0 = the raw material index reported in the ANIE's bulletin about prices referred to in point A.

Variation in the amount of the supply resulting from the calculations referred to above must be paid upon submittal of the respective invoice resulting from the calculations referred to above must be paid upon submittal of the respective invoice [sic]. The payment of the installment upon order does not prevent application of the price variation clause.

In Milan, on January 1, 1979. >>

The Adjudicating Panel notes that, considering it as a whole according to common criteria for the interpretation of documents that are intended for inclusion in a legal agreement, the purpose of the clause seems to be to index the price set in the agreement or in purchase proposal to increases in the costs of production factors that may occur until such time as the product is delivered.

17

Points A and B of the clause seem to constitute the necessary premises for making the calculations set forth in points C and D, and they seem to answer the needs of allowing for the inclusion of costs variations, expressly in relation to the diverse production factors and in relation to the time scale for which each of those factors is inserted into the production procedure.

This corresponds to the arguments advanced by the appellant companies that the clause was agreed to within the association during a period in which inflation was high and the need to index prices was important even over short periods of time.

The antitrust authority, on the other hand, held that points A and B were aimed at presenting a calculation method for the formation of prices to companies based on the cost factors of quarterly statistics, which was used to calculate an average price of elevators.

The antitrust authority reached its conclusion, as has been stated, on the basis of the literal interpretation of point A of the clause ("The cost of the sale is calculated on the basis of the following elements...") confirmed by an ANIE document according to which "the sales price should be determined by each company on the basis of entrepreneurial structure, the costs it has to bear and the desired margin of profit ... and it should not be based on less precise criteria."

The Adjudicating Panel holds that such circumstances are not sufficient to prove the allegation.

As for the literal interpretation, it is worth mentioning that the stated content of point A of the clause cannot be extrapolated to attribute to it a meaning that is different from the context in which it was drafted.

Even the 1994 ANIE document, that in any case refers to a technical analysis and is not intended to represent the effective behavior of the companies, does not have an unequivocal meaning, and can easily be construed in conformity with the overall content of the price variation clause, and as such it lays bare the necessity that in order to index prices it is also important to take into consideration the effective incidence of production factors and company profits and not the agreed one set forth therein.

As regards the assertion of the antitrust authority in paragraph 103, "… the analysis of contracts produced during the procedure shows that the majority of operators attributed the same importance to the same price adjustment parameters. Implicitly, therefore, the incidence of each cost element on the final price is predetermined in an homogenous way for all the members of Assoascensori," it reveals - contrary to the allegation - the clause's aim of indexing prices and the fact that the examination of those contracts revealed that the alleged homogenization of the final prices was not inferred.

The Panel cannot ignore the fact that it would be highly unlikely for companies that intend to violate antitrust rules to produce less than exemplary documentation and that it is highly probable in the case in question that there can be documentary proof beyond all doubt, since the aforesaid antitrust authority can only make reference to presumed elements. However, given the existence of a document drafted in 1979, when companies could legitimately and clearly coordinate their own activities in the national market even in an anticompetitive manner, it would not seem logical to attribute a different meaning to a document than the one inferred as a whole from its terms.

Under these circumstances, the antitrust authority - not having acquired documentary evidence or the decisive elements of proof to establish that the concerted practices between the companies sought to prevent competition in the sense intended by Article 2 of Law No. 287/90, it could not therefore undertake a concrete verification of the anticompetitive effects on the market - in accordance with the claim that gave rise to the commencement of the investigation stage - that the clause in question might have produced, and not with the purpose of ascertaining a constitutive element of the case but for evidentiary purposes.

Moreover, a verification of this type was not undertaken in order to gather further evidence, nor did the Commission do so in the two examples cited above, even though it related to agreements whose "purpose" was to prevent competition, while in the case in question it simply analyzed a certain number of contracts drawn up by the appellant companies.

