UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re ELEVATOR ANTITRUST                 :     Civil Action No. 04-CV-01178(TPG)
LITIGATION                               :
                                         :     **ELECTRONICALLY FILED**
————————————————————     :
                                         :
This Document Relates To:                :     PLAINTIFFS' OPPOSITION TO
                                         :     DEFENDANTS' MOTION TO DISMISS
    ALL ACTIONS.                         :     THE SECOND CONSOLIDATED
                                         :     AMENDED COMPLAINT
———————————————————— x

Dockets.Justia.com

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTORY STATEMENT ................................................................1

II.     SUMMARY OF ALLEGATIONS ............................................................3

III.    STANDARDS ON MOTIONS TO DISMISS ANTITRUST ALLEGATIONS ...............7

IV.     ARGUMENT ................................................................................8

        A.      The Complaint Adequately States a Section 1 Claim.............................8

        B.      Plaintiffs' Claims for Conspiracy to Monopolize Are Sufficient ...........13

        C.      Plaintiffs' Unilateral Monopolization Allegations Are Sufficient........15

        D.      Subject Matter Jurisdiction Exists over Plaintiff Transhorn's Claims..................21

                1.      Plaintiff Transhorn Satisfies the Antitrust Standing Requirements..........24

V.      CONCLUSION.................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*American Copper & Brass, Inc. v. Donald Boliden AB*,
    No. 04-2771-DV,
    2005 WL 1631034 (W.D. Tenn. July 6, 2005) .........................................................10, 11

*Apex Oil Co. v. DiMauro*,
    822 F.2d 246 (2d Cir. 1987).........................................................................................12

*Associated General Contractors of California, Inc. v.*
    *California State Counsel of Carpenters*,
    459 U.S. 519 (1983).................................................................................................24, 25

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d. Cir. 1979).......................................................................................15

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)...................................................................................................19

*C. A. Weed & Co. v. Lockwood*,
    266 F. 785 (2d Cir. 1920) .......................................................................................1, 17

*CVD, Inc. v. Raytheon Co.*,
    769 F.2d 842 (1st Cir. 1985).......................................................................................20

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986)...................................................................................................24

*Chance v. Armstrong*,
    143 F.3d 698 (2d Cir. 1998)..........................................................................................7

*Conley v. Gibson*,
    355 U.S. 41 (1957).......................................................................................................7

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)...................................................................................................12

*Cool Wind Ventilation Corp. v. Sheet Metal Workers Int'l Ass'n.*,
    139 F. Supp. 2d 319 (E.D.N.Y. 2001) .......................................................................16

*Corsearch, Inc. v. Thomson & Thomson*,
    792 F. Supp. 305 (S.D.N.Y. 1992)..............................................................................20

# TABLE OF AUTHORITIES

**Page**

*Den Norske Stats Oljeselskap AS v. HeereMac v.o.f.*,
  241 F.3d 420 (5th Cir. 2001) ...................................................................................24, 25

*Discon, Inc. v. NYNEX Corp.*,
  93 F.3d 1055 (2d Cir. 1996) ...........................................................................................9

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992) ...............................................................................15, 18, 19, 20

*Eastman Kodak Co. v. S. Photo Materials Co.*,
  273 U.S. 359 (1927) .....................................................................................................21

*F. Hoffmann-La Roche Ltd v. Empagran, S. A.*,
  542 U.S. 155 (2004) .....................................................................................................22

*Fears v. Wilhelmina Model Agency, Inc.*,
  No. 02 Civ. 4911 (HB),
  2004 U.S. Dist. LEXIS 5045 (S.D.N.Y. Mar. 29, 2004) ...........................................5, 12

*Floors-N-Moore, Inc. v. Freight Liquidators*,
  142 F. Supp. 2d 496 (S.D.N.Y. 2001) ..........................................................................11

*GAF Corp. v. Eastman Kodak Co.*,
  519 F. Supp. 1203 (S.D.N.Y. 1981) ...............................................................17, 19, 20

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
  386 F.3d 485 (2d Cir. 2004) .....................................................................................15, 16

*Heart Disease Research Foundation v. General Motors Corp.*,
  463 F.2d 98 (2d Cir. 1972) ...........................................................................................11

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
  425 U.S. 738 (1976) ........................................................................................................8

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
  253 F. Supp. 2d 262 (D. Conn. 2003) ..........................................................................11

*In re NASDAQ Mkt. Makers Antitrust Litig.*,
  894 F. Supp. 703 (S.D.N.Y. 1995) ..............................................................................5, 12

*In re Publication Paper Antitrust Litigation*,
  No. 3:04 MD 1631 (SRU),
  2005 U.S. Dist. LEXIS 19896 (D. Conn. Sept. 6, 2005) ...........................................11, 22

# TABLE OF AUTHORITIES

**Page**

*Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co.*,
  No. 75 Civ. 5828-CSH,
  1977 U.S. Dist. LEXIS 17851 (S.D.N.Y. Jan. 18, 1977) ...........................................22, 23

*Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*,
  990 F. Supp. 119 (E.D.N.Y. 1997) ....................................................................20

*John's Insulation, Inc. v. Siska Construction Co.*,
  774 F. Supp. 156 (S.D.N.Y. 1991).....................................................................11

*Klebanow v. New York Produce Exchange*,
  344 F.2d 294 (2d Cir. 1965).............................................................................14

*Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V.*,
  No. 03 Civ. 10312 (HB)(DF),
  2005 U.S. Dist. LEXIS 19788 (S.D.N.Y. Sept. 8, 2005)...................................23

*Lee v. Bankers Trust Co.*,
  166 F.3d 540 (2d Cir. 1999)..............................................................................7

*Levitch v. CBS*,
  495 F. Supp. 649 (S.D.N.Y. 1980)...............................................................13, 14

*MM Global Servs. v. Dow Chem. Co.*,
  329 F. Supp. 2d 337 (D. Conn. 2004)..........................................................22, 23, 25

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*,
  795 F. Supp. 639 (S.D.N.Y. 1992)....................................................................15

*Moore U.S.A., Inc. v. Standard Register Co.*,
  139 F. Supp. 2d 348 (W.D.N.Y. 2001)..............................................................16

*N.Y. Jets LLC v. Cablevision Sys. Corp.*,
  No. 05 Civ. 2875 (HB),
  2005 U.S. Dist. LEXIS 23763 (S.D.N.Y. Oct. 18, 2005).....................................16, 18, 19

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998)........................................................................................13

*Nagler v. Admiral Corp.*,
  248 F.2d 319 (2d Cir. 1957)............................................................................14

# TABLE OF AUTHORITIES

**Page**

*Northeastern Tel. Co. v. Am. Tel. & Tel. Co.,*
  651 F.2d 76 (2d Cir. 1981)........................................................................17, 18

*Poller v. CBS,*
  368 U.S. 464 (1962).........................................................................................8

*SCM Corp. v. Xerox Corp.,*
  645 F.2d 1195 (2d. Cir. 1981).......................................................................20

*Sweet v. Sheahan,*
  235 F.3d 80 (2d Cir. 2000).............................................................................7

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.,*
  346 U.S. 537 (1954).......................................................................................12

*Todd v. Exxon Corp.,*
  275 F.3d 191 (2d Cir. 2001)...........................................................................7

*Tops Mkts, Inc. v. Quality Mkts., Inc.,*
  142 F.3d 90 (2d Cir. 1998).............................................................................8

*Twombly v. Bell Atlantic Corp.,*
  425 F.3d 99 (2d Cir. 2005).................................................................. *passim*

*United States v. Colgate & Co.,*
  250 U.S. 300 (1919).......................................................................................18

*United States v. Grinnell Corp.,*
  384 U.S. 563 (1966).......................................................................................15

