UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re ELEVATOR ANTITRUST       :     Civil Action No. 04-CV-01178(TPG)
LITIGATION                     :
                               :
                               :
                               :
This Document Relates To:      :     NOTICE OF APPEAL
                               :
    ALL ACTIONS.               :
                               :
———————————————————— x

Dockets.Justia.com

NOTICE IS HEREBY GIVEN that Transhorn, Ltd.; 1775 Housing Associates; Triangle Housing Associates, L.P.; Rochdale Village, Inc.; Birmingham Building Trades Towers, Inc.; Riverbay Corporation; D.F. Chase, Inc.; Towers of Coral Springs Ltd.; 181 Maple Avenue Associates; Lenox Road Associates; Olen Commercial Realty Corp.; Bay Crest Condominium Association; Joseph M. Bennardi d/b/a Nedmac Associates, Inc.; and Joseph M. Bennardi d/b/a Building Supers of Camden, Inc., plaintiffs in the above-named case on behalf of themselves and all others similarly situated, hereby appeal to the United States Court of Appeals for the Second Circuit from the final judgment that was entered on June 6, 2006, and all prior orders (including but not limited to the May 26, 2006, order dismissing the case with prejudice that was entered on May 30, 2006).

DATED: June 29, 2006

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON
BONNY E. SWEENEY
CHRISTOPHER M. BURKE
WILLIAM J. DOYLE II


_Christopher W. Burke/TFH_

CHRISTOPHER M. BURKE

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ, LLP
FRED TAYLOR ISQUITH
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
212/545-4653 (fax)

Liaison Counsel

S:\CasesSD\Elevators\NOT 00032338.doc

# ATTACHMENT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

IN RE ELEVATOR ANTITRUST LITIGATION

------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/6/66
```

04 **CIVIL** 1178 (TPG)
**JUDGMENT**

The Otis, Kone, Schindler, and Thyssen defendants having moved to dismiss the Second Amended Complaint for failure to state a claim, or, in the alternative, to dismiss the claims of the foreign plaintiff pursuant to Fed. R. Civ. P. 12(b)(1), and the matter having come before the Honorable Thomas P. Griesa, United States District Judge, and the Court, on May 26, 2006, having rendered its Opinion (93174) granting the motion to dismiss the complaint, dismissing the action without leave to re-plead, and denying the alternative motion to dismiss the claims of the foreign plaintiff, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion (93174) dated May 26, 2006, the motion to dismiss the complaint is granted and the action is dismissed without leave to re-plead; the alternative motion to dismiss the claims of the foreign plaintiff is denied.

**Dated:** New York, New York
June 6, 2006

J. MICHAEL McMAHON
_____
Clerk of Court

BY: _____
Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

# ATTACHMENT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
                                   :

IN RE ELEVATOR ANTITRUST        :       04 CV 1178 (TPG)
LITIGATION                          :

                                   :        **OPINION**

                                   :

                                   :

                                   :
------------------------------------------x

        Plaintiffs, purchasers of elevators and elevator maintenance
services from defendants, the largest sellers of such products and
services in the United States, bring this putative class action on behalf of
all purchasers of elevators and elevator maintenance services from
defendants from February 13, 2000 through the present.

        There are fourteen plaintiffs purporting to represent the class.
Each of these plaintiffs is described as the owner or manager of a
building or building complex, equipped with elevators presumably
purchased from one or more of defendant companies.  The number of
elevators involved with an individual plaintiff ranges from 2 to over 100.

        Defendants are United Technologies Corporation, Otis Elevator
Company, Kone Corporation, Kone Inc., Schindler Holding, Ltd.,
Schindler Elevator Corporation, ThyssenKrupp AG, Thyssen Elevator
Capital Corp., and ThyssenKrupp Elevator Corp.  United Technologies

- 1 -

Corporation is the parent of Otis. These four groups of defendants will be referred to as Otis, Kone, Schindler, and Thyssen, or the four defendants.

The Complaint contains ten counts. Count I, asserted against all defendants, alleges that defendants have engaged in a horizontal price fixing conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Count I has two basic parts. The first is a claim of price fixing in connection with the sale of elevators. The second is a claim of price fixing as to the maintenance of elevators.

Count II, also asserted against all defendants, alleges that defendants have engaged in a conspiracy to monopolize the sale of elevators and the maintenance of elevators in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

Counts III through X contain four pairs of counts – the first of each pair claiming monopolization of an elevator maintenance market in violation of the Sherman Act § 2, and the second claiming attempted monopolization of elevator maintenance in violation of § 2. Counts III and IV are against Otis, Counts V and VI against Kone, Counts VII and VIII against Schindler, and Counts IX and X against Thyssen. The theory of these counts is that, as to each defendant, there was a distinct market, within the meaning of the antitrust laws, and that the particular defendant monopolized or attempted to monopolize that market.