The Adjudicating Panel must therefore conclude that the documents gathered in the investigation stage do not seem to prove conclusively that the clause that was the subject of the collusion or concerted practice was not such that it had a decisive effect on the

calculation of final prices of products, and as such was capable of continuously restricting or distorting competition.

The claim that the sanction is vitiated due to abuse of power appears to be substantiated, given the defective investigation procedure, inconsistency of reasons and lack of grounds, and the reasons given in the appealed decision are not capable of proving that the appellants have violated Article 2 of Law No. 287/90.

8. We can, therefore, now give consideration to the challenges advanced by OTIS, CEAM, Kone, and Schindler against the determination of the existence of abuse of a dominant position, in breach of Article 3 of Law No. 287/90 and the application of the respective sanctions.

It must be stated that the antitrust authority did not directly contest Ceam's abuse of a dominant position, and in its most recent decision of January 19, 2001 it shouldered the group leader OTIS with the burden of the fine relating to the violation that had been previously inflicted upon Ceam in its original decision.

As the amount of this sanction was based on Ceam's sales revenues, and as the conduct of the latter had been contested, in the absence of new significant facts from it, it must be held that the accusation pertains to the interests of the said company.

The Adjudicating Panel holds that, in relation to this determination, there are blatant errors in the investigation procedure, inconsistency of reasons and lack of grounds as claimed by the appellants, insofar as even in such circumstances the documentary evidence collected by the antitrust authority does not seem to be sufficient to demonstrate - within reason - that the latter effectively behaved in such a way as to directly refuse to or delay without good reason the supply of original replacement parts to independent maintenance companies that were necessary for them to be able to carry out their maintenance activities on elevators.

The antitrust authority held that "In the framework of a strategy aimed at preserving its position in the maintenance market, each elevator manufacturing company adopted behavior aimed retaining its market for the maintenance of its own brand elevators. To this end, they applied a general policy of refusing to supply their own replacement parts either explicitly or implicitly .... An explicit refusal can also be constituted by a continuous policy of not responding to orders for up to 60/90 days and in some cases 120

days, ... which in this case ... means that the elevator installation is paralyzed for two to four months ... to the detriment of the image and reputation of those operators" (paragraph 114).

9. This conclusion was arrived at on the basis of the following probative elements (paragraphs 81/84):

For the OTIS group:

a) unanswered requests to Otis for the supply of replacement parts (document Emiliana Ascensori);

b) letters sent to their own former clients (hearing ex employees)

c) private standard term agreements of Ceam in its relations with its own dealer technicians;

d) notification made by Grosseta Servizi Ascensori;

For the Kone group:

a) A letter by Kone to a condominium in Aquila;

b) Declaration made to a customer that "Kone elevators only uses original replacement parts;"

c) unanswered requests made to Kone Ascensori for the supply of original replacement parts;

For Schindler:

a) A letter to a maintenance company at the Fumicino Airport;

b) A letter to CO.TR.AN.

c) Declaration that the execution of orders would take place within 60/90 days.

For all of them, finally, the antitrust authority recalled events that took place at the Supercondominio Torri San Benigno di Genova.

10. First and foremost the Panel observes that of all the documentation gathered by the antitrust authority only the letter sent by the Aquila branch of Kone to a condominium contains an explicit refusal to supply or rather a threat not to supply replacement materials with the clear aim of preserving for itself the continuity of the maintenance service:

(... We inform you that, it having come to our attention that you have entrusted the maintenance service to another company, and considering that the installation was

guaranteed for one year in relation to any defective materials, we do not take any responsibility for eventual breakdowns and we reserve the right moreover not to supply replacement parts for the eventual repair of the elevator).

Just one act of refusal coming from a subsidiary of one of the companies is not enough, however, to prove that there is a significant degree of this type of conduct, and to be such it must be repeated and generalized, in other words, such that it proves that there is a conscious intention on the part of the company to this effect, to such an extent that one can, therefore, exclude incidental and subjective reasons.