*United States v. Singer Mfg. Co.,*
  374 U.S. 174 (1963).......................................................................................20

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004).......................................................................................20

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,*
  857 F.2d 55 (2d Cir. 1988).............................................................................16

## TABLE OF AUTHORITIES

**Page**

**STATUTES, RULES AND REGULATIONS**

Sherman Act
    15 U.S.C. §§1, *et seq*..................................................................................... *passim*

Federal Rules of Civil Procedure
    Rule 8..................................................................................................3, 14
    Rule 8(a)......................................................................................................7
    Rule 12(b)(6)...............................................................................................7
    Rule 26(f)...................................................................................................21

## I.    INTRODUCTORY STATEMENT

In January 2004, the press reported that European Union ("EU") officials raided the premises of defendants,[1] manufacturers of elevators and providers of elevator service, in four countries. The raid was triggered by complaints that defendants refused to supply potential competitors with spare parts necessary to maintain elevators. The EU accused defendants of colluding to share markets. Ex. 1.[2] Also in January 2004, the European Lift Association (the "Association") confirmed that the EU raided its headquarters and took copies of minutes of its meetings. One source said that defendants, who participated on a number of Association boards and committees, would "use these meetings to talk about fixing prices for lift spare parts. This is where the margins are made." Ex. 2.

In March 2004, the EU again raided defendants' offices in Belgium, Germany and Luxembourg, while investigating a suspected cartel "concerning the sale, installation and maintenance of elevators and escalators." Ex. 3. A spokesman for defendant UTC, whose company, Otis, is the world's largest elevator and escalator company, acknowledged that "there may be some substance" to the investigation. *Id*. Otis further admitted that an internal audit revealed that some of its employees could have violated the law. Ex. 4. Defendant Kone also admitted that an internal investigation revealed evidence of anticompetitive behavior by employees. *Id*.

---

[1]    Defendants are four multi-national conglomerates: (1) United Technologies Corp. ("UTC") and Otis Elevator Co. ("Otis") (collectively the "UTC Defs"); (2) Kone Corp. and Kone Inc. ("Kone") (collectively the "Kone Defs"); (3) Schindler Holding Ltd. and Schindler Elevator Corp. (collectively the "Schindler Defs"); and (4) ThyssenKrupp AG, ThyssenKrupp Elevator Corp. and Thyssen Elevator Capital Corp. (collectively the "Thyssen Defs") and are collectively referred to as "defendants."

[2]    All "Ex.__" references herein are attached to the Declaration of David W. Mitchell in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Consolidated Amended Complaint, filed herewith.

In October 2005, the EU formally charged defendants with running a cartel from 1995 to 2004 in Belgium, The Netherlands, Luxembourg and Germany (with combined populations of nearly 110 million), by sharing information and carving up part of the $37 billion global elevator and escalator market.  *See Id*.

After transfer by the MDL panel of all related cases to this Court, plaintiffs[3] filed their Consolidated Amended Class Action Complaint on November 1, 2004.  Prior to any briefing or a motion hearing, this Court ruled plaintiffs' allegations were not specific enough.  The current Complaint,[4] filed on July 25, 2005, reflects plaintiffs' lengthy investigation which confirmed that the same wrongdoing being investigated by the EU was, in fact, occurring in the United States.  The Complaint alleges that defendants agreed to maintain high prices and divide up the market for service and maintenance of elevators by agreeing not to compete with each other on the service of each other's elevators.  Defendants also agreed to drive out smaller competitor elevator service companies by, *inter alia*, refusing to supply replacement parts and/or making them very difficult to obtain.  In addition, defendants agreed to keep information as to how to service and maintain their elevators secret so that third parties could not provide maintenance service.

In sum, the Complaint alleges the same type of wrongdoing that defendants have admitted occurred in Europe, and against which they are defending themselves in formal EU proceedings.

---

[3]    Representative plaintiffs Transhorn, Ltd. ("Transhorn"), 1775 Housing Associates, Triangle Housing Associates, Rochdale Village, Inc., Birmingham Building Trades Towers, Inc., Riverbay Corp., D.F. Chase, Inc., Towers of Coral Springs Ltd., 181 Maple Avenue Associates, Lenox Road Associates, Olen Commercial Realty Corp., Bay Crest Condominium Ass'n, Joseph M. Bennardi d/b/a Nedmac Associates, Inc., and Joseph M. Bennardi d/b/a Building Supers of Camden, Inc. are collectively referred to herein as "plaintiffs."

[4]    All "Complaint" references herein are to the Second Consolidated Amended Class Action Complaint.

## II.    SUMMARY OF ALLEGATIONS

The Complaint sufficiently pleads antitrust claims against defendants.  It alleges that beginning in 2000, defendants conspired to: (1) fix prices for the sale and service of elevators; (2) allocate markets and customers for elevator sales; (3) rig bid prices for contracts for elevator sales and maintenance and repair services; and (4) prevent anyone but the defendant who manufactured the elevator from having the capability to provide service.  ¶¶41, 52-54.[5]  Plaintiffs have also clearly alleged that individual defendants monopolized the service market for their own elevators, and that plaintiffs have paid defendants supra-competitive prices to service their elevators.

Defendants' Motion[6] mischaracterizes plaintiffs' allegations and disregards the notice pleading requirement of Rule 8 of the Federal Rules of Civil Procedure ("FRCP").[7]  In addition, defendants ignore two significant factors that weigh heavily against their Motion.  First, recent Second Circuit authority, *Twombly v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005), reiterates that antitrust complaints need only satisfy Rule 8's notice pleading standards, and thus demonstrates that plaintiffs sufficiently plead their antitrust claims.  Second, plaintiffs have alleged direct evidence in the form of the UTC and Kone Defs' admissions resulting from an ongoing EU investigation that they engaged in price-fixing, bid-rigging and other anti-competitive conduct.  ¶¶67-69.  Defendants do not attempt to explain away these admissions.

Defendants' Motion is peppered with inaccuracies.  For example, defendants claim that the Complaint's only "non-generic" allegations are plaintiffs' references to EU investigations into

---

[5]    All "¶__" or "¶¶__" references herein are to the Complaint, unless otherwise indicated.

[6]    All "Motion" or "Defs' Mem." references herein are to Defendants' Motion to Dismiss the Second Consolidated Amended Complaint, filed October 21, 2005, unless otherwise indicated.

[7]    All "Rule __" or "Rules __" references herein are to the FRCP, unless otherwise indicated.

defendants' anti-competitive conduct.  Defendants' contention that "[t]he Court has already found these allegations to be insufficient" (Defs' Mem. at 4) is false and misleading.  At the January 13, 2005 status hearing, plaintiffs stated that the previous complaint was based *in part* on a European investigation, to which the Court replied "That doesn't mean much.  What do you say happened?" Ex. 5 at 6:19-20.  Defendants' heavy reliance on this January 13, 2005 comment reflects defendants' strategy to relate back to plaintiffs' superseded pleadings to evade the allegations in this Complaint. The Complaint alleges that the UTC Defs admitted that employees at their Otis unit may have acted illegally and that Otis's own internal investigation revealed that its employees violated Otis policies and applicable competition law.  ¶67.  Plaintiffs also allege that UTC admitted that Otis employees may have participated in secret price-fixing and bid-rigging meetings.  ¶69.  As to the Kone Defs, plaintiffs allege that Kone Corp. admitted on March 17, 2004 that it had engaged in anti-competitive activities at its subsidiaries throughout Europe. ¶68.  These allegations support plaintiffs' claims that defendants controlled the global market for sales and service of elevators and that prices charged in Europe affected prices charged in the United States.  ¶61.