Defendants have moved to dismiss the Second Amended Complaint (the "Complaint") for failure to state a claim, or, in the alternative, to dismiss the claims of the foreign plaintiff pursuant to Fed. R. Civ. P. 12(b)(1).

The court finds it unnecessary to address defendants' alternative motion under Rule 12(b)(1) because it is dismissing the case for failure to state a claim. The court concludes that Counts I and II must be dismissed because plaintiffs have failed to allege any specific cause of action for violation of Sherman Act § 1 or § 2 as to the plaintiffs or any of them. Also, plaintiffs have failed to allege any factual basis for their claim of conspiracy. Counts III through X must be dismissed because plaintiffs have failed to allege any specific cause of action on the part of any of the plaintiffs.

<u>The Complaint</u>

The Complaint begins by alleging that the elevator industry is characterized by economic conditions conducive to anticompetitive behavior. In particular, the complaint asserts that the elevator industry is an oligopoly, dominated by a small number of manufacturers, with the four defendants controlling 75% of the market for elevator sales and maintenance. The Complaint further states that the industry is "closely knit," and that defendants belong to many of the same trade groups and associations, the frequent meetings of which provide numerous opportunities for defendants to reach collusive agreements.

- 3 -

According to the Complaint, collusion is made even more feasible and effective by the elevator industry's standardized practices. As an example, the Complaint asserts, without providing any specifics, that defendants issue standard price lists and contracts for maintenance and repair of elevators, which include similar language and terms.

Further allegations of the Complaint will be summarized with respect to the specific claims.

Conspiracy to Engage In Horizontal Price Fixing

Count I of the Complaint, alleging horizontal price fixing, is against all defendants and relates to both the sale of elevators and the maintenance of elevators. Count I is asserted on behalf of the entire Class of purchasers of elevators and elevator maintenance services in the United States and Europe. This is in contrast to the smaller sub-classes involved in subsequent counts of the Complaint.

In connection with the price fixing claims, there is a section of the Complaint headed "Allegations of Wrongdoing," contained in paragraphs 41-44. The feature of this section is a lengthy list contained in paragraph 43. This is a list of basically every type of conspiratorial activity that one could imagine, including agreeing at "meetings and conversations, to charge prices at certain levels," agreeing on "bid prices and bid winners," allocating markets and customers, etc. These allegations of wrongdoing are made against all defendants without any differentiation, and they are made with respect to both the sale of

elevators and the maintenance of elevators. The list is in entirely general terms without any specification of any particular activities by any particular defendant. It is said that all of these activities occurred beginning at least as early as 2000 and that they continue to the present. The section entitled "Allegations of Wrongdoing" appears in the lengthy introductory part of the Complaint.

Following this introduction, there is the actual pleading of Count I, charging horizontal price fixing. It re-alleges the earlier portions of the Complaint. However, in recognition of the need, under Sherman Act § 1, to plead an illegal contract, combination, or conspiracy, Count I repeats in paragraph 78 the same list of alleged conspiratorial activities contained in paragraph 43. Paragraph 79 then asserts that as a result of the conspiracy, defendants have restrained competition and "injured plaintiffs and each Class member" in that "each has paid a higher price for elevators or elevator service and repair than it would have paid absent the concerted unlawful activity."

The problem with this pleading is that the list of types of conspiratorial wrongdoing in paragraphs 43 and 78 is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever. Also, the claims in paragraph 78 are stated without any specific allegations relating to any particular plaintiff or Class member or any particular defendant.

As to the fourteen listed plaintiffs, there is no allegation in the Complaint about any of them except the listing of their names. There is no attempt to assert even the barest statement of facts about a particular plaintiff experiencing some wrongdoing resulting in injury to that plaintiff.

With respect to the claim regarding the fixing of elevator sales prices, there is no allegation about what elevators a specific plaintiff purchased from any defendant or defendants. There is no description of any of the matters which would be relevant to a pleading in this case - i.e., whether there was or was not competition by the defendants with each other in soliciting an elevator sales contract or in submitting bids for an elevator sales contract; whether there was competition by elevator companies other than the defendants for a particular elevator sales contract; and what is the actual claim of being overcharged for elevators and the basis for that claim.

With respect to the claim of price fixing for elevator maintenance, again there is no specific allegation about a particular plaintiff with respect to a specific defendant or specific defendants. As will be described, there are allegations in the introductory portion of the Complaint about how defendants introduced intricate technology into their elevators and otherwise made it difficult for anyone but the manufacturing company to perform maintenance on that company's elevators. However, there is no allegation with respect to any specific

plaintiff about particular elevators and the technology in those elevators or about any desire or attempt on the part of that plaintiff to obtain maintenance services other than that offered by the manufacturer and being prevented from doing so.  Furthermore, there is no claim by a specific plaintiff of being overcharged for maintenance services, and no showing of the basis for such a claim.