All other documents relied upon only contain indicative elements, which, moreover, do not lead to any unequivocal findings in that sense or in relation to their content (Otis: c - d; Kone: b;) or because there is not a reasonable certainty that the unanswered request effectively reached the company (Otis a; Kone c; Schindler b), or because the reply occurred within the time limits required by the maintenance company (Schindler: a), or generally speaking (Otis: b;).

Nor are the circumstances of the Torri di San Benigno di Genova case unequivocal in this sense.

First, it is important to recognize, as the appellants emphasized in their defense, the unmistakable fact that the alleged restrictive conduct was perpetrated over many years to the detriment of about one thousand five hundred independent companies (paragraph 47) that looked after the maintenance of over 60% of the 650,000 operative elevator installations (table 2, paragraph 53), whether old (certain parts of the hoist cannot be replaced with compatible parts) or new generation installations (electronic cards that cannot be reproduced), in relation to which only a few indicative elements were gathered, whereas one might have reasonably expected tens and dozens of protests and challenges from companies (either made individually or through their associations) in relation to refusals by the appellant companies to supply original replacement parts.

In fact, there is no reason to suspect the existence of collusive behavior between the dominant companies and the independent maintenance companies.

During the hearings dated June 8, June 10, and July 8, 1999, the category associations (Anacam, Anim CNA, and CSA), despite their agreement as to the difficulty in locating

replacement original parts due to the conduct of the appellants, could not, however, refer to specific verifiable episodes in which there was a refusal to supply.

Nor did the hearing (6/2/1999) of the former Otis technicians reveal any specific and verifiable evidence of refusals to supply over the period concerned for the purposes of the investigation phase.

As regards the events of the "Supercondominio Torri San Benigno" that managed Otis, Kone, and Schindler elevators maintained by the respective manufacturing companies, it is noted that, to its request to contract the maintenance of all the elevators to a single one of those companies, the answers were of the following tenor:

(OTIS (10/13/98): ... in relation to your request, it is our duty to state, as you well know, that the elevators installed in Torri ... have not been constructed by our company and the majority of them have sophisticated software systems to control their maneuvers that can only be deciphered with the aid of the appropriate instruments (each manufacturer has its own) and obviously, dedicated and qualified staff for such maintenance, and this is our only major problem in approaching your initiative.

We would further like to point out that, faced with technologically advanced equipment, another aspect that cannot be underestimated relates to the necessity to be able to obtain original replacement parts insofar as any hypothetical adaptation by any company other than the manufacturer must be excluded a priori.

We feel that your initiative aims at increasing the efficiency of the maintenance apparatus and we therefore feel that it is not ethical to propose ourselves for an undertaking that we in any case would not be in a position to carry out according to the required qualitative standards that we set ourselves on a day-to-day basis in the performance of our activities.

Kone (11/3/98) ... it is our intention only to carry out the service in relation to the installations maintained by us, insofar as they are made by Kone.

This decision is dictated by the fact that, given the specialized characteristics of the elevators, we cannot guarantee the rapid supply of materials with original replacement parts produced at our factories.

Schindler (10/19/98) ... On the basis of an analysis carried out on the installations, it resulted that, given the characteristics thereof, the electronic maneuvers using microprocessors operated by computer and remote control, it is not possible to offer a backup service equivalent to that offered to our customers and therefore one which satisfies your demands ...)

These answers certainly indicated the lack of interest of those companies in undertaking the maintenance of elevators that they have not constructed themselves, for different reasons: lack of trained personnel, delays in locating replacement parts, and reduction of the operative standards, but not the joint intention not to supply original replacement parts to their respective competitors.

The accusation made by Emiliana Ascensori does not appear to have any particular probative value insofar as the failure to reply on the part of Otis to the requests for supplies for the electronic cards for maneuvers, given that there is no proof that Otis received the first request, while in relation to the second request the defendant company rightly emphasized the unreliability due to the lack of coincidence (there is a delay of over two months) between the notice of receipt and the date of the letter.

The same considerations are substantially valid in relation to the requests by Ema to Kone and Co.Tr.An to Schindler.