To deflect the Court's attention, defendants refer to an Italian appellate authority, which made factual findings of anti-competitive conduct against three of the defendants.[8]  However, defendants failed to inform the Court that in October 2005, the EU issued a formal Statement of Objections to each defendant regarding anti-competitive conduct in Germany, Belgium, The Netherlands and Luxembourg.  The charges, which allege price-fixing in a market of approximately 110 million people, can hardly be classified as "localized" conduct.  *See* Defs' Mem. at 4.

---

[8]     At the time plaintiffs' filed this Complaint, they were unaware of (and were unable to access) information contrary to the Italian Antitrust Authority's original findings of defendants' anticompetitive conduct.

Predictably, defendants' attempt to isolate some of plaintiffs' allegations — those involving trade associations,[9] oligopolistic conduct and standard list pricing — and address each standing alone, as if any was the totality of the Complaint. Defs' Mem. at 5. It is a time honored defense tactic to narrowly compartmentalize allegations pled as a pattern of practice to avoid analyzing the Complaint as a whole. *See In re NASDAQ Mkt. Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995); *see also Fears v. Wilhelmina Model Agency, Inc*., No. 02 Civ. 4911 (HB), 2004 U.S. Dist. LEXIS 5045, at *13 (S.D.N.Y. Mar. 29, 2004). Defendants have failed to address the aggregate of these and the Complaint's other powerful allegations. For example, plaintiffs' allegations of direct conspiratorial conduct are conspicuously absent from defendants' analysis. Defendants cannot attack those allegations, and this Circuit's pleading standard for antitrust actions recently enunciated in *Twombly* requires far less than plaintiffs have alleged here.

The Complaint alleges that defendants engaged in a conspiracy to suppress and eliminate competition in the sale and service of elevators by colluding to raise, fix and maintain at artificially high levels the prices at which defendants sold elevators and elevator service. ¶41. These allegations are sufficient to state a claim. In addition to defendants' own admissions of anti-competitive conduct, plaintiffs allege numerous facts buttressing their core conspiracy allegations, including:

- the structure of the elevators industry is conducive to price-fixing (*see*, *e.g.*, ¶¶45-47);

- defendants met with one another regularly by virtue of each defendant's membership in various industry trade associations, and during such meetings agreed to charge prices for elevators and elevator services at certain levels (¶¶43(b), 47-48);

---

[9]     UTC acknowledged that Otis employees participated in secret ***meetings*** to fix prices and rig bids. ¶69.

- defendants allocated customers in the elevator service market by agreeing not to take each other's business and requiring proprietary diagnostic tools that defendants would not provide to non-defendant competitors (¶¶43(a), 50, 59);

- European antitrust authorities have been investigating defendants' conduct in the elevator industry for several years (*see*, *e.g.*, ¶¶62-66); and

- defendants collusively required customers purchasing new elevators from a defendant to also enter into a long-term maintenance and repair contract with that same defendant (¶43(f)).

Plaintiffs also allege that defendants engaged in collective and exclusionary conduct that has increased consolidation and reduced competition in the elevator service market. ¶¶43(g), 52-54. The repair and servicing of elevators manufactured by defendants requires diagnostic testing using defendants' proprietary service tools. ¶52. These service tools are not available on the open market and are generally not even sold to customers who purchase defendants' elevators. ¶53. When coupled with defendants' refusal to release schematic diagrams for elevators they sell, it is extremely difficult for ***any*** company other than the manufacturing defendant to maintain or repair the elevator. *Id*. As a result, independent service companies cannot compete with defendants, increasing consolidation and reducing competition. ¶54.

Finally, plaintiffs allege violations of §2, including (1) a conspiracy to monopolize by all defendants (¶¶82-86); and (2) monopoly and attempted monopoly of the maintenance markets as to each defendant. ¶¶87-133. Plaintiffs allege that as a result of defendants' manipulation of the service market (1) prices in the particular defendant's maintenance market were higher than they would have been in a competitive market; (2) the supply of services in that maintenance market were lower than they would have been in a competitive market; and (3) competition has been diminished by unlawful means. ¶¶87-92, 98-103, 110-115, 122-127.

## III.    STANDARDS ON MOTIONS TO DISMISS ANTITRUST ALLEGATIONS

In *Twombly*, the Second Circuit, citing a long line of Supreme Court and Second Circuit cases, reversed the dismissal of an antitrust class action complaint and reiterated that antitrust complaints need only satisfy FRCP 8(a)'s notice pleading standards.  The court emphasized:

> We have consistently rejected the argument – put forward by successive generations of lawyers representing clients defending against civil antitrust claims – that antitrust complaints merit a more rigorous pleading standard, whether because of their typical complexity and sometimes amorphous nature, or because of the related extraordinary burdens that litigation beyond the pleading stage may place on defendants and the courts.

425 F.3d at 108; *see also Todd v. Exxon Corp*., 275 F.3d 191, 198 (2d Cir. 2001) ("No heightened pleading requirements apply in antitrust cases.").  The *Twombly* court also held that a conspiracy claim based on parallel conduct need not allege the "plus factors" to survive a Rule 12(b)(6) motion. *Twombly*, 425 F.3d at 114.  The complaint need only allege facts such that a conspiracy is among the "realm of plausible possibilities."  *Id*. at 11.  Defendants utterly fail to distinguish *Twombly* from this case.

A court shall not dismiss a complaint pursuant to Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 46-47 (1957).  When considering a motion to dismiss for failure to state a claim, courts must assume as true all allegations contained in the complaint. *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).  Factual allegations in the complaint must be construed in a light most favorable to the plaintiff.  *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999).  The standards for judging a §1 claim in the context of a Rule 12(b)(6) motion are less demanding than they are for summary judgment: "At the pleading stage, we are concerned only with whether the defendants have 'fair notice' of the claim, and the conspiracy that is alleged as part of the claim, against them – that is,

enough to 'enable [the defendants] to[, *inter alia,*] answer and prepare for trial,' – not with whether the conspiracy can be established at trial." *Twombly*, 425 F.3d at 116.[10]

Dismissals of antitrust complaints prior to giving plaintiffs the opportunity for discovery should be rare because the relevant proof is typically in the hands of defendants. *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746-47 (1976) ("dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly"); *Poller v. CBS*, 368 U.S. 464, 473 (1962) ("summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles [and] the proof is largely in the hands of the alleged conspirators"); *see also Twombly*, 425 F.3d at 109 (recognizing the argument that "antitrust cases are less suitable candidates for dismissal at the pleading stage than some other kinds of litigation because evidence of the claimed illegality is likely to be in the exclusive control of the defendants"). Defendants have not produced a single page of discovery. Nor can defendants claim that expense in defending a lawsuit justifies greater scrutiny of the Complaint. *Twombly*, 425 F.3d at 116-17 (remedy to expense in defending antitrust case is ***not*** raising the pleading standards).

## IV.    ARGUMENT

### A.    The Complaint Adequately States a Section 1 Claim

Plaintiffs more than adequately plead an illegal conspiracy under §1 and provide defendants with "fair notice" of the claim asserted. Under §1, a plaintiff must allege: "(1) the defendants were involved in a contract, combination, or conspiracy that (2) operated unreasonably to restrain interstate trade, together with the factual predicate upon which those assertions are made." *Twombly*, 425 F.3d at 113 (citing *Tops Mkts, Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95-96 (2d Cir.

---

[10]    Emphasis is added and citations are omitted here and throughout, unless otherwise indicated.

1998)); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1059 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998). As emphasized in *Twombly*, "neither the [FRCP] nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege." 425 F.3d at 116. "While [Supreme Court and Second Circuit] decisions do not offer a bright-line rule for identifying the factual allegations required to state an antitrust claim, they suggest that the burden is relatively modest." *Id.* at 112.

The Complaint alleges (1) the existence of a "conspiracy to suppress and eliminate competition in the sale and service of elevators by fixing the price of elevators and replacement parts and services, rigging bids for contracts for elevator sales, allocating markets and customers for elevator sales and maintenance services, and rigging bids for contracts for elevator maintenance and repair services" (¶41); (2) the participants in the conspiracy (¶¶20-28); (3) that defendants sold elevators and elevator maintenance services in the United States and Europe (¶¶20-28); (4) that plaintiffs and other class members purchased elevators and elevator maintenance services from defendants (¶¶5, 32); (5) that plaintiffs and other class members paid higher prices for elevators and elevator maintenance purchased from defendants than they would have paid absent the conspiracy (¶79 ); and (6) that the conspiracy affected interstate commerce (¶40).

In addition, the Complaint alleges that defendants implemented and conducted their conspiracy by, among other things:

(a)    Participating in meetings and conversations to discuss the prices of elevators and elevator service contracts sold in the United States and Europe and to discuss the applicable customers or markets for such elevators and elevator service contracts (¶78(a));

(b)    Agreeing, during those meetings and conversations, to charge prices at certain levels for elevators and elevator service contracts sold in the United States and Europe (¶78(b));

(c)   Agreeing in advance on bid prices and bid winners for elevator sales contracts and for contracts for the provision of elevator maintenance and repair services (¶78(c));

(d)   Discussing and exchanging price quotations to certain customers so as not to undercut the price of the competitor (¶78(d));

(e)   Allocating customers and markets for the sale and maintenance of elevators consistent with the agreements reached (¶78(e));

(f)   Collusively requiring customers purchasing new elevators from any defendant to also enter into a long-term maintenance and repair contract with that same defendant (¶78(f)); and

(g)   Agreeing to take, and taking, collective actions to drive independent repair companies out of the marketplace or otherwise eliminate or decrease the availability of competitive options for elevator maintenance services, including preventing or restricting the access of independent repair companies and other competitors to proprietary replacement parts, repair equipment and software (¶78(g)).

The Complaint also contains a detailed description of the elevator industry, including the market conditions that have facilitated the conspiracy, the bidding process for elevator service contracts and the steps defendants have taken collectively to foreclose competition through restrictive agreements, use of proprietary replacement parts and repair software, coordinating bidding for maintenance contracts and agreements allocating customers and markets. ¶¶45-60. These allegations exceed what is required under the FRCP's liberal notice pleading requirements.

Defendants' argument for dismissing plaintiffs' §1 claim consists almost entirely of repeated mischaracterizations of the Complaint as "barebones" and "formbook" while ignoring what plaintiffs have actually alleged. As discussed above, the Complaint lays out a detailed factual predicate for plaintiffs' §1 claim that is anything but "bare bones."

In a recent decision, the court in *American Copper & Brass, Inc. v. Donald Boliden AB*, No. 04-2771-DV, 2005 WL 1631034, at *4 (W.D. Tenn. July 6, 2005), rejected similar contentions by the defendants that the complaint was "vague and conclusory," and found that the plaintiffs'

allegations of a global price-fixing conspiracy, based in part on the results of an investigation and fines imposed by the EU, were "sufficient to state the conspiracy element for purposes of Section 1 of the Sherman Act." *Am. Copper & Brass*, 2005 WL 1631034, at *4. Similarly, the court in *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 278 (D. Conn. 2003), rejected a defendant's argument that the complaint contained only a "bare bones statement of conspiracy," concluding that "[i]t is not necessary to plead either the evidence or the facts upon which the antitrust conspiracy are based . . . . Plaintiff identified the co-conspirators and described the nature and effect of the alleged conspiracy. This is sufficient." In *In re Publication Paper Antitrust Litigation*, No. 3:04 MD 1631 (SRU), 2005 U.S. Dist. LEXIS 19896 (D. Conn. Sept. 6, 2005), the court denied a motion to dismiss the complaint containing general price-fixing conspiracy allegations, rejecting defendants' argument that the plaintiffs made conclusory allegations coupled with allegations of lawful parallel pricing. *Id.* at *4-*5.

Further, defendants' contention that more factual specificity is required is inconsistent with the FRCP and the case law.[11] Defendants also selectively attack individual allegations of the Complaint and argue that each, taken separately, does not establish the existence of a conspiracy. For example, defendants point to plaintiffs' trade association allegations and assert that membership in a trade association is not in itself proof of a conspiracy. Defs' Mem. at 5. However, courts have acknowledged participation in trade association meetings provides opportunities to conspire and

---

[11]    The cases cited by defendants, where the complaints at issue truly were bare bones, do not support dismissal of the Complaint here. In *Heart Disease Research Foundation v. General Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972), for example, the complaint alleged "no facts" in support of an antitrust conspiracy. Much of defendants' other cited authority, including *Floors-N-Moore, Inc. v. Freight Liquidators*, 142 F. Supp. 2d 496, 501 (S.D.N.Y. 2001) ("Plaintiffs do not provide a single fact in support of this [conspiracy].") and *John's Insulation, Inc. v. Siska Construction Co.*, 774 F. Supp. 156, 163 (S.D.N.Y. 1991) (rejecting antitrust complaint as a "mere allegation of a legal conclusion," with no allegations of anticompetitive effects or antitrust injury), contained similar defects and do not apply here.

exchange competitive information.  *See*, *e.g.*, *Twombly*, 425 F.3d at 118; *Fears*, 2004 U.S. Dist. LEXIS 5045, at *46.  Similarly, defendants argue that plaintiffs' allegation that the market for sales and service of elevators is an oligopoly is insufficient on its own to support a conspiracy claim. Defs' Mem. at 5.  These arguments would have the Court analyze the sufficiency of the allegations by ignoring what was actually pled.  As courts have held, the sufficiency of an antitrust complaint is determined by looking at the complaint as a whole.  *See*, *e.g.*, *NASDAQ*, 894 F. Supp. at 712 (analyzing allegations of §1 complaint "as a whole" on motion to dismiss); s*ee also Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each").

Defendants also argue that "allegations of parallel conduct standing alone do not state an antitrust violation."  Defs' Mem. at 6.  Plaintiffs allege more than just parallel conduct.  Moreover, neither of the cases cited by defendants on this point involved a motion to dismiss.  *See Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537 (1954) (denial of a directed verdict) and *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987) (an appeal of summary judgment).  This distinction is important in light of *Twombly's* holding that while proof beyond parallel conduct may be necessary to establish a §1 claim at trial or on summary judgment, plaintiffs are not required to plead such "plus factors" to survive a motion to dismiss.  425 F.3d at 113-16.

Here, plaintiffs have alleged sufficient details to enable defendants to determine the nature of the claims asserted against them.  In setting forth defendants' scheme to illegally dominate the market for both elevators and elevator services, the Complaint provides defendants with "fair notice" of plaintiffs' conspiracy claim "to 'enable [them] to answer and prepare for trial.'"  *Twombly*, 425 F.3d at 119.

### B.    Plaintiffs' Claims for Conspiracy to Monopolize Are Sufficient

Plaintiffs have alleged facts sufficient to support their conspiracy to monopolize claim.  ¶¶46-70.  The Complaint alleges that defendants utilized trade organizations to coordinate practices in the market for maintenance and replacement parts.  ¶48.  It also alleges that defendants used startlingly similar terms in their agreements and contracts that facilitated each defendant's ability to engage in parallel conduct and coordinate market behavior.  ¶49.  Plaintiffs also allege that defendants agreed not to license or otherwise provide their technology and parts in order to drive independent service providers out of the market.  ¶¶52-54.  As a result, defendants were able to monopolize the market for maintenance and replacement parts and charge supra-competitive prices.  ¶55.  These allegations do not, merely "disguise faulty antitrust claims" or repackage unilateral conduct as a §2 conspiracy.  Defs' Mem. at 8.

Defendants' authority does not support their position.[12]  Defendants cite no cases which considered allegations comparable to those in the Complaint.  For instance, in *Levitch v. CBS*, 495 F. Supp. 649 (S.D.N.Y. 1980), the plaintiffs did "nothing more than strategically insert the conclusory allegation of conspiracy in an effort to state a §1 violation." 495 F. Supp. at 673.  Unlike *Levitch*, plaintiffs' allegations go far beyond the strategic insertion of the word "conspiracy."  Plaintiffs allege that defendants belonged to associations and held meetings at which plans to exclude competition, fix prices and allocate markets were discussed and adopted.  Plaintiffs also

---

[12]    The Supreme Court opinion cited by defendants, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998), is inapposite.  In that case, the court ruled that alleged agreements did not harm the competitive process, stating that §2 claims could not survive if the §1 claims did not survive as well.  *NYNEX*, 525 U.S. at 139-40.  Here, defendants have argued that *NYNEX* dictates dismissal of this claim because courts must reject "attempts by plaintiffs to disguise faulty antitrust claims as 'conspiracies to monopolize.'" *See* Defs' Mem. at 8.  If anything, *NYNEX* indicates that a §2 conspiracy claim can be based upon the same conduct which otherwise forms the basis of a §2 or §1 claim, as long as that underlying claim can show harm to the competitive process.  *Cf. NYNEX Corp.*, 525 U.S. at 139-40.

allege defendants collectively issued standard price lists and contracts and that defendants colluded to not provide technology or parts to independent service providers. Further, plaintiffs allege defendants designed their elevator systems so that potential competitors could not service them. Moreover, the elevator maintenance contracts themselves are key evidence of conspiracy. ¶51. Elevator owners reluctantly accept harsh penalties for early termination of these contracts, as well as automatic renewal clauses, because defendants, who control the elevator sales and maintenance industry, engaged in a coordinated practice. No defendant sold open systems that permitted competition over their maintenance. The parallelism in contractual terms and exclusionary design is probative of an industry-wide conspiracy and distinguishes the Complaint's allegations from those made in *Levitch*.

As with the §1 claims, defendants urge the Court to both (1) apply a heightened pleading standard and (2) make a merits determination. The Second Circuit has repeatedly rejected this approach. There is no heightened pleading standard for conspiracy to monopolize claims. *Twombly*, 425 F.3d at 108; *see also Nagler v. Admiral Corp.*, 248 F.2d 319, 322-23 (2d Cir. 1957); *Klebanow v. New York Produce Exchange*, 344 F.2d 294, 299 (2d Cir. 1965). Citing *Klebanow*, defendants contend that "under the law of this Circuit a plaintiff ***must*** assert facts that support the existence of a claimed conspiracy." Defs' Mem. at 9 (emphasis in original). Defendants' citation to *Klebanow* conveniently omits the preceding sentence, which stated that *Nagler* repudiated the notion that there is a special pleading standard in antitrust cases. *Klebanow*, 344 F.2d at 299. While *Klebanow* does state that a plaintiff cannot merely "plead nothing but the statutory words," the court also held that the normal "notice pleading" standard of Rule 8 applied. *Id.* Indeed, *Nagler* suggests that a pleading of facts indicating parallel conduct by the defendants can suffice to state a plausible claim of conspiracy. *Nagler*, 248 F.2d at 325.

The Complaint clearly alleges that defendants have engaged in concerted anti-competitive conduct. The Complaint also alleges, among other things, the similarity of contractual language and pricing, the various European investigations into the same alleged conduct by these same defendants and the extensive opportunities to conspire through trade associations. ¶¶48, 62-66. These allegations are sufficient to put defendants on notice of the claims against them.

## C.    Plaintiffs' Unilateral Monopolization Allegations Are Sufficient

Counts III-X of the Complaint, which allege monopolization and attempted monopolization by individual defendants, articulate well-recognized theories of relief.[13] In response, defendants recite general maxims on antitrust instead of applying the relevant case law on monopolization to the allegations of the Complaint. *See* Defs' Mem. at 11.

The elements of monopolization under §2 are: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) ("plaintiffs must prove that defendants possessed monopoly power, and willfully acquired or maintained that power in the relevant market"); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d. Cir. 1979) (Section 2 prohibits "pernicious market structure in which the concentration of power saps the salubrious influence of competition."); *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 645 (S.D.N.Y. 1992). The elements of a claim for attempted monopolization are (1) anti-

---

[13]    A separate sub-class exists for those who purchased repair or maintenance service from each of the following: the Otis Defs, the Kone Defs, the Schindler Defs and the Thyssen Defs. ¶32(b)-(e). The Supreme Court has recognized brand-specific aftermarkets. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481-82 (1992).

competitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a dangerous probability that the attempt will succeed. *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 73-74 (2d Cir. 1988). Plaintiffs have met the pleading standard for monopolization and attempted monopolization.

The threshold issue to be considered in an antitrust claim is the determination of a relevant market. *N.Y. Jets LLC v. Cablevision Sys. Corp.*, No. 05 Civ. 2875 (HB), 2005 U.S. Dist. LEXIS 23763, at *15 (S.D.N.Y. Oct. 18, 2005). The court in *N.Y. Jets* explained:

> As defined by the Second Circuit, a "relevant market" consists of "all products reasonably interchangeable by consumers for the same purposes." Such a determination involves a "deeply fact-intensive" inquiry and "courts are hesitant to grant motions to dismiss for failure to plead the relevant product market." Therefore, to survive a motion to dismiss, a plaintiff need only allege a "plausible" market.

*Id.* at *15-*16.

Defendants do not challenge plaintiffs' definition of the relevant markets for the monopolization and attempted monopolization claims as the separate market for maintenance services for the elevators manufactured by the individual defendants. Nor do defendants dispute that the Complaint properly alleges that defendants have acquired monopoly power in their respective relevant service markets. *See* ¶¶ 88, 99, 111, 123. Market power may be inferred from a firm's large percentage share of the relevant market. *Geneva Pharms.*, 386 F.3d at 495. The existence of monopoly power presents a question of fact that cannot be resolved on a motion to dismiss. *See Cool Wind Ventilation Corp. v. Sheet Metal Workers Int'l Ass'n.*, 139 F. Supp. 2d 319, 328 (E.D.N.Y. 2001); *Moore U.S.A., Inc. v. Standard Register Co.*, 139 F. Supp. 2d 348, 357 (W.D.N.Y. 2001) (to survive dismissal, a §2 claim need only allege that defendant possessed a certain level of market share of power).

Unable to challenge the sufficiency of plaintiffs' allegations of relevant market and monopoly power, defendants argue that plaintiffs have not alleged that defendants willfully acquired

monopoly power or committed anti-competitive conduct. Defendants again mischaracterize the Complaint, erecting and toppling straw men unrelated to plaintiffs' allegations. For example, defendants argue that they have no obligation to share their trade secrets, including proprietary information about the design of their elevators, with their competitors. Defendants, however, incorrectly conflate trade secret protection with the anticompetitive monopolistic conduct actually alleged in the Complaint. The Complaint describes in detail the exclusionary conduct through which defendants acquired and maintained monopoly power. ¶¶52-54.

Defendants intentionally designed their elevators so that no one else could service them and refused to sell competitors the parts, tools, software or diagrams necessary to service these elevators. Defendants also make parts, manuals, schematic diagrams and software for the elevators they sell difficult or impossible for their competitors to obtain. ¶50. For example, they obstruct other companies' attempts to purchase parts from original equipment manufacturers ("OEMs"). ¶¶50, 57. Defendants' conduct evinces a monopolistic purpose because "[i]t is unnecessary to design and manufacture elevators with proprietary features that prevent other companies from maintaining or repairing them." ¶55.

"[A]n absolute monopolist's design conduct is subject to antitrust scrutiny by a jury." *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1228 (S.D.N.Y. 1981); *Northeastern Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 94 (2d Cir. 1981). Defendants' argument that "there is no obligation . . . to design products for the benefit of competitors," (Defs' Mem. at 11), is beside the point because plaintiffs do not assert such a claim. Plaintiffs' real claims are supported by well established authority that a company may not design products in order to establish or maintain monopoly power. Section 2 "require[s] the monopolist's design to be 'reasonable.'" *GAF*, 519 F. Supp. at 1228. Reasonableness is a factual question for a jury. *See, e.g., C. A. Weed & Co. v.*

*Lockwood*, 266 F. 785, 790 (2d Cir. 1920) ("[i]n everyday practice in the civil courts, questions of fact are determined by what a jury considers [ ] reasonable").  In *Northeastern Telephone*, the plaintiff contended "that AT&T intentionally designed the protective couplers to impede competition in the terminal equipment market." 651 F.2d at 94.  The court acknowledged facts that substantiated "Northeastern's claim that appellants intentionally designed the protective coupler in an unreasonable manner" and ordered a new trial on this issue.  *Id.* at 94-95.

In their Complaint, plaintiffs make several detailed allegations of anticompetitive design.  For example:

- Defendants have "[designed] their elevators to require proprietary diagnostic and service tools that Defendants will not provide to other elevator service companies." ¶50;

- The proprietary elevator control systems sold by defendants contain embedded computer systems and software.  In order to repair or service elevators manufactured by defendants it is necessary to perform diagnostic testing using proprietary service tools available only to defendants.  ¶52;

- This design practice has intensified, requiring ever more "specialized electronic service tools."  ¶53; and

- As a result, independent service organizations ("ISOs") have to "reverse engineer the necessary software and service tools" to do any work.  ¶54.

The Complaint also alleges that defendants' design strategy is not reasonable because it has "no objective or pro-competitive justification."  ¶58.

Defendants also argue that the monopolization claims must be dismissed because "firms have no general duty to deal with their competitors."  Defs' Mem. at 12 (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  "However, the right to 'refuse to deal' is not unrestrained."  *N.Y. Jets*, 2005 U.S. Dist. LEXIS 23763, at *25.  A firm may refuse to deal with competitors "only if there are legitimate competitive reasons for the refusal."  *Eastman Kodak*, 504 U.S. at 483 n.32.  It

may not refuse when the purpose of the refusal is to maintain a monopoly. *N.Y. Jets*, 2005 U.S. Dist. LEXIS 23763, at *28.

Here, plaintiffs allege that there was no valid business justification for the conduct through which defendants exclude competitors from their service market, while they ignore the maxim that antitrust laws are enacted to protect competition, not competitors. *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). Where, as here, a complaint alleges that defendants' refusal to deal was predicated on an impermissible purpose and lacked any rational business justification, a motion to dismiss must be denied. *N.Y. Jets*, 2005 U.S. Dist. LEXIS 23763, at *27-*28.

Defendants incorrectly assert that they have an absolute right to exclude competitors from the service markets for the elevators they manufacture by intentionally designing their elevators so that, as a practical matter, no other company can effectively compete in servicing those elevators for many years after the elevators are manufactured.[14] The Supreme Court, however, found similar conduct unlawful in *Eastman Kodak*, 504 U.S. 451. In *Eastman Kodak*, ISOs were competing with Kodak to repair and service Kodak equipment. *Id*. at 457. Kodak "implemented a policy of selling replacement parts for micrographic and copying machines only to buyers of Kodak equipment who use Kodak service or repair their own machines. As part of the same policy, Kodak sought to limit ISO access to other sources of Kodak parts," including OEMs. *Id*. at 458. Through this policy, Kodak drove many ISOs out of business and forced some customers "to switch to Kodak service even though they preferred ISO service." *Id*. The Supreme Court found that "Kodak took

---

[14]    Defendants claim they "have no duty to identify a business justification for their alleged refusal to sell." Defs' Mem. at 13. Defendants attempt two justifications in a footnote: (1) "to protect the quality of [their] products" and (2) "to prevent free-riding on [their] investment." *Id*. at 13, n.12. The Supreme Court has rejected both of these justifications. *See Eastman Kodak*, 504 U.S. at 483-85.

exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market." *Id.* at 483.

Ignoring *Eastman Kodak*, defendants rely on *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), which did not address the situation at issue here or in *Eastman Kodak*. The *Trinko* decision was based on the existence of a pervasive regulatory scheme involving network access under the Telecommunications Act of 1996. *See Trinko*, 540 U.S. at 401, 409-10. As the Supreme Court recognized, "[t]he regulatory framework that exists in this case demonstrates how, in certain circumstances, 'regulation significantly diminishes the likelihood of major antitrust harm.'" *Id*. at 412. Here, there is no regulatory structure in place to deter anti-competitive conduct in the elevator industry.[15]

Plaintiffs also allege that defendants' willful acquisition of monopoly power was facilitated by defendants' abuse of intellectual property, including patents, copyrights and trade secrets ("'secret' maintenance information") involving the design and repair of elevators. ¶54. *See United States v. Singer Mfg. Co.*, 374 U.S. 174, 196-97 (1963) (intellectual property rights do not give an exemption from Sherman Act); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1205 (2d. Cir. 1981). The law prohibits both the acquisition of intellectual property and the refusal to license it when this promotes a monopoly. Specifically, plaintiffs allege that defendants enjoyed a dominant position in the elevator service industry throughout the Class Period. ¶¶46-47. Defendants monopolized service on their own brand of elevators during the lucrative first years of operation by bundling maintenance agreements with

---

[15]    Defendants' other citations are also inapposite. Defendants rely on cases where a court's ruling depended on a developed factual record. *See Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305, 322 (S.D.N.Y. 1992) (post-trial ruling); *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 140 (E.D.N.Y. 1997) (party sought temporary restraining order). Defs' Mem. at 11.

elevator sales. ¶51. Defendants obtained "numerous patents and/or copyrights" on their proprietary control systems and service tools. ¶54. Because defendants also dominate the manufacture and sale of elevators (¶¶46-47), their intellectual property rights in controllers and service tools cover a very substantial share of the service market.[16] The Court has no duty to assume a legal motive under these circumstances. *See Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 375 (1927).

Accordingly, plaintiffs' have properly alleged all the required elements for claims of monopolization and attempted monopolization.

### D.    Subject Matter Jurisdiction Exists over Plaintiff Transhorn's Claims

While defendants devote an entire section of their Motion to issues of standing and subject matter jurisdiction (Defs' Mem. at 16-20), all of defendants' cited authority addresses only foreign plaintiffs. Thus, defendants' arguments about either standing or subject matter jurisdiction only apply to Transhorn, the lone foreign plaintiff.

Defendants argue that Transhorn's claims should be dismissed for lack of subject matter jurisdiction. Before the Court rules on this issue, defendants should be required to provide discovery regarding subject matter jurisdiction. Despite plaintiffs' best efforts, to date defendants have (1) failed to produce a single document to plaintiffs; (2) ignored the draft discovery plaintiffs provided ***one year ago***; and (3) rejected plaintiffs' request to confer pursuant to Rule 26(f). Without a factual record, the Court cannot determine whether subject matter jurisdiction exists. Accordingly, at this stage the Court must accept plaintiffs' allegations regarding subject matter jurisdiction as true

---

[16]    Plaintiffs have also alleged that "[E]ach defendant is aware that the other defendants are reverse engineering their respective proprietary systems, software and service tools . . . . Defendants do not, however, generally sue one another for patent and copyright violations in connection with such reverse engineering, but instead selectively enforce these intellectual property rights only against independent elevator service companies." ¶54.

and deny defendants' Motion.  *See Publ'n Paper*, 2005 U.S. Dist. LEXIS 19896, at *21-*23.  In the alternative, the Court should defer ruling on subject matter jurisdiction until after the close of discovery because evidence relevant to subject matter jurisdiction is also relevant to resolving the merits of plaintiffs' claims.  *See id*.

The Supreme Court interpreted the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") in *F. Hoffmann-La Roche Ltd v. Empagran, S. A.*, 542 U.S. 155, 172-74 (2004), stating that jurisdiction exists when a plaintiff has alleged that the defendant's conduct affected United States commerce and that the effect gave rise to the plaintiff's injury.  While the Court held that the Sherman Act did not apply when a foreign plaintiff cannot show a causal link between the domestic effect and their alleged injury, it did not close the door on foreign plaintiffs bringing a claim in the United States.  *Id*. at 163-72.  The Court carved out certain foreign plaintiffs and distinguished *Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co.*, No. 75 Civ. 5828-CSH, 1977 U.S. Dist. LEXIS 17851 (S.D.N.Y. Jan. 18, 1977) from the scope of its holding.  *See Empagran*, 542 U.S. at 158-59.

In *Industria Siciliana*, the district court found that it had subject matter jurisdiction to decide a Sherman Act claim based on a foreign injury suffered by a foreign company.  When discussing *Industria Siciliana*, the *Empagran* court expressly noted that the foreign injury in *Industria Siciliana* was "'inextricably bound up with . . . domestic restraints of trade,' and that the plaintiff 'was injured . . . by reason of an alleged restraint of our domestic trade.'"  *Empagran*, 542 U.S. at 171-72.  Few courts have since addressed the issue of whether subject matter jurisdiction exists when the foreign injury is dependent on or bound up with the domestic effect of anti-competitive conduct.  *See, e.g.*, *MM Global Servs. v. Dow Chem. Co.*, 329 F. Supp. 2d 337 (D. Conn. 2004).  In *MM Global*, the plaintiffs alleged that the defendants compelled them to engage in a price maintenance

- 22 -

conspiracy with respect to the resale of products in India and refused to accept orders if the prospective resale prices to end-users in India were below certain levels. *MM Global*, 329 F. Supp. at 340. By doing so, the defendants allegedly sought to ensure that prices charged by the plaintiffs to end-users in India would not erode the prices to the end-users in the United States. *Id*. The district court found that the plaintiffs sufficiently alleged that the defendants' conduct had an effect on competition in and from the United States and that the foreign plaintiffs were injured as a result of that effect. *Id*.

Transhorn's claims, like those of the foreign plaintiff in *MM Global*, do not arise solely from independent foreign effects, and the Court need not expand the FTAIA in order to find that defendants' alleged conduct affected domestic commerce. Plaintiffs allege that "prices charged in the European market affect the prices in the United States and vice versa." ¶61. Plaintiffs' allegations link the adverse foreign and domestic effects of the price-fixing conspiracy and thus meet the requirements of the FTAIA. The Complaint falls within *Industria Siciliana* because it alleges the effect of defendants' conduct on foreign trade and commerce in the United States: "the conduct of defendants and their co-conspirators has taken place in and affected the interstate and foreign trade and commerce of the United States. The conduct of defendants and their co-conspirators has directly and substantially restrained such trade and commerce." ¶40. Plaintiffs also allege that the elevator sales and service markets are global. ¶70.[17]

---

[17]    Unlike *Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V.*, No. 03 Civ. 10312 (HB)(DF), 2005 U.S. Dist. LEXIS 19788 (S.D.N.Y. Sept. 8, 2005), which involved indirect allegations that were insufficient to support a finding of subject matter jurisdiction, plaintiffs sufficiently allege a causal relationship between prices in the United States and prices in Europe.

1.    **Plaintiff Transhorn Satisfies the Antitrust Standing Requirements**

There are no special standing requirements for plaintiffs under the FTAIA. Plaintiff Transhorn meets the requirements of antitrust standing because the harm suffered, payment of supra-competitive prices, is "of the type the antitrust laws were designed to prevent." *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986).

Defendants rely on *Associated General Contractors of California, Inc. v. California State Counsel of Carpenters*, 459 U.S. 519 (1983), and *Den Norske Stats Oljeselskap AS v. HeereMac v.o.f.*, 241 F.3d 420 (5th Cir. 2001), to argue that direct causation is required to show that standing exists. In *Associated General Contractors*, the Supreme Court found that the complaint contained only "somewhat vaguely defined links" between the plaintiffs' injury and the alleged restraint in the construction market, and held that the alleged harm was too attenuated to set forth an antitrust claim. 459 U.S. at 540-46. In *Den Norske*, the foreign plaintiff did not allege that conduct in the United States gave rise to its claim, instead claiming that the defendants' conspiracy compelled it to charge higher prices for the crude oil it exported to the United States. The plaintiff's injury in the North Sea was a "necessary prerequisite" to the injury suffered in the United States, and the court found that the plaintiff failed to allege that its injury arose from the conspiracy's proscribed effects on United States commerce. 241 F.3d at 422-425, 427 n.24.

Unlike *Associated General Contractors* and *Den Norske*, plaintiffs allege that defendants' anti-competitive conduct adversely affected United States commerce and that their injury was inextricably intertwined with the injury defendants inflicted on the United States market. ¶¶40-41, 61, 70. Specifically, plaintiffs allege that "[d]efendants have viewed and treated the market for sales and service of elevators as a global market, such that the prices charged in the European market affect the prices in the United States and vice versa." ¶61. Defendants could not have maintained

their international price fixing cartel – and therefore Transhorn would not have suffered its foreign injury – without the adverse effect on United States commerce.

Plaintiffs' allegations aver a far more direct causal relationship between the domestic effect and plaintiffs' injury than *Associated General Contractors*, *Den Norske* and other cases where the plaintiffs allegedly suffered foreign injury independent of domestic harm. *See MM Global Servs.*, 329 F. Supp. 2d at 342 (subject matter jurisdiction exists when foreign plaintiffs injured abroad assert a causal connection between their injuries and the United States effects of defendants' conduct). Accordingly, the Court should find that plaintiffs have alleged a sufficient link between the domestic effect caused by defendants' anti-competitive conduct and Transhorn's injury to establish subject matter jurisdiction over Transhorn's claims.

## V.    CONCLUSION

Based on the foregoing, defendants' Motion should be denied. Alternatively, if the Court deems the Complaint deficient in any respect, plaintiffs respectfully request leave to amend.

DATED:  December 20, 2005

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ, LLP
FRED TAYLOR ISQUITH


          /s/Fred Taylor Isquith
          FRED TAYLOR ISQUITH

270 Madison Avenue
New York, NY  10016
Telephone:  212/545-4600
212/545-4653 (fax)

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC
MARY JANE FAIT
55 West Monroe Street, Suite 1111
Chicago, IL 60603
Telephone: 312/984-0000
312/984-0001(fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON
CHRISTOPHER M. BURKE
DAVID W. MITCHELL
WILLIAM J. DOYLE II
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Co-Lead Counsel for plaintiffs

BRANSTETTER, KILGORE, STRANCH
  & JENNINGS
JAMES G. STRANCH, III
C. DEWEY BRANSTETTER
J. GERALD STRANCH
227 Second Avenue North, Fourth Floor
Nashville, TN 37201-1631
Telephone:  615/254-8801
615/225-5419 (fax)

BERDING & WEIL LLP
DANIEL L. ROTTINGHAUS
JEFFREY CEREGHINO
STEVEN R. WEINMANN
3240 Stone Valley Road West
Alamo, CA 94507
Telephone:  925/838-2090
925/820-5592 (fax)

WOLF POPPER LLP
LESTER L. LEVY, SR.
845 Third Avenue
New York, NY  10022
Telephone:  212/759-4600
212/486-2093 (fax)

MAGER & GOLDSTEIN LLP
JAYNE A. GOLDSTEIN
One Liberty Place, 21st Floor
Philadelphia, PA 19103
Telephone:  215/640-3280
215/640-3281 (fax)

WHATLEY DRAKE, LLC
JOE R. WHATLEY, JR.
RICHARD P. ROUCO
GLENN M. CONNOR
2323 2nd Avenue North
P.O. Box 10647
Birmingham, AL  35203-0647
Telephone:  205/328-9576
205/328-9669 (fax)

FARUQI & FARUQI, LLP
NADEEM FARUQI
ANTHONY VOZZOLO
320 East 39th Street
New York, NY 10016
Telephone:  212/983-9330
212/983-9331 (fax)

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
1010 Second Avenue, Suite 2360
San Diego, CA 92101
Telephone:  619/525-3990
619/525-3991 (fax)

S:\CasesSD\Elevators\BRF00026827.doc

- 27 -

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List and all parties on the attached service list.

/s/Fred Taylor Isquith
FRED TAYLOR ISQUITH

WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ, LLP
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
212/545-4653 (fax)
E-mail: isquith@whafh.com

# Mailing Information for a Case 1:04-cv-01178-TPG

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Leah Brannon**
  lbrannon@cgsh.com
- **Deborah M. Buell**
  maofiling@cgsh.com
- **Mary Jane Fait**
  fait@whafh.com
- **Nadeem Faruqi**
  nfaruqi@faruqilaw.com
- **Frederick Taylor Isquith, Sr**
  isquith@whafh.com
- **Beth Ann Keller**
  bkeller@faruqilaw.com
- **Mark Leddy**
  mleddy@cgsh.com
- **Terry Alan Myers**
  tmyers@gibbonslaw.com ckaplan@gibbonslaw.com
- **Alexander H. Schmidt**
  schmidt@whafh.com
- **Curtis Victor Trinko**
  ctrinko@trinko.com
- **Antonio Vozzolo**
  avozzolo@faruqilaw.com
- **Gerald Zingone**
  gzingone@thelenreid.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
435 Pacific, Inc.

Bay Crest Condominium Association
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1700
San Diego
, CA 92101
```

**Nadeem Faruqui**
Faruqui & Frauqi
320 East 39th Street
New York, NY 10017

**Michael E. Jaffe**
Thelen, Reid & Priest, L.L.P.
701 Eight Street, N.W.
Washington, DC 20001

**Mountain Bay Construction, Inc.**

**Stuart M. Saft**
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016

ELEVATORS
Service List - 12/20/2005  (04-0073)
Page 1 of  4

**Counsel For Defendant(s)**

Mark  Leddy
Patricia M. McDermott
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, N.W.
9th Floor
Washington, DC  20006
    202/974-1500
    202/974-1999 (Fax)

Deborah M. Buell
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY  10006
    212/225-2000
    212/225-3999 (Fax)

Anthony A. Dean
Terry  Myers
Thomas R. Valen
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
One Pennsylvania Plaza, 37th Floor
New York, NY  10019
    212/649-4700
    212/333-5980 (Fax)

Stewart M. Gisser
Associate General Counsel
Schindler Elevator Corporation (Legal Department)
20 Whippany Road
Morristown, NJ  07960-1935
    973/397-6580
    973/397-6574 (Fax)

Kenneth M. Kramer
Jerome S. Fortinsky
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY  10022-4676
    212/848-4000
    212/848-7179 (Fax)

Michael E. Jaffee
Thelen, Reid & Priest, LLP
701 Eighth Street, N.W.
Washington, DC  20001
    202/508-4000
    202/508-4321 (Fax)

Veronica Ellen Rendon
Thelen, Reid & Priest, LLP
875 Third Avenue, 10th Floor
New York, NY  10022
    212/603-6748
    212/603-2001 (Fax)

Michael  Connolly
Thelen, Reid & Priest, LLP
200 Campus Drive, Suite 210
Florham Park, NJ  07932
    973/660-4400
    973/660-4401 (Fax)

ELEVATORS
Service List - 12/20/2005   (04-0073)
Page 2 of  4

Attn: Legal Department
Thyssenkrupp Elevator AG
August-Thyssen-Strassel, 40221
Dusseldorf, Germany,

Robert S. Berezin
Edward  Soto
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, 12th Floor
Miami, FL  33131
   305/577-3215
   305/577-3290 (Fax)

A. Paul Victor
Scott A. Martin
Christopher V. Roberts
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119
   212/310-8000
   212/310-8007 (Fax)

**Counsel For Plaintiff(s)**

Ann D. White
Ann D. White Law Offices, P.C.
165 Township Line Road, Suite 2400
Jenkintown, PA  19046
   215/481-0274
   215/481-0271 (Fax)

Daniel L. Rottinghaus
Jeffrey B. Cereghino
Steven R. Weinmann
Berding & Weil LLP
3240 Stone Valley Road West
Alamo, CA  94507
   925/838-2090
   925/820-5592 (Fax)

James G. Stranch, III
C. Dewey Branstetter
J. Gerard Stranch, IV
Branstetter, Kilgore, Stranch & Jennings
227 Second Avenue, North, 4th Floor
Nashville, TN  37201-1631
   615/254-8801
   615/255-5419 (Fax)

Nadeem  Faruqi
Antonio  Vozzolo
Beth A. Keller
Faruqi & Faruqi, LLP
320 East 39th Street, 3rd Floor
New York, NY  10016
   212/983-9330
   212/983-9331 (Fax)

ELEVATORS

Service List - 12/20/2005   (04-0073)

Page 3 of  4

Curtis V. Trinko
Law Offices of Curtis V. Trinko LLP
16 West 46th Street, Seventh Floor
New York, NY  10036
  212/490-9550
  212/986-0158 (Fax)

Mark  Solomon
Christopher M. Burke
David W. Mitchell
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423 (Fax)

Jayne Arnold Goldstein
Mager & Goldstein LLP
One Liberty Place
1650 Market Street, 21st Floor
Philadelphia, PA  19103
  215/640-3280
  215/640-3281 (Fax)

Brian J. Robbins
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101
  619/525-3990
  619/525-3991 (Fax)

Krishna  Narine
Kendall S. Zylstra
Stephen E. Connolly
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA  19087
  610/667-7706
  610/667-7056 (Fax)

Edmund W. Searby III
Scott + Scott, LLC
33 River Street
Chagrin Falls, OH  44022
  440/247-8200
  440/247-8275 (Fax)

Joe R. Whatley, Jr.
Glenn M. Connor
Richard  Rouco
Whatley Drake, LLC
2323 Second Ave., North
Birmingham, AL  35203
  205/328-9576
  205/328-9669 (Fax)

Mary Jane Fait
Wolf Haldenstein Adler Freeman & Herz, LLC
55 West Monroe Street, Suite 1111
Chicago, IL  60603
  312/984-0000
  312/984-0001 (Fax)

ELEVATORS

Service List - 12/20/2005   (04-0073)

Page 4 of  4

Fred T. Isquith
Stuart M. Saft
Wolf Haldenstein Adler Freeman & Herz, LLP
270 Madison Avenue
New York, NY  10016
     212/545-4600
     212/545-4653 (Fax)