As to the issue of conspiratorial activity, again, the court does not expect plaintiff to come up with details of secret conversations. But if nothing in the way of specific transactions or patterns of transactions can be alleged indicating possible conspiratorial collusion or agreement to fix prices for the sale and maintenance of elevators, then the complaint is entirely lacking in any basis for claiming an illegal agreement or conspiracy.

Conspiracy to Monopolize

The Count II claim of conspiracy to monopolize is alleged on behalf of Sub-Class A, consisting of persons who purchased elevators or elevator maintenance services in the United States.

What has been said in the previous section about the alleged price fixing conspiracy basically applies to the claim of conspiracy to monopolize the sale and maintenance of elevators.  Here too, there is the catch-all list of types of conspiratorial activity.  Paragraph 43 is again copied in paragraph 85.  Again, no specific transaction is alleged.  Nor

are there any specific allegations asserted in the Complaint indicating actual wrongdoing taking any concrete form.

Here too, the court does not expect the pleading of secret conspiratorial conversations. But, again there is nothing alleged in the way of specific monopolistic activity by specific defendants from which a conspiracy can even be inferred.

Other Allegations Regarding Maintenance

What has been said in the two previous sections of this opinion must be supplemented as to the issues about elevator maintenance by a description of certain allegations in the Complaint on the subject of maintenance (pars. 51-57). Although these allegations are an attempt to put forth some details about alleged wrongdoing in regard to maintenance, ultimately, as will be seen, they do not provide any specific allegation of antitrust injury to particular plaintiffs or specific wrongdoing by particular defendants.

It is fair to say that the main focus of the Complaint is the maintenance of elevators. It is alleged that maintenance and repair comprise as much as 60-70% of defendants' business. The introductory portion of the Complaint contains a set of allegations about wrongdoing in connection with maintenance services, which wrongdoing has been allegedly designed to make it difficult for anyone to compete with the manufacturer in providing such service.

The problem with these allegations is that they are almost exclusively descriptions of what can be fairly called "generic" kinds of conduct. With one exception, there is no specific allegation of the technology used by a particular company, or the type of service or the quality of service provided by a particular company. There is nothing to indicate that, as to all the subjects covered in the complaint in generic terms, there were not differences from defendant to defendant and that there was not competition among defendants.

The complaint asserts three main forms of such misconduct. First, in paragraph 51, the Complaint alleges that a "key part" of defendants' conspiracy to control the market for elevator maintenance is their use of long-term maintenance contracts. According to the complaint, defendants' maintenance contracts include oppressive terms, such as stiff penalties for early termination by the customer and "evergreen" clauses that provide for automatic renewal unless the customer takes action to discontinue the contract

Second, the Complaint alleges that defendants deliberately design their elevators with complex technology, including embedded systems and software, so that complicated proprietary diagnostic and service tools are necessary for maintenance and repair work, and that this was done specifically to make it more difficult for any other company to service or maintain defendants' elevators.

The complaint further asserts that the recent introduction of
Remote Elevator Monitoring ("REM") as a feature on some of defendants'
elevators has made it even more difficult for other companies to compete
for maintenance contracts for defendants' elevators.  For example, the
REM installed by Otis on many of the new elevators it sells automatically
transmits fault codes to the Otis office allowing Otis to diagnose the
problem, and send a technician if necessary.  According to the
Complaint, the REM is removed by Otis if the customer enters into a
maintenance contract with any other company, to dissuade the customer
from inviting bids on maintenance contracts.  The complaint asserts that
defendants' growing use of REMs further ties customers to using the
defendant from whom they purchase elevators to perform the
maintenance on those elevators.

The complaint alleges that the only way an independent elevator
maintenance company can repair the proprietary elevator systems
designed and manufactured by defendants is to "reverse engineer" the
necessary software and service tools, something which is usually
prohibitively expensive and time consuming for smaller independent
elevator service companies.

According to the Complaint, although each defendant is aware that
the other defendants are, in fact, performing such reverse-engineering on
one another's proprietary systems, which are protected by numerous
patents and copyrights, they do not generally sue one another for patent

- 10 -

and copyright violations in connection with such reverse engineering, but instead selectively enforce these intellectual property rights only against independent elevator service companies.

Third, according to the Complaint, defendants deliberately withheld the "secret maintenance information" and proprietary tools discussed above, in the form of parts, manuals, schematic diagrams and software, from smaller elevator service companies, effectively precluding those companies from competing for maintenance and repair contracts, and forcing them out of business.

In addition, the complaint asserts that defendants make it difficult for other companies to obtain original equipment manufacturer ("OEM") parts needed to repair or service the elevators sold by defendants. The complaint states that, to the extent such parts are made available to competitors, the parts are sold at inflated prices, and shipments sometimes intentionally delayed, in order to frustrate the ability of other companies to compete.

In paragraphs 50 and 58, there are conclusory allegations that defendants conspire by "agreeing to and designing their elevators" with the features just described in this opinion (par. 50), and that they have "collectively introduced" the measures to restrict competition in the elevator maintenance market (par. 58). But there is really nothing in the description of the practices to support these allegations.

What is described are activities that each manufacturer would reasonably be expected to do on its own. Indeed, the idea that defendants reverse engineer each other's technology implies that they are, in fact, competing with each other.

The Complaint contains a specific allegation about Otis, which should be noted. In addition to its subsidiary Otis, defendant United Technologies Corporation ("UTC") also owns North American Elevator Services ("NAES"). NAES was established to operate a number of elevator companies that were not under the Otis name. According to the Complaint, the relationship between Otis, UTC and the NAES companies is not disclosed to prospective customers, who are instead led to believe that they are independent companies that compete with one another. However, the Complaint asserts that when a customer solicits elevator maintenance bids from both Otis and one or more of the NAES elevator service companies, Otis management often confers with the management of the solicited NAES company and determines which company would submit a bid. UTC thus uses its ownership and control of Otis and the smaller elevator service companies owned through NAES to allocate market share and to prevent Otis from having to lower its prices.

Although the Complaint asserts that other defendants have created similar arrangements by acquiring smaller independent elevator maintenance companies that continue to operate in their own name although they are actually owned by one of the defendants, the

Complaint does not contain any specific facts as to any such arrangement by any of the other defendants.

Unilateral Monopolization Claims

As described earlier, Counts III - X allege that each defendant has monopolized or attempted to monopolize the maintenance market for servicing its own elevators. It is alleged that there are sub-classes consisting of all the customers of each defendant – Sub-Classes B, C, D, and E.

The allegations against each of the four defendants are identical. They are in standard hornbook terms regarding what monopolization and attempted monopolization consist of, and the kinds of injury following from such wrongdoings.

Again, there is absolutely no description of any specific transactions, any specific contracts, any specific practices engaged in by a defendant, or any specific injury suffered by any plaintiff.

Allegations of Defendants' Conduct in Europe

The Complaint also contains allegations related to proceedings and investigations in certain European countries regarding illegal anticompetitive conduct alleged to have been committed by defendants in those countries. The Complaint asserts that these allegations support the claim that defendants violated antitrust laws in the United States.

As an initial matter, it is important to point out that there have been no findings by any regulatory or judicial body in Europe of any law violation by any of defendants.

The Complaint does allege certain findings made by the Italian Antitrust Authority (the "IAA") upon an investigation of defendants' European subsidiaries' business practices. However, as defendants have pointed out and plaintiffs now concede, in 2001, an Italian court reversed the IAA's findings for lack of factual support and lack of reasoning. Nevertheless, because the Complaint relies heavily upon the IAA's investigation, the allegations concerning that investigation are summarized below.

According to the Complaint, in late 1998, the IAA instituted an investigation into collusive bidding and price-fixing in the Italian elevator sale and maintenance markets. Based upon documents that were seized during this investigation, the IAA determined that the members of Italy's national association for elevator maintenance, which include Otis SpA, Kone Italian SpA and Schindler SpA (the Italian subsidiaries of defendants UTC, Kone Corporation and Schindler Holding) had adopted price lists with the intention of fixing prices for elevator maintenance services.

In another investigation, this one initiated in the spring of 1999, the IAA concluded that Otis SpA, Kone Italian SpA, and Schindler SpA violated Italy's antitrust laws by their regular, and coordinated practices

of (1) refusing to provide elevator use and maintenance manuals to customers, (2) refusing to sell to independent elevator service companies spare parts necessary to maintain elevators they manufactured, and (3) imposing long-term contracts that included opportunistic renewal clauses and substantial penalties on elevator customers. The IAA concluded that the identical and simultaneous nature of this conduct by Otis SpA , Kone Italian SpA, and Schindler SpA was the result of a conspiracy by those companies to keep others from competing with them to provide maintenance service for elevators they had manufactured.

In May 2000, the IAA issued a collective fine of ITL 18 billion (EUR 9.3 million) to Kone SpA and thirteen other members of the Italian Elevator Association for alleged violations of Italian Antitrust law. However, as noted above, an Italian court subsequently reversed the IAA's findings for lack of factual support and lack of reasoning.

In January 2004, as part of an investigation into possible antitrust violations by defendants' European subsidiaries, the European Commission raided the offices of each of those subsidiaries. Following those raids, the European Commission issued the following statement:

> The commission has good reason to believe that the manufacturers [including defendants Kone Corporation, Schindler Holding and ThyssenKrupp AG] may have shared between themselves the tenders for sale & installation of elevators & escalators and may have colluded to restrict competition with regard to after-sales services.

At oral argument, counsel for defendants conceded that Otis has admitted that some of its employees in certain local Markets in Europe have violated the law, but asserted that such violations were confined to four European countries.

With respect to these admissions, the Complaint asserts that, on March 17, 2004, the Wall Street Journal reported that "UTC said some employees at its Otis unit's offices in Europe may have acted illegally . . ." and that "its own internal investigation had given it reason to believe that some Otis employees in a small number of locations may have engaged in activities at a local level in violation of Otis and UTC policies and applicable competition law."

The Complaint further alleges that, the following day, March 18, 2004, World Markets Analysis reported that Kone Corporation had admitted on March 17, 2004 that it had engaged in anti-competitive activities at its subsidiaries in Germany, Belgium and Luxembourg by fixing prices.

The Complaint asserts that the Italian and European Union proceedings are relevant to plaintiffs' claims because, they allege, defendants' pricing for sales and service of elevators in the United States is closely intertwined with pricing in Europe. As evidence of this interconnectedness, the Complaint asserts that (1) all defendants sell and service elevators in both the United States and Europe; (2) elevator systems sold in the United States by defendants are manufactured in

- 16 -

Europe and imported to the United States; and (3) invoicing to customers in the United States and Europe is handled through the same inter-company accounting system. Moreover, the Complaint concludes, defendants have "viewed and treated the market for sales and service of elevators as a global market, such that the prices charged in the European market affect the prices in the United States and vice versa."

Discussion

Count I: Horizontal Price Fixing

Section 1 of the Sherman Act proscribes "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To properly plead a violation of Section 1, a plaintiff must allege that (1) the defendants were involved in a contract, combination, or conspiracy that (2) operated unreasonably to restrain interstate trade, together with the factual predicate upon which those assertions are made. See Twombly v. Bell Atl. Corp., 425 F.3d 99, 112-113 (2d Cir. 2005); Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95-96 (2d Cir. 1998).

The Complaint has a plethora of conclusory allegations about forms of conspiratorial conduct and the other elements which would constitute a Section I violation. As stated earlier, the court does not expect plaintiffs to plead what happened at secret meetings. But something in the way of a factual predicate for alleging a price fixing

conspiracy must be pleaded. The pleading requirements in a case about elevators must be viewed in the context of what is obvious about that industry. Elevators are not a mass-produced commodity. They are mechanisms which, even according to the Complaint, have become more and more complicated over the years. There is surely a substantial degree of individuality in the needs of building owners for their elevators, and a particular elevator contract would necessarily be preceded by negotiation or some other procedure to arrive at specifications for the design and mechanics. Elevator maintenance has also become more complicated in recent times, and an elevator manufacturer would be expected to offer a maintenance contract along with the sale, and such contract could well have a complexity of detail.

The point is that a complaint alleging antitrust violation in elevator sales and maintenance is truly vacuous unless it contains allegations about specific plaintiffs, specific transactions, and specific wrongdoing. It is wholly insufficient to simply allege that there were, during the relevant period, a large number of elevator purchasers, that there were four leading manufacturers, that there are various kinds of anticompetitive conduct which the four defendants might have committed against some unspecified purchasers, and that the defendants did all these various possible things by conspiring and agreeing to do so. The inevitable fact is that there were individual elevator purchasers who engaged in highly individualized transactions.

Without a single mention of such a transaction, the Complaint cannot be said to be sufficient.

It is of interest that, at the argument of the motion, the court asked plaintiffs' attorney if she could describe any specific claims of wrongdoing whatever. She replied that she could not do so. (Minutes of May 10, 2006, pp. 38-42).

In asserting that the present Complaint sufficiently alleges a conspiracy to violate the antitrust laws, plaintiffs rely heavily upon Twombly v. Bell Atl. Corp., 425 F.3d 99 (2d Cir. 2005), and thus a full discussion of this recent Second Circuit case is in order.

In Twombly, the court considered the pleading requirements and, more precisely, the nature of the factual allegations, necessary to state an antitrust claim. Twombly arose in the context of the Telecommunications Act of 1996, Pub L. No. 104-104, 110 Stat. 56 (codified at scattered sections of Titles 15 and 47 of the United States Code) (the "Telecommunications Act"), which was designed to promote competition in the market for local telephone service. The Telecommunications Act required the defendants, the so-called "Baby-Bells" or Incumbent Local Exchange Carriers ("ILECs"), to "open their government-sanctioned regional monopolies over local telephone service to competition from so-called 'Competitive Local Exchange Carriers' ('CLECs')." Twombly, 425 F.3d at 102.

Under the Telecommunications Act, the ILECs were required to allow the CLECs to connect their own telephone networks to those of the ILECs, by providing the CLECs with access to the ILECs' network elements for "just, reasonable, and nondiscriminatory rates," and by allowing the CLECs to purchase the ILECs' telecommunications services at wholesale rates for resale to their own subscribers. See 47 U.S.C. § 251(c).

In the same way that the Telecommunications Act opened up local telephone service markets to competition from the CLECs, it also allowed the ILECs themselves to compete with other ILECs for local telephone service customers in territories traditionally served by those other ILECs.

The complaint in Twombly alleged that the defendants had conspired to resist the mandate of the Telecommunications Act, and to unlawfully restrain trade, by agreeing not to compete with other ILECs to provide local telephone service in the newly opened-up territory traditionally served by the other ILECs. The complaint did not contain any facts directly showing that defendants had entered into such an agreement. Rather, the complaint alleged parallel conduct on the part of the ILECs which would be "anomalous" in the absence of an agreement not to compete. Id. at 102-3.

In particular, the complaint alleged that the defendants' respective service territories are not contiguous, and that some defendants serve pockets of territory that are entirely surrounded by the territories of their

- 20 -

supposed competitors. For example, the complaint alleged that SBC serves most of the State of Connecticut, even though Verizon serves the surrounding northeastern states, and that Verizon serves many small patches of territory in various western and midwestern states that are otherwise primarily served by SBC. The complaint asserted that, although such geographical anomalies should, for example, provide Verizon with a "substantial competitive advantage" in competing with SBC for business in Connecticut, and should likewise make it advantageous for SBC to compete against Verizon in the west and midwest, none of those companies had sought to compete with the others in any meaningful manner. Id. at 103.

The complaint alleged that this was anomalous parallel conduct, which would be unlikely in the absence of an agreement not to compete. Id.

The complaint also cited a statement by the Chief Executive Officer of another defendant, Qwest, who stated that for Qwest, competing in the territory of the other defendants "might be a good way to turn a quick dollar but that doesn't make it right." The plaintiffs in Twombly argued that, given Qwest's declining revenues at the time, the statement constituted an admission of collusive conduct among the ILECs.

The district court dismissed the complaint, finding that the allegations of conscious parallel conduct by the ILECs in not competing

in each other's territory were insufficiently probative of a conspiracy to survive a motion to dismiss.

The Second Circuit reversed. The court dealt with the question of the sufficiency of alleging independent parallel conduct. The court first noted that parallel conduct is not, by itself, prohibited by the antitrust laws, which forbid only "contracts, combinations, and conspiracies that operate unreasonably to restrain trade." 15 U.S.C. § 1.

Thus, the court held that in order to survive a motion to dismiss, an antitrust claimant must allege the "existence of a conspiracy and a sufficient supporting factual predicate on which that allegation is based." Id. at 114. The court concluded that, in the case before it, the allegations of anomalous anticompetitive parallel conduct by the defendants, coupled with the alleged admission by Qwest's CEO, were sufficient. Id. at 117-19.

The present case is different from Twombly in crucial respects. As far as the conduct that is alleged, there is nothing in the nature of this conduct as described, which would indicate any likelihood that it was the result of a combination or conspiracy, as distinct from individual competitive conduct by the individual manufacturers. There are no facts alleged to suggest that defendants did not compete against one another in regard to the sale of elevators and the pricing of such sales.

By the same token, as far as what is alleged in the complaint, there is no basis for inferring that the defendants jointly arranged the

- 22 -

technology and other features or practices relating to maintenance services, as distinct from competing with each other to provide such services. In other words, the Complaint in the present case lacks the anomalous behavior, which the court in <u>Twombly</u> found to be a strong indicia of conspiracy.

Plaintiffs' allegations regarding investigations of defendants' subsidiaries' business practices in Europe are patently insufficient for two reasons. First, as asserted by counsel for defendants at oral argument, there has not, in fact, been any finding of wrongdoing by any regulatory or judicial body of law in Europe. Second, despite the admission by certain defendants of illegal conduct in certain European countries, there is no basis from which to infer that those localized investigations or proceedings implicate defendants in the far broader conspiracy plaintiffs allege with respect to the U.S. markets.

The complaint also alleges that (1) the elevator industry is an oligopoly; and (2) that defendants attended frequent trade association meetings together. These generic assertions fall short of the factual predicate required by <u>Twombly</u> to support a claim under Section 1 of the Sherman Act.

First, courts have repeatedly stated that allegations of oligopoly are insufficient to state a claim under the antitrust laws. <u>See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 227 (1993); <u>E. I. Du Pont de Nemours & Co. v. FTC</u>, 729 F.2d 128 (2d Cir. 1984).

E. I. Du Pont involved a challenge to a ruling by the Federal Trade Commission ("FTC") that the petitioners had engaged in unfair methods of competition under the Federal Trade Commission Act ("FTCA"). Although the court recognized that the FTC had very broad powers under the FTCA to "supplement" enforcement of the antitrust laws, the court nevertheless reversed the FTC's ruling, holding that "the mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws." Id. at 139.

Moreover, the allegation that elevator company executives attend trade, industry, or social functions together is clearly insufficient to state a claim. See Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co., 00-CV-5663, 2001 U.S. Dist. LEXIS 18831 (S.D.N.Y. November 19, 2001) ("A conspiracy will not be inferred from participation in a trade association.")

Finally, plaintiffs' allegation that certain of the defendants conspired with their wholly owned subsidiaries to determine which of them would submit a bid for certain projects fails to state a claim because, under well-established law, a company is legally incapable of conspiring with its wholly owned subsidiary. The Supreme Court has held that

> The coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. . . . If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that

had previously served different interests, and there is no justification for § 1 scrutiny.

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984).

The court concludes that Count I must be dismissed because plaintiffs have failed to allege any specific cause of action for violation of Sherman Act § 1 as to the plaintiffs or any of them. In addition, plaintiffs have failed to allege any factual basis for their claim of conspiracy.

Count II: Conspiracy to Monopolize

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

Like claims brought under Section 1 of the Sherman Act, mere allegations that defendants conspired or agreed to monopolize are insufficient. Without allegations containing some basis in fact for such assertions, a Section 2 claim must be dismissed. See Klebanow, 344 F.2d at 299; Levitch v. Columbia Broadcasting System, Inc., 78-CV-4264, 495 F. Supp. 649, 668 (S.D.N.Y. July 23, 1980).

Basically, the same considerations demonstrating the inadequacy of the pleading in Count I apply to Count II – theory and generality rather than specifics.

Count II contains the general allegation that defendants and their co-conspirators have combined and conspired to monopolize the market

- 25 -

for the sale and service of elevators, and that they have done so with the deliberate and specific intent to achieve an unlawful monopoly. Then they list the "overt acts" committed and this list is exactly the same list of various types of possible conspiratorial activity (par. 85) as is presented in Count I. Count II concludes by alleging (par. 86) that as a proximate result of the conspiracy to monopolize, defendants have injured plaintiffs and class members in that each has paid a higher price for elevators and elevator maintenance than would have been paid absent the unlawful activity.

Count II does re-allege the introductory portions of the complaint, including the allegations summarized earlier regarding misconduct affecting the maintenance market.

However, considering all the relevant allegations, Count II, like Count I, lacks any allegation about a transaction involving any one of the plaintiffs or about any injury to such plaintiff from a § 2 violation. Also, again, there is no pleading of anything in the way of a factual basis for the listing of various kinds of possible conspiratorial activity.

Count II is dismissed.

Counts III through X: Unilateral Monopolization Claims

As described earlier, this section of the complaint contains four pairs of counts, with each pair directed against one of the four defendants. It is claimed that there is a market, or perhaps a sub-market, for elevator maintenance service in respect of the elevators of

each defendant, and that each defendant has monopolized, or attempted to monopolize, that market.  The markets are called the Otis Maintenance Market, the Kone Maintenance Market, etc.

Precisely the same allegations of wrongdoing are made in each of the four pairs of counts.  The allegations are in the most general form possible, claiming monopolization, harm to competition, higher prices than in a competitive market, and less available service than in a competitive market.

However, again, there is no specific cause of action alleged as to a single plaintiff.  For reasons already enunciated, the court is of the view that such pleading is entirely inadequate.  Counts III through X are dismissed.

The Question of Possible Re-pleading

The Complaint, which is the subject of this opinion dealt with in this opinion is the Second Amended Complaint, and thus the third try. The lack of more specific pleading is somewhat difficult to understand. However, as described earlier, plaintiffs' attorney declined to offer anything more specific even when pressed by the court at the oral argument of the motion.

It is the view of the court that the case should be dismissed finally, without leave to re-plead.  For one thing, it would be grossly unfair to defendants to be faced with another amended complaint and the

necessity of another motion, particularly since there is no indication whatever that plaintiffs would do any better.

### Conclusion

The motion to dismiss the complaint is granted and the action is dismissed without leave to re-plead.   The alternative motion to dismiss the claims of the foreign plaintiff is denied.

SO ORDERED

Dated: New York, New York
       May 26, 2006

Thomas P. Griesa
U.S.D.J.

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.     That on June 29, 2006, declarant served the **NOTICE OF APPEAL** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this twenty-ninth day of June, 2006, at San Diego, California.

_____
Terree DeVries

ELEVATORS (APPEAL)
Service List - 6/29/2006   (04-0073A)
Page 1 of 3

**Counsel For Defendant(s)**

Mark Leddy
Patricia M. McDermott
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, N.W.
9th Floor
Washington, DC 20006
   202/974-1500
   202/974-1999 (Fax)


Anthony A. Dean
Terry Myers
Thomas R. Valen
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
One Pennsylvania Plaza, 37th Floor
New York, NY 10019
   212/649-4700
   212/333-5980 (Fax)


Kenneth M. Kramer
Jerome S. Fortinsky
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-4676
   212/848-4000
   212/848-7179 (Fax)


Michael Connolly
Thelen, Reid & Priest, LLP
200 Campus Drive, Suite 210
Florham Park, NJ 07932
   973/660-4400
   973/660-4401 (Fax)


Deborah M. Buell
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
   212/225-2000
   212/225-3999 (Fax)


Stewart M. Gisser
Associate General Counsel
Schindler Elevator Corporation (Legal Department)
20 Whippany Road
Morristown, NJ 07960-1935
   973/397-6580
   973/397-6574 (Fax)


Michael E. Jaffee
Thelen, Reid & Priest, LLP
701 Eighth Street, N.W.
Washington, DC 20001
   202/508-4000
   202/508-4321 (Fax)


Attn: Legal Department
Thyssenkrupp Elevator AG
August-Thyssen-Strassel, 40221
Dusseldorf, Germany,

ELEVATORS (APPEAL)

Service List - 6/29/2006    (04-0073A)

Page 2 of 3

A. Paul Victor
Scott A. Martin
Christopher V. Roberts
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119
　　212/310-8000
　　212/310-8007 (Fax)

Robert S. Berezin
Edward  Soto
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, 12th Floor
Miami, FL  33131
　　305/577-3215
　　305/577-3290 (Fax)

**Counsel For Plaintiff(s)**

Ann D. White
Ann D. White Law Offices, P.C.
165 Township Line Road, Suite 2400
Jenkintown, PA  19046
　　215/481-0274
　　215/481-0271 (Fax)

Daniel L. Rottinghaus
Jeffrey B. Cereghino
Steven R. Weinmann
Berding & Weil LLP
3240 Stone Valley Road West
Alamo, CA  94507
　　925/838-2090
　　925/820-5592 (Fax)

James G. Stranch, III
C. Dewey Branstetter
J. Gerard Stranch, IV
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue, North, 4th Floor
Nashville, TN  37201-1631
　　615/254-8801
　　615/255-5419 (Fax)

Nadeem  Faruqi
Antonio  Vozzolo
Beth A. Keller
Faruqi & Faruqi, LLP
320 East 39th Street, 3rd Floor
New York, NY  10016
　　212/983-9330
　　212/983-9331 (Fax)

Curtis V. Trinko
Law Offices of Curtis V. Trinko LLP
16 West 46th Street, Seventh Floor
New York, NY  10036
　　212/490-9550
　　212/986-0158 (Fax)

Eric A. Isaacson
Christopher M. Burke
Tami Falkenstein Hennick
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
　　619/231-1058
　　619/231-7423 (Fax)

ELEVATORS (APPEAL)

Service List - 6/29/2006    (04-0073A)

Page 3 of 3

Jayne Arnold Goldstein
Mager & Goldstein LLP
One Liberty Place
1650 Market Street, 21st Floor
Philadelphia, PA  19103
    215/640-3280
    215/640-3281 (Fax)


Kendall S. Zylstra
Stephen E. Connolly
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA  19087
    610/667-7706
    610/667-7056 (Fax)


Joe R. Whatley, Jr.
Glenn M. Connor
Richard  Rouco
Whatley, Drake & Kallas, LLC
2323 Second Ave. North
Birmingham, AL  35203
    205/328-9576
    205/328-9669 (Fax)


Fred T. Isquith
Stuart M. Saft
Wolf Haldenstein Adler Freeman & Herz, LLP
270 Madison Avenue
New York, NY  10016
    212/545-4600
    212/545-4653 (Fax)


Brian J. Robbins
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101
    619/525-3990
    619/525-3991 (Fax)


Edmund W. Searby III
Scott + Scott, LLC
33 River Street
Chagrin Falls, OH  44022
    440/247-8200
    440/247-8275 (Fax)


Mary Jane Fait
Wolf Haldenstein Adler Freeman & Herz, LLP
55 West Monroe Street, Suite 1111
Chicago, IL  60603
    312/984-0000
    312/984-0001 (Fax)


Lester L. Levy
Wolf Popper LLP
845 Third Avenue
New York, NY  10022
    212/759-4600
    212/486-2093 (Fax)