The event notified by Grosseto Servizi also appears to be equally isolated, and does not provide a basis for concluding that OTIS or Ceam refused to supply replacement parts.

Neither does the fact of writing to ones own clients to inform them that original replacement parts are kept exclusively for elevators manufactured by them necessarily mean that a company refuses to supply replacement parts that it manufactures itself.

Even the Ceam standard contract with its own technical dealers does not necessarily prove that Ceam refused to supply its own replacement parts requested to the interested maintenance companies.

The same conclusion must be drawn from the remaining documents concerning Kone and Schindler.

In addition to the evidence of refusal to supply that the antitrust authority found it could infer from the documents collected, this allegation can be plausibly denied on the basis of alternative facts – self-evident ones at that - that Kone had entrusted to one of its

subsidiaries the task of selling original replacement parts (an activity that was later suspended in that it was not profitable), and that the companies effectively do supply their own original replacement parts to third parties (tables supplied by the antitrust authority).

The lists supplied to the court show that such supplies related both to the appellant companies and third party companies, some of which figure in the list of independent maintenance companies (as is asserted) produced by Otis.

These findings are enough to repudiate, regardless of what has previously been stated, both the probative content of circumstances of Supercondominio (insofar as each of the companies supplied original replacement parts to other companies), the effective relevance of original parts in the maintenance market and hence their marginal importance in relation to the overall sales revenues, as well as the overall conclusion that the appellants refused to supply the said replacement parts to independent firms.

Obviously, the type of replacement parts effectively supplied to third parties can be of relevance, and it cannot be excluded that, whereas the appellants sold common replacement parts, they effectively refused to supply strategic replacement parts in order to retain their market in the maintenance of the elevators they manufacture to the detriment of competitors.

However, if the antitrust authority has difficulty in obtaining certain documentary proof concerning the abuse of a dominant position, and it is obliged to base its decision on proven evidence, when the evidence thus presented reveals a margin of doubt and is not sufficient - either in terms of its abundance or its probative value - to refute the plausible arguments to the contrary advanced by the interested companies, the antitrust authority cannot simply avoid using all the investigative powers that it possesses (hearings with the competitor companies, verifications of the market conditions, etc.) which are necessary to base its own determinations on solid and certain probative evidence.

For the reasons stated above, it must be held that this objective has not been achieved in the case in question, and that the determinations adopted against the appellants finding that is an abuse of a dominant position lack probative value.

11. In conclusion, the joint appeals are granted, as it has been verified that their objections are well-founded, in that there are shortcomings in the investigative procedure,

inconsistency of reasons and lack of grounds, and, accordingly, the appealed decision is annulled concerning the collusion and abuse of a dominant position, and the respective sanctions, which make an examination of any other objections superfluous, and they can therefore be absorbed.

There are justified grounds to compensate the parties for their legal costs.

FOR THESE REASONS

The Regional Administrative Court of Lazio

- Section One -

- Grants the appeals previously joined and annuls the appealed decision

- Costs compensated

Orders that this judgment be executed by the Administrative Authority.

Thus decided in Rome, in the Advisory Chamber, on January 31, 2001.

The Presiding Judge    [Signature]

The Referral Judge    [Signature]

[rubber stamp:]
PUBLISHED BY FILING WITH THE OFFICE OF THE CLERK OF THE COURT
On 21 FEB 2001
  The Section Office of the Clerk of the Court
  [Signature]
                [rubber-stamped seal:]
                The Regional Administrative Court of Lazio, Section 1

[rubberstamp:]
THE REGIONAL ADMINISTRATIVE COURT OF LAZIO, Section 1
Today, 21 FEB 2001, a copy conforming to the present document has
been provided to Autorita Garante della Concorrenza e del Mercato, the
Italian antitrust authority / Office of the National Attorney General
pursuant to Article 67 of Procedure No. 842 of August 17, 1997.
                The Director of the
                Office of the Clerk of the Court
                s/                      [rubber-stamped seal:]
                                        The Regional Administrative Court of Lazio, Section